# UNITED STATES DISTRICT COURT
## MIDDLE DISTRICT OF FLORIDA
### ORLANDO DIVISION

In re:

MIRABILIS VENTURES, INC.
Bankruptcy Case No. 6:08-bk-04327-KSJ
Adversary Proceeding No. 6:08-ap-223-KSJ

———————————————————————/

MIRABILIS VENTURES, INC.,

    Plaintiff,

v.                                     CASE NO. 6:09-cv-271-Orl-31DAB

RACHLIN COHEN HOLTZ, LLP, a Florida
limited liability partnership n/k/a RACHLIN, LLP;
LAURIE S. HOLTZ, an individual,

    Defendants.

———————————————————————/

## PLAINTIFF'S RESPONSE TO DEFENDANTS' MOTION FOR
## SUMMARY JUDGMENT ON LIABILITY AND DAMAGES

Plaintiff Mirabilis Ventures, Inc. ("Mirabilis") files this response to *Defendants' Motion for Summary Judgment on Liability and Damages* (Doc. 63, "*Motion*"), filed November 1, 2010. The *Motion* should be denied because there are disputed material facts, and there are applicable exceptions to the legal doctrines asserted by Defendants.

## I. FACTS

### A. Disputed Facts[1]

(1) Frank Amodeo had no legal control of Mirabilis, was not a majority shareholder of Mirabilis, did not have voting rights with respect to Mirabilis, and was not an officer, director, or

_____

[1] In the November 9, 2009 Case Management and Scheduling Order (Doc. 26, "*CMSO*"), the Court directed that "[a] motion for summary judgment shall specify the material facts as to which the moving party contends there is no genuine issue for trial . . . ." *CMSO* at 6. Defendants failed to do so. *See Motion* at 5-12. This failure makes it difficult, if not impossible, for Plaintiff—and for the Court—to identify those facts as to which Defendants contend there is no genuine issue. Nevertheless, Plaintiff specifies facts that contradict those on which Defendants apparently rely, as well as facts that establish exceptions to the legal doctrines on which Defendants rely.

employee of Mirabilis. *See Affidavit of R.W. Cuthill* ("*Cuthill Affidavit*") (Exhibit 1); *Articles of Incorporation of Mirabilis* (Exhibit 2);[2] *Mirabilis Ventures, Inc. and Subsidiaries Consolidated Financial Statements and Independent Auditors' Report for the Years Ended December 31, 2005 and 2004* ("*2005 Auditors' Report*") (Exhibit 3); *Shareholders' Agreement* (Exhibit 4).[3]

(2) Frank Amodeo was not in control of Mirabilis. *October 5, 2004 Deposition of Yaniv Amar* ("*10/5/10 Amar Depo.*") (Exhibit 11) at 62, lines 7-19; 275, lines 6-13; *October 14, 2010 Deposition of Yaniv Amar* ("*10/14/10 Amar Depo.*") (Exhibit 12) at 335, lines 1-5.

(3) Defendant Laurie Holtz, as the Chairman of the Board of Directors of Mirabilis, was aware of the payroll tax fraud at Mirabilis and participated in it. *10/5/10 Amar Depo.* at 105, lines 18-25; 114, lines 17-25; 115, lines 14-18; *September 27, 2010 Deposition of Martin C. Flynn, Jr.* ("*Flynn Depo.*") (Exhibit 10) at 102, lines 22-25; 103, lines 5-10; 104, lines 2-10.

**B.   Evidence of Defendants' Role in Scheme**

In early 2006, Martin Flynn, a Human Resources specialist at Mirabilis Ventures, Inc., and President of a Mirabilis subsidiary walked into the office of Frank Amodeo. *Flynn Depo.* at 103, lines 13-16.[4]  Mr. Amodeo was just finishing a meeting with Mirabilis' General Counsel, Richard Berman, and it's Chairman of the Board, Laurie Holtz. *Id.* at 260, lines 17-24.  Mr. Holtz is a nationally recognized, experienced professional in the specialized practice of forensic

---

[2]   For ease of reference and convenience to the Court, the Exhibits referenced herein are being filed separately as an appendix. *See Notice of Filing Exhibits*.

[3]   *See also Minutes of the January 3, 2005 Meeting of Board of Directors of Mirabilis Ventures, Inc.* ("*1/3/05 Board Meeting*") (Exhibit 5); *Minutes of the July 6, 2005 Meeting of Board of Directors of Mirabilis Ventures, Inc.* ("*1/3/05 Board Meeting*") (Exhibit 6); *Minutes of the January 25, 2006 Meeting of Board of Directors of Mirabilis Ventures, Inc.* ("*1/25/06 Board Meeting*") (Exhibit 7); *Minutes of the March 23, 2006 Meeting of Board of Directors of Mirabilis Ventures, Inc.* ("*3/23/06 Board Meeting*") (Exhibit 8); *Minutes of the May 19, 2006 Meeting of Board of Directors of Mirabilis Ventures, Inc.* ("*5/19/06 Board Meeting*") (Exhibit 9) (collectively, "*Board Minutes*").  The remaining minutes from the meetings of the Mirabilis Board of Directors are attached to the *Cuthill Affidavit*.

[4]   Deposition testimony may be used at a hearing or proceeding at which evidence in affidavit form is also admissible. *Gulf USA Corp. v. Fed. Inc. Co.*, 259 F.3d 1049, 1056 (9h Cir. 2001) (determining that a deposition in an unrelated case can be used on summary judgment); *Tormo v. Yomark*, 398 F.Supp. 1159, 1168-69 (D.N.J. 1975); *United States v. Fox*, 211 F.Supp. 25 (E.D. La. 1962) (stating that "[t]he depositions were taken under oath and we hold that they are at least as good as affidavits"), *aff'd* 334 F.2d 449 (5th Cir. 1964).

accounting.  *February 23, 2010 Deposition of Laurie Holtz* ("*Holtz Depo.*") (Exhibit 13) at 8-9, lines 22-11; *Marcum Rachlin Website Profile of Laurie Holtz (Exhibit 2 to Holtz Depo.)* (Exhibit 16).  Mr. Holtz promoted himself as one of the nation's pioneers in the area of investigative accounting, known for his keen ability to track financial footprints and to present valid, accurate evidence of the nature and logistics of fraud.  *See id.*

   Mr. Flynn asked Messrs Berman and Holtz about a new part of Mirabilis' business, the "Presidion Plan."  *Flynn Depo.* at 103-04, lines 21-10.  Presidion was a "PEO"—an entity that handled payroll for employers—which a Mirabilis subsidiary had begun managing at the beginning of 2006.  Mr. Flynn asked them "how the Presidion plan was going."  *Id.* at 103, lines 5-10.  Instead of getting a straight answer, Mr. Flynn was asked "what do you mean?," which Mr. Flynn took to mean that they didn't know if it was okay to talk to him about it.  *Id.* at 104, lines 5-10.  To put them at ease, Mr. Flynn said, "the plan not to pay the payroll taxes."  *Id.* at 104, line 6.[5] The two looked at Frank Amodeo, apparently stunned that Mr. Flynn actually knew of this plan.  *Id.* at 104, line 7.  Mr. Amodeo gestured, indicating the two could tell Mr. Flynn about the plan.  *Id.* at 104, line 8-10.  Mr. Holtz assured Mr. Flynn there was nothing to worry about.  *Id.* at 102-03, lines 24-1; 104, lines 9-10.  That they've got it covered.  *Id.* at 103, line 9; 104, line 10.  They said it was their (Mr. Holtz's and Mr. Berman's) responsibility.  *Id.* at 103, line 10; *see also id.* 153-54, lines 21-19.

   Shortly after Mr. Flynn's encounter, Mr. Holtz met with Yaniv Amar.  *10/14/10 Amar Depo.* at 78, lines 2-7; 81, lines 11-21; 82-83, lines 24-2.  Mr. Amar is a high school graduate, with no college degree and certainly lacking the national reknown of Mr. Holtz.  *10/5/10 Amar Depo.* at 11, lines 10-23.  Mr. Amar was the person responsible at the PEO manager, AEM, Inc., to insure

---

[5]  A more detailed description of the plan to use the payroll taxes for other expenses being discussed with Mr. Holtz and others can be found at pages 104-05, lines 18-14.

4835-2114-6632.1
43582/0004

that the payroll taxes were remitted to the United States government. *See State of Florida Department of Business and Professional Regulation Quarterly Report Form (Quarter Ending March 31, 2006 (Ex. 59 to 10/14/10 Amar Depo.)* (Exhibit 19) (showing Mr. Amar as the CEO and "controlling person" of AEM, Inc.). But Mr. Amar became concerned. He had been kept blind of the finances of the PEO. *10/5/10 Amar Depo.* at 80, line 13; 81-82, lines 22-17. Worse, he had made a troubling discovery: He saw Mirabilis spending over $8 million per month, but no stream of income to finance such a large "burn rate." *Id.* at 97, lines 14-25. Instead, he had realized that the PEO business passed through about $10 million in monthly payroll tax trust funds. *Id.* at 100, lines 7-13. The possible relation of those amounts gave him grave concern.

Mr. Amar told Mr. Holtz that he was comforted that Mr. Holtz was the newly appointed Chairman of Mirabilis. *Id.* at 102-03, lines 19-2. Mr. Amar told Mr. Holtz he had researched Mr. Holtz's qualifications and discovered he was "the dean of forensic accounting, quite qualified." *Id.* Mr. Amar told Mr. Holtz of this troubling "correlation" he had discovered and said, "please, give me some assurances that everything is okay." *Id.* Mr. Holtz said "Yaniv, I'm here to make sure everything will be ship shape, nothing to concern yourself with." *Id.* Mr. Amar pressed on, saying "I'm not an accountant or qualified here, assure me that there's no correlation between the burn rate in Orlando [Mirabilis' main office], from what I'm told is eight to ten million a month and the payroll taxes from this company." *Id.* at 103, lines 4-8. For emphasis, the nationally recognized accountant literally scoffed at the young man's suggestion. *Id.* at 103, line 9. Mr. Holtz ended the matter saying "No, no, I'll get back to you on that, but I assure you everything is in fine order." *Id.* at 103, line 9-11.

Mr. Holtz didn't get back to Mr. Amar. *Id.* at 110, lines 12-23. He didn't need to. He knew that what the high school graduate suspected was precisely what was occurring. He had told

4835-2114-6632.1
43582/0004

Marty Flynn as much just shortly before Mr. Amar's impertinent questioning of the nationally recognized accountant.

### C.  Mirabilis and Its Corporate Structure

Mirabilis (formerly known as Stellar Industries, Inc.) was incorporated under the laws of Nevada in November 2003.  *See Articles of Incorporation*.  According to the *2005 Auditors' Report*, as of December 31, 2005, Mirabilis had issued stock as follows:  (A) 100 shares of Class A Common Stock (Black Shares) in total; (B) 156,750 shares of Class B Standard Preferred Stock (Green Shares) in total; and (C) 6,000 shares of Class Z Special Preferred Stock (Blue Shares) in total.[6]  *2005 Auditors' Report* at 20-21.

The voting rights of these shares differed.  Pursuant to a September 22, 2005 *Shareholders' Agreement*, and by operation of section 78.196 of the Nevada Statutes, the Black Shares were vested with all voting rights, as well as the ability to veto any decision by other classes of shareholders.  *See Shareholders' Agreement* at 2; N.R.S. § 78.196 (requiring one or more classes or series of shares to have unlimited voting rights); *2005 Auditors' Report* at 21.  Green Shares had "limited voting rights" and could vote only on the approval of an additional distribution.  *Shareholders' Agreement*  at 4; *2005 Auditors' Report* at 21.  Blue Shares had no voting rights.  *Shareholders' Agreement* at 11; *2005 Auditors' Report* at 21.

The evidence shows that all of the Black Shares were issued to Yaniv Amar.  On October 28, 2004, the Board of Directors ("Board") authorized the issuance of 1,000[7] shares of common stock, of which 100 were issued to Yaniv Amar.  *10/28/04 Board Meeting*; *October 28, 2004 Written Action of the Directors of Mirabilis Ventures, Inc.* ("*10/28/04 Written Action of Board*") (Exhibit 21).  According to minutes from the 2006 Annual Meeting of Shareholders, Mr. Amar

---

[6]  Although Mirabilis was authorized to issue additional shares, these were the only shares that were actually issued.
[7]  Although the issuance of 1,000 shares was authorized, only 100 shares were actually issued.  *See 10/28/04 Written Board Action*.

was identified as the "<u>sole</u> Class A shareholder."[8]  *See Minutes of the Annual Meeting of the Shareholders of Mirabilis Ventures, Inc.*, dated January 25, 2006, ("*2006 Shareholders' Meeting*") (emphasis added).  The *2005 Auditors' Report* confirms that only 100 shares of Black Stock were issued.  *See 2005 Auditors' Report* at 21.  Mr. Cuthill, who reviewed the corporate records, states in an Affidavit that Black Shares were issued only to Mr. Amar.  *Cuthill Affidavit*. Given the documentary and testimonial evidence, it is clear that Mr. Amar was the only holder of voting shares and therefore had all voting control over Mirabilis.[9]

### D.  Control of Mirabilis

Not only did Mr. Amodeo lack voting control over Mirabilis; he was never, at any point in time, an employee, officer, or director of Mirabilis.  *Cuthill Affidavit*.  A review of the minutes from board meetings confirms that Mr. Amodeo was never an officer or director of Mirabilis. *See Board Minutes*.  In addition, pursuant to the *Shareholders' Agreement,* no one held veto power because no one held at least 25,000 Black Shares.  *See Shareholders' Agreement* at 2; *2005 Auditors' Report* at 21.

---

[8]  Defendants may attempt to assert that the Black Shares were "bearer" shares, as it appears even Mr. Amar (a non-lawyer) believed he could hand them in.  However, the documentary evidence, including the *10/28/04 Board Meeting,* indicates that the shares were issued to Mr. Amar, personally, not as a "bearer."  In addition, on October 1, 2005, Mirabilis adopted bylaws providing in pertinent part that "[e]very certificate representing shares issued by the Corporation shall state the following: . . . (b) <u>the name of the person to whom the stock certificate is issued</u>." *Bylaws of Mirabilis Ventures, Inc.* ("*Bylaws*") at § 5.02(b).  Thus, bearer shares were not permitted by the bylaws. Moreover minutes from the *2006 Shareholders' Meeting* state that Mr. Amar remained the "sole Class A shareholder," *2006 Shareholders' Meeting* at 1, even after he believed he had "handed them in."

[9]  Defendants may attempt to assert that Mr. Amar issued a proxy to Mr. Amodeo.  However, Defendants have not produced a signed copy of any proxy, and Mr. Amar does not recall signing one.  *10/5/10 Amar Depo.* at 149, lines 17-18; 150, lines 11-13; 152, lines 20-21; *10/14/10 Amar Depo.* at 273, line 25; 274, lines 15-23.  Thus, the only evidence of record indicates that there was no valid proxy issued by Mr. Amar to Mr. Amodeo.  Even if a proxy had been signed, it would be valid for only six months under Nevada law.  *See* NRS § 78.355 (providing that a proxy is valid for only six months, unless the proxy was deemed irrevocable and coupled with an interest sufficient in law to support an irrevocable power).  A review of the minutes from board meetings reveals that Mr. Amodeo never used a proxy to enact any of the wrongdoing that is asserted to have occurred.  *See Board Minutes*. Furthermore, the minutes reveal that only the following individuals were ever appointed as directors:  Jason Carlson; Eddie Curry; Robert Pollack; Frank Hailstones; James V. Sadrianna; Bruce Walko; Laurie Holtz; Richard A. Berman; Thomas Broadhead; Jay Stollenwerk; Shane Williams; Michael Moecker; and Yaniv Amar.  *See Board Minutes*; *10/28/04 Written Action of Board.*

According to the bylaws of Mirabilis, control rests solely with the Board of Directors.  *See Bylaws of Mirabilis Ventures, Inc.* ("*Bylaws*") (Exhibit 23) at § 3.01.  Only Mr. Amar, as the sole shareholder of voting shares, could overrule the Board.  A review of the minutes from Board meetings reveals that Mr. Amodeo was never on the Board.  *See Board Minutes*.  On March 23, 2006, Laurie Holtz became Chairman of the Board.  *See 3/23/2006 Board Meeting*; *Holtz Depo.* at 25, lines 7-13.  Simply put, Mr. Amodeo had no legal ability to control Mirabilis.

Testimony of witnesses with knowledge confirms that Mr. Amodeo did not control Mirabilis.  For instance, director and controlling shareholder Yaniv Amar testified that the Board of Directors controlled the significant decisions of Mirabilis.  *10/14/10 Amar Depo.* at 142, lines 17-20; *10/5/10 Amar Depo.* at 62, lines 7-11.

Despite the above facts, which establish with legal certainty that Mr. Amodeo did not enjoy legal authority to control Mirabilis, several persons have described Mr. Amodeo as exercising "control" without defining that term.  It is unclear whether "control" is intended to mean the influence one possesses when they provide the most ready source of cash for a business, like many lenders, investors, and customers enjoy.  *See April 21, 2010 Deposition of R.W. Cuthill* ("*Cuthill Depo.*") (Exhibit 15) at 110, lines 1-2; 236, lines 17-23 (indicating that Mr. Amodeo may have controlled the "purse strings" of Mirabilis but did not have voting control).  It is not clear if this means "control" by Mr. Amodeo's conspiracy with persons who had legal control, such as Mr. Holtz.  Thus, without definition, these statements provide little use in adjudicating this case.

Nonetheless, there are several facts, although disputed, which are referenced when control by Mr. Amodeo is discussed.  Mr. Amodeo signed two documents asserting himself to be the "sole director and shareholder" of Mirabilis during its infancy.  These statements were made only by

Mr. Amodeo, not third parties.  One such statement was made to a lender.  However, the records of Mirabilis and third parties contradict Mr. Amodeo's assertions.  *See 10/28/04 Board Meeting*; *2005 Auditors' Report*; *2006 Shareholders' Meeting*; *Cuthill Affidavit*.

As described above, Mr. Amodeo did not have legal control of Mirabilis.  That authority rested with Mirabilis's Board of Directors and its Chairman, Laurie Holtz.  Thus, the issue of control is a disputed fact.

### E.  The Presidion Plan

Mr. Flynn asked Messrs Holtz and Berman about the "Presidion Plan."  *Flynn Depo.* at 103-104, lines 21-10.  This was not called the "Mirabilis Plan" for good reason—there is no allegation in the Government's Statement of Facts, cited by Defendants as binding upon Mirabilis, that Mirabilis itself misdirected payroll taxes.  *United States' Notice of Statement of Facts Which the United States Contends It Would Prove at Trial* (Doc. 146 in Case No. 6:08-cr-231-JA-KRS, ("*Government's Statement of Facts*") (Exhibit 24).  Instead, the allegations in the *Government's Statement of Facts* are that a Mirabilis subsidiary (AEM) managed the Presidion/PBS book of business, which included payroll taxes.  *Id.* at 11.  All of those payroll taxes were deposited into an account managed by Presidion's CFO, Sue Shoemacher, not a Mirabilis employee.  *Id.* at 10.  It is alleged that Mr. Amodeo and one of his co-conspirators, Mr. Vanderberg, directed funds be paid out of that account for the benefit Presidion, Mr. Amodeo, and others.  *Id.* at 10.  Mirabilis's alleged liability arises from funds moving through Mirabilis and it's subsidiaries, not for affirmative acts of Mirabilis to misdirect the funds.  Thus, Defendants' repeated allegation that Mr. Amodeo "controlled" Mirabilis misses the point that control of Mirabilis could not have misdirected these funds from the account managed by Presidion.  Instead, it is Mr. Amodeo's ownership of Presidion through Mr. Amodeo's company,

4835-2114-6632.1
43582/0004

Wellington, that allowed the misdirection of funds from an account managed by Sue Shoemacher of Presidion. *See Cuthill Affidavit* at Ex. F.

**F.  Board Members and Decision Makers Who Did Not Know of the Fraud**

Mr. Amar was CEO of AEM, Inc., the subsidiary of Mirabilis handling payroll taxes. 10/14/10 Amar Depo. at 9, lines 21-22.  Mr. Amar was also a director of Mirabilis.  *10/28/04 Written Action of Board* (signed by "Yaniv Amar, Director").  Mr. Amar spoke to Mirabilis's professionals, including Mr. Holtz, to insure that payroll taxes were being properly remitted. *10/5/10 Amar Depo.* at 105, lines 18-25.  Mr. Amar was assured that that payroll tax issues were being dealt with, and everything would be handled "by the book."  *10/14/10 Amar Depo.* at 24, lines 13-15; *10/5/10 Amar Depo.* at 96, lines 22-23; 115, lines 14-18.  Mr. Amar testified that he would have taken action, had he known that the payroll taxes were not being paid.  *10/14/10 Amar Depo.* at 387-88, lines 24-5.

Edie Curry was appointed to the Board of Mirabilis on January 3, 2005.  *See 1/3/05 Board Meeting*.  Ms. Curry was the Board's Secretary and Treasurer.  *Id.*  Ms. Curry was misled as to Mirabilis's plan for resolving its payroll tax problems.  Ms. Curry testified that the strategy of not paying payroll taxes and instead using them for other purposes was never communicated to her, and her understanding was that Mirabilis was going to figure out other ways, such as reducing expenses and improving sales, to resolve the payroll tax problem.  *May 14, 2009 Transcript of Hearing on Sentencing of Frank Amodeo* (Case No. 6:08-cr-176-Orl-28) ("*5/14/09 Sentencing Hearing*") (Exhibit 14) at 119-120, lines 20-3.

The testimony of Mr. Amar and Ms. Curry establishes that Mirabilis had innocent decisionmakers who were unaware of the fraud and would have acted if properly advised by Mirabilis's professionals.

### G.  Ousting of the Corrupt Management

Moreover, Mr. Amodeo and any corrupt corporate management were ousted from Mirabilis prior to the filing of the bankruptcy petition.  In an *Order* which resolved consolidated appeals challenging the Bankruptcy Court's refusal to dismiss Mirabilis's bankruptcy case in *Rachlin Cohen & Holtz, LLP v. Mirabilis Ventures, Inc. (In re Mirabilis Ventures, Inc.)* (Doc. 30 in Case No. 6:09-cv-1658-Orl-31) ("*Order Affirming Denial of Dismissal*") (Exhibit 26), this Court affirmed the Bankruptcy Court's finding that "Moecker was properly appointed [as a director], making Moecker's appointment of Cuthill legal, and therefore Cuthill's decision to have Mirabilis file for bankruptcy protection was not an ultra vires act." *Order Affirming Denial of Dismissal* at 5-6.  This Court also found that "the decision to file [a bankruptcy petition] was not made by Amodeo, and there was no evidence presented that Cuthill (or Moecker for that matter) intended to aid Amodeo by doing so." *Id.* at 11.  Thus, Mr. Cuthill was legally installed as President of Mirabilis prior to the filing of the bankruptcy petition.  Indeed, Mr. Cuthill was brought into Mirabilis for the purpose of removing the taint of corruption from Mirabilis. *Cuthill Depo.* at 95, lines 7-15.

### H.  Allegations in this Lawsuit

The instant lawsuit was filed against Rachlin Cohen & Holtz, LLP ("Rachlin"); Laurie S. Holtz; and Jose I. Marrero. *See Second Amended Complaint* (Doc. 52).  Plaintiff alleges that Defendants Holtz and Marrero, on behalf of their employer Rachlin, provided tax advice and otherwise consulted with Mirabilis regarding the legality, treatment, and use of payroll taxes; and Rachlin failed to supervise Mr. Holtz and Mr. Marrero properly. *Id.* at 1-2.  Plaintiff has brought claims of professional negligence against each of the Defendants; breach of fiduciary duty

against all Defendants; negligent supervision against Rachlin; and Breach of Fiduciary Duty by Aiding and Abetting against all Defendants.  *Id.* at 9-15.

## I.  Damages to Mirabilis

On November 25, 2008, Mirabilis filed a *Motion for Approval of Compromise of Controversy by and between Debtors and the United States of America* (Doc. 101 in Case No. 6:08-bk-04327-KSJ, "*Motion to Approve Settlement*") (Exhibit 27) wherein Mirabilis had to consent to an allowed unsecured forfeiture claim against it in favor of the United States of America in the amount of $200,000,000.00 ("Allowed Unsecured Claim").   In its operative *Second Amended Complaint* (Doc. 52), Mirabilis alleges that Mirabilis suffered damage to its business, property, the Allowed Unsecured Claim, adverse tax consequences, including interest and penalties, and legal and expert fees and costs.   When asked to breakdown the Unsecured Claim, Mr. Cuthill testified that the Allowed Unsecured Claim in round figures included $61,000,000.00 of interest and penalties, $120,000,000.00 in unpaid payroll taxes, and $19,000,000.00 of miscellaneous that the United States government claimed.  *Cuthill Depo.* at 299-300, lines 18-15; *see also Plaintiff's Answers to Defendants' First Set of Interrogatories to Plaintiff* (Exhibit 29) at 2-3.  It is unclear from the *Motion to Approve Settlement* what portion, if any, of those payroll taxes went to Mirabilis rather than Mr. Amodeo or his entities.

## II.  ARGUMENT AND MEMORANDUM OF LAW

### A.  SUMMARY JUDGMENT STANDARD

The burden is on the moving party to demonstrate that it is entitled to summary judgment. *Info. Sys. And Networks Corp. v. City of Atlanta*, 281 F.3d 1220, 1224-25 (11th Cir. 2002).  This Court has found that summary judgment is inappropriate for defendants regarding an *in pari*

*delicto* defense when there are disputes of fact.   *See Moecker v. Honewell Int'l, Inc.,* 144 F.Supp.2d 1291 (M.D. Fla. 2001).

## B.   *IN PARI DELICTO*

### 1.   GENERAL STANDARD FOR APPLICATION OF THE *IN PARI DELICTO* DEFENSE—EQUAL OR GREATER FAULT

The main ground on which Defendants seek the entry of summary judgment is the common-law defense of *in pari delicto*.   "*In pari delicto* means 'in equal fault.'"   *O'Halloran v. PricewaterhouseCoopers*, 969 So.2d 1039, 1044 (Fla. 4th DCA 2007) (quoting Black's Law Dictionary 806 (8th ed. 2004)).   "'In its classic formulation, the *in pari delicto* defense was narrowly limited to situations where the plaintiff truly bore <u>at least substantially equal</u> responsibility for his injury, because in cases where both parties are in delicto, concurring in an illegal act, it does not always follow that they stand in pari delicto; for there may be, and often are, very different degrees in their guilt.'"   *Id.* (emphasis added) (quoting *Bateman Eichler, Hill Richards, Inc. v. Berner*, 472 U.S. 299, 307, 314 (1985) ("[t]here was certainly no basis for concluding <u>at this stage of the litigation</u> that the [plaintiffs] were *in pari delicto* with [the defendants]") (emphasis added).

The fundamental prerequisite for application of the *in pari delicto* defense is lacking here: Plaintiff is not at equal or greater fault than Defendants.[10]   The evidence of record and inferences

---

[10]   The legal standard urged by Defendants in this regard is incorrect.  Defendants cite *Turner v. Anderson*, 704 So.2d 748, 750 (Fla. 4th DCA 1998) for the proposition that "the court must first examine whether the plaintiff's guilt 'is <u>far less</u>' in degree than defendant's so as to make the doctrine inapplicable."  *Motion* at 14 (quoting *Turner*, 704 So.2d at 750) (emphasis added).  However, the section of the *Turner* opinion on which Defendants rely does not articulate the rule in Florida.  Rather, the section quoted by Defendants consists of the Florida Fourth District Court of Appeal's summary of the Supreme Court of Pennsylvania's decision in *Feld and Sons, Inc. v. Pechner, Dorfman, Wolfee, Rounick & Cabot*, 312 Pa.Super. 125, 458 A.2d 545 (1983).  Indeed, in *Turner*, the Fourth DCA explicitly declined to determine whether the "far less" standard is the correct standard in *in pari delicto* cases: "We need not decide whether the doctrine of *in pari delicto* is a bar where the client's misconduct is far less in degree than counsel's."  *Turner*, 704 So.2d at 751.  Even more convincing, when the Florida's Fourth District Court of Appeal revisited *Turner* and *in pari delicto* doctrine earlier this year, it did not apply the "far less" standard.  *See Dorestin v. Hollywood Imports, Inc.*, --- So.3d ---, No. 4D08-44, 2010 WL 3154848, (Fla. 4th DCA Aug. 8, 2010).  In *Dorestin*, the Fourth District Court of Appeal affirmed the trial court's decision, which found that "court should not reward

therefrom show that Defendant Holtz was aware of and participated in Mr. Amodeo's overarching payroll tax fraud, which encompassed several companies including Mirabilis. Mr. Flynn and Mr. Amar both testified Mr. Holtz kept this payroll tax scheme secret and thwarted their efforts to ensure payroll tax fraud was not occurring at Mirabilis. *See supra Section I.B.*

Indeed, the evidence in this case shows that Mirabilis bears much less fault than Defendants. A review of the allegations in the *Government's Statement of Facts* shows that there were relatively limited allegations against Mirabilis: those relating to Mirabilis being a conduit for one real estate purchase and having used payroll taxes for Mirabilis' last payroll. In contrast to Mirabilis, the evidence shows that Defendant Holtz was one of the key co-conspirators who actively kept the multi-entity fraud from key members of Mirabilis management to insure Mirabilis could not stop it. *See supra Section I.F.* Given those facts, a jury could reasonably find that Defendants bear much greater fault than Plaintiff. *Cf. Freeman v. BDO Seidman, LLP (In re Bankest, L.C.)*, Adv. Pro. 06-1220-BKC-AJC-A, 2010 WL 1417732 at *7 (Bankr. S.D. Fla. April 6, 2010) (*Bankest I*) (indicating that, when one has a duty to detect fraud, it cannot benefit from the fraud it failed to detect by asserting claims or defenses based on that fraud); *Moecker v. Honeywell Int'l, Inc.*, 144 F.Supp.2d 1291, 1314-15 (M.D. Fla. 2001) (denying summary judgment based on "significant disputes of material fact, and inferences of facts from the record" as to relative fault of the parties in determining whether the *in pari delicto* defense applied).

### 2. CONTROL OF MIRABILIS

#### a. Issue Preclusion

---

either party for fraudulent conduct," and it "specifically weigh[ed] and assess[ed] the guilt, shall we say, of the alleged fraud perpetrated." *Id.* at *4 (emphasis added) (internal quotation and citation omitted). Regardless, Plaintiff still meets the "far less" standard even if it were to be applied.

In their *Motion*, Defendants argue issue preclusion[11] asserting Mr. Amodeo's control of Mirabilis was conclusively determined in the Order granting summary judgment for the defendants entered in *Mirabilis Ventures Inc. v. Palaxar Group, LLC* (Doc. 285 in Case No. 6:07-cv-1788-ORL-28KRS) ("*Palaxar* Order") (Exhibit 30). *See Motion* at 21. The *Palaxar* Order is the only order asserted to have preclusive effect in Defendants' argument section of their *Motion*.

Defendants reliance on issue preclusion is now baseless. In their *Motion*, Defendants rely exclusively upon the *Palaxar* Order.[12] However, the *Palaxar Order* has been vacated. *See Order* vacating *Palaxar Order* (Doc. 339 in Case No. 6:07-cv-1788-Orl-28KRS) (Exhibit 31). Since the *Palaxar Order* has been vacated, it has absolutely no preclusive effect. *See Corp. of*

---

[11] Pursuant to applicable case law, issue preclusion applies when the following four elements are present: (1) the issue at stake is identical to the one involved in the prior proceeding; (2) the issue was actually litigated in the prior proceeding; (3) the determination of the issue in the first action was a "critical and necessary part" of the judgment; and (4) the party against whom issue preclusion is asserted had a full and fair opportunity to litigate the issue in the prior proceeding. *Christo v. Padgett*, 223 F.3d 1324, 1339 (11th Cir. 2000) (citing *Pleming v. Universal-Rundle Corp.*, 142 F.3d 1354, 1359 (11th Cir. 1998)).

[12] Defendants mention two additional orders in the "Background and Facts" Section of their *Motion*, pages 9-11, although they do not refer to them in their argument on issue preclusion. In that "Background and Facts" Section, Defendants mention how this Court also mentioned the issue of Amodeo's control over Mirabilis in an April 21, 2010 Order in the present case ("*Rachlin Cohen* Case") (*see Motion*, fn 17), and how the issue of Amodeo's control over Mirabilis was also mentioned in an Order granting summary judgment for the defendants in *Mirabilis Ventures, Inc. v. Saxon, Gilmore, Carrway, Gibbons, Lash & Wilcox, P.A. et al* ("*Beyer* Case") (*see Motion*, page 10). Defendants in their *Motion* do not actually argue issue preclusion based on either the April 21, 2010 Order in the *Rachlin Cohen* Case or based on the summary judgment Order in the *Beyer* case. It is likely that Defendants do not make such issue preclusion arguments in their *Motion* because the dispositive issues in both referenced orders had nothing to do with who actually controlled Mirabilis. Specifically, the April 21, 2010 Order in the *Rachlin Cohen* Case ruled on consolidated appeals of creditors asserting that the Bankruptcy Court erred by failing to grant previous motions to dismiss. In the Order, the Court dismissed the appeals, in part ruling that the creditors failed to show that Mirabilis lacked standing to file or maintain its bankruptcy case. *See Rachlin Cohen* Order, page 12. Also, in the Order, the Court held that the decision to file the Bankruptcy case was not made by Amodeo, and that there was no evidence presented that Cuthill intended to aid Amodeo by doing so. *See id.* at 11. In the *Beyer* Order, the court, in ruling on defendants' Motion for Summary Judgment, focused solely on the legal malpractice case against Beyer and held that there is no evidence from which a reasonable jury could find that Beyer was hired to provide legal advice to Mirabilis, that anyone at Mirabilis relied on his advice in deciding to divert payroll funds, or that Mirabilis suffered any damages as a result of anything Beyer did. *See Beyer Order*, pages 5-9. Any statements in either order regarding arguments as to Mr. Amodeo's purported control or regarding Mr. Amodeo's control over Mirabilis were merely mentioned in the orders as additional dicta. *See Rachlin Cohen* Order, page 2; *See Beyer* Order, page 1. Essentially, any statement related to Amodeo's control of Mirabilis could be removed from each of the orders, and the same results would be reached. As such, those statements are obviously not "critical and necessary" parts of the decisions, meaning that the statements would not fulfill the required elements of issue preclusion established by applicable case law. *See Christo*, 223 F.3d at 1339. For that reason, issue preclusion does not and could not apply.

*Lloyd's v. Lloyd's U.S.*, 831 F.2d 33, 36 (2d Cir. 1987) (stating, "Of course, vacating the order removes any res judicata or collateral estoppel effect it might have"); *see also Delta Air Line, Inc. v. McCoy Restaurants, Inc.*, 708 F.2d 582, 585 (11th Cir. 1983) (providing that the parties properly did not rely on a vacated judgment in a federal suit, as a vacated ruling has no precedential value).

### b.  Imputation

The *in pari delicto* defense can be asserted against a corporation only if misconduct can be imputed to the corporation.  *See Liquidation Comm. Of Banco Intercontinental, S.A. v. Renta*, 530 F.3d 1339, 1355 (11th Cir. 2008) (explaining that the *in pari delicto* defense must be distinguished from the agency law principles that allow it to be asserted against a corporate plaintiff).

One of the leading cases regarding *in pari delicto* in Florida states that a bad actor's actions will not be imputed to a corporation, and the defense of *in pari delicto* will fail, if there are "innocent decision-makers" in the corporation.  *O'Halloran* at 1045.[13]  The court in *O'Halloran* held "[c]onversely, the presence of **any** innocent decision-maker in the management of a corporation can provide the basis for invoking the adverse interest exception, preventing the imputation of wrongdoing and defeating the use of the *in pari delicto* defense against the corporation."  *Id.* at 1045 (emphasis added); *See also Bankest I*, 2010 WL 1417732 at *7-8.  In *Bankest*, a United States Bankruptcy Court for the Southern District of Florida held that the presence of innocent directors barred the defendant's imputation and *in pari delicto* defenses. *Bankest I*, 2010 WL 1417732 at *7-8.  The *Bankest* court held that "if there are 'innocent

---

[13]  State law determines when wrongful conduct should be imputed to a corporation.  *Nisselson, Trustee of the Dictaphone Litigation Trust v. Lernout*, 469 F.3d 143, 154 (1st Cir. 2006).  Here, Florida law applies because Mirabilis's principle place of business was Florida, and the wrongful acts are alleged to have occurred in Florida. *See O'Melveny v. Myers v. FDIC*, 512 U.S. 79, 83-85 (1994).

decision-makers' at the corporation, the wrongdoing cannot be imputed to the corporation." *Id.*; *cf. Freeman v. Dean Witter Reynolds, Inc.*, 865 So.2d 543, 550-52 (2d Fla. DCA 2003) (considering whether there were honest directors or shareholders when determining whether to apply the innocent decision-maker exception and, finding none, concluded that claims were barred because "no honest person existed within the corporation to whom such conduct could be reported").

In the instant matter, there is clear evidence that there were innocent decision-makers at Mirabilis. For example, Yaniv Amar was the sole shareholder of voting stock at Mirabilis. *See 10/28/04 Board Meeting*; *2005 Auditors' Report*; *Minutes from 2006 Shareholder Meeting*; *Cuthill Affidavit*. Further, at material times he was a director at Mirabilis, the President of Mirabilis' subsidiary AEM, which was the corporation managing payroll taxes, and the control person charged with insuring the payment of taxes. *10/14/10 Amar Depo.* at 9, lines 21-22. *State of Florida Department of Business and Professional Regulation Quarterly Report Form (Quarter Ending March 31, 2006)*. Mr. Amar specifically testified that he was unaware of the improper taking of the payroll taxes. *10/5/10 Amar Depo.* at 96, lines 20-23; *10/14/10 Amar Depo.* at 387, lines 4-8; 388, line 2. In fact, he specifically questioned Defendant Holtz whether payroll taxes were being improperly used for business operations of Mirabilis and was assured by Mr. Holtz that was not occurring and that everything was fine. *10/14/10 Amar Depo.* at 102-03, lines 23-11. Mr. Amar also testified that had he known about the diversion of payroll taxes, he would have told someone and stopped it. *Id.* at 388, lines 3-5. Mr. Amar is clearly an innocent decision maker as provided in *O'Halloran* and *Bankest*, and his presence bars the application of *in pari delicto* to Mirabilis.

4835-2114-6632.1
43582/0004

A second innocent decision-maker was Edith Curry.[14]  Ms. Curry was elected as an officer of Mirabilis in 2005, became a director in 2006, and served at various times on the audit/risk committee and executive committee.  *See 1/3/05 Board Meeting*.  Ms. Curry specifically testified that she was unaware of the theft of the payroll taxes even though she was an officer, director and served on important committees.  *5/14/09 Sentencing Hearing* at 119-20, lines 20-3.  Ms. Curry testified that she was not advised of any plan to use payroll taxes for operating expenses and instead was told that prior delinquent payroll taxes were being repaid by cost saving measures.  *Id.*  She clearly qualifies as an innocent decision maker whose presence bars application of *in pari delicto* to Mirabilis.  Since there were the presence of "innocent decision-makers," imputation of bad acts by certain members of Mirabilis and therefore the defense of *in pari delicto* is unavailable to Defendants.  It is only fitting that this equitable defense cannot be relied upon here as the evidence tends to show that these Defendants actually conspired in hiding this fraud from these innocent decision makers.  *Flynn Depo.* at 153-54, lines 21-19; 155, lines 14-166; *10/14/10 Amar Depo.* at 102-03, lines 19-2.

Further, Defendants simply have not proven the elements of *in pari delicto*.  *In pari delicto* is 'an affirmative defense, which Defendants have the burden to prove.'" *Martin v. Dodson*, 2010 WL 4683737 (E.D.N.Y. 2010) *quoting In re Parmalat Securities Litigation*, 659 F.Supp.2d 504, 530 (S.D.N.Y. 2009).  Under Florida law, in the context of *in pari delicto* that "[a]s a general rule, a principal may be held liable for the acts of its agent that are within the course and scope of the agency." *O'Halloran*, 969 So.2d at 1044-45; *Tolz*, 332 B.R. at 230.   "The party who seeks to establish the existence of such a relationship carries the burden of proof." *Wolicki-Gables v. Arrow Int'l, Inc.*, 641 F.Supp.2d 1270 (M.D.Fla. 2009).  In the instant matter, the Defendants

---

[14] This is not intended to be an exhaustive list of the innocent decision-makers—just examples to show that imputation and therefore the defense of in pari dilecto defense is unavailable to the defendants.

attempt to have Mr. Amodeo's actions imputed to Mirabilis because of some unspecified "agency." However, the evidence adduced establishes that Mr. Amodeo was neither an officer, directot, nor employee of Mirabilis. *See 10/28/04 Board Meeting*; *2005 Auditors' Report*; *Minutes from 2006 Shareholder Meeting*; *Cuthill Affidavit*. Even though the Defendants have the burden to establish the purported agency which allegedly forms factual basis of *in pari delicto* and the scope of the alleged agency, the Defendants cite no evidence of agency in their *Motion*.

### c.  Adverse Interest Exception

Even if Amodeo could be said to have exercised some amount of control over Mirabilis, this case falls within the "adverse interest exception" to imputation. "[I]f a corporate agent was 'acting adversely to the corporation's interests, the knowledge and misconduct of the agent are not imputed to the corporation.'" *O'Halloran*, 969 So.2d at 1045 (quoting *State Dep't of Ins. v. Blackburn*, 633 So.2d 521, 524 (Fla. 2d DCA 1994). If "the agent's misconduct is calculated to benefit the agent and harms the corporation, the agent has forsaken the corporation and acts only for himself," and the adverse interest exception applies. *Welt v. Efloortrade, LLC (In re Phoenix Diversified Investment Corp.)*, --- B.R. ---, 2010 WL 4483361 (S.D. Fla. Nov. 1, 2010).

Here, Mr. Amodeo was essentially looting money from Presidion that was supposed to be paid to the United States Government for payroll taxes. *See Individual Compensation Breakdown (Ex. 55 to 10/14/10 Amar Depo.*; *Ex. 6 to Holtz Depo.)* (Exhibit 17); *see also Amended Plea Agreement* (Doc. 38 in Case No. 6:08-cr-176-Orl-28GJK) (Exhibit 18) at 30-36. Any funds that made their way into Mirabilis were there for no reason other than Mr. Amodeo and the other co-conspirators had not yet stolen them. The benefit to Mirabilis, if any, was

merely incidental to Amodeo's payroll tax fraud scheme.   The tax fraud here resulted in the eventual conviction and bankruptcy of Mirabilis.

In fact, Mr. Amodeo and Mr. Holtz tried to conceal the payroll tax fraud from the innocent directors, such as Mr. Amar and Ms. Curry.   *See supra Section I.F.*   Mr. Amar testified that, when he asked about payroll taxes, he was assured that everything was in "fine order" and that they were not being used for operating expenses.   Ms. Curry testified that she was misled regarding the solution for the payroll tax problem.   When an agent intentionally attempts to keep certain actions from a company, it can be inferred that those actions are adverse to the company. *See Joel Strickland Enters., Inc. v. Atlantic Disc. Co.*, 137 So.2d 627, 629 (Fla. 1st DCA 1962) (stating that imputation is improper "where the conduct of the agent is such as to raise a clear presumption that he would not communicate to the principal the facts in controversy, as where an agent is in reality acting in his own business or for his own personal interest and adversely to the principal").

In the *Motion*, Defendants attempt to establish an exception to the adverse interest exception: the "sole actor" exception.   *See Motion* at 19-21.   Under the sole actor exception, "[i]f an agent is the sole representative of a principal, then that agent's fraudulent conduct is imputable to the principal regardless of whether the agent's conduct was adverse to the principal's."   *Tolz v. Proskauer Rose, LLP (In re Fuzion Technologies Group, Inc.)*, 332 B.R. 225, 231 (Bankr. S.D. Fla. March 2, 2005).   Defendants assert that Mr. Amodeo "controlled" Mirabilis.   *Motion* at 20. Control is not the standard for the "sole actor" exception.   *See O'Halloran*, 969 So. 2d 1039 at 1045 (explaining that the sole actor exception applies "where the corporate actors whose conduct is at issue were the 'alter egos' of the corporation"; that is, "[w]here a corporation is wholly dominated by persons engaged in wrongdoing").

Here, there is evidence that Amodeo was not the sole actor at Mirabilis, and there is evidence that other individuals with apparent authority acted on behalf of Mirabilis.  Mr. Amar testified that Mr. Amodeo was not even in control of Mirabilis, much less "wholly dominated" by Mr. Amodeo.  *See supra Section I.D.*

Moreover, "[w]hether the 'sole actor doctrine' can be raised in connection with a defense of *in pari delicto* by a third party where the third party itself has been accused of wrongdoing is an unsettled question in Florida law."  *O'Halloran*, 969 So. 2d at 1045, n. 5.  This issue has been considered in other jurisdictions, however, and courts have been understandably reluctant to apply *in pari delicto* to immunize third-party professionals who participated in the wrongdoing instead of preventing it.  *See, e.g., Official Committee of Unsecured Creditors of Allegheny Health, Education and Research Foundation v. PricewaterhouseCoopers, LLP*, 607 F.3d 346 (3d Cir. 2010).  In *AHERF*, the Third Circuit was faced with the issue whether the conduct of a corporation's agent should be imputed to the corporation when the agent colludes with a third-party professional to defraud the corporation.  *See AHERF*, 607 F.3d at 348.  After certifying the question to the Pennsylvania Supreme Court, the Third Circuit concluded, based on Pennsylvania law, that the *in pari delicto* defense cannot be asserted by a professional if the professional did not deal with the corporation in good faith.  The Third Circuit explained that collusive conduct between corporate agents and professionals is "overwhelmingly adverse to the corporation, even if the collusion provided a peppercorn benefit."  *Id.* at 352 (quotation and citation omitted).  Because the ordinary rules of imputation break down in such circumstances, "the corporation, or those in its place, may sue the corporation's [professional] free of that [professional]'s claim that the misconduct of the corporate officers is imputed to the corporation itself."  *Id.*  Thus, when a

4835-2114-6632.1
43582/0004

professional colludes in corporate wrongdoing, as here, that professional cannot assert *in pari delicto* as a defense.

Furthermore, Laurie Holtz, as Chairman of the Board of Mirabilis, is also equitably estopped[15] from arguing that anyone else, including Frank Amodeo, controlled Mirabilis. Specifically, Mr. Holtz accepted the position of chairman of the board of directors which controls Mirabilis. If he breached that duty and allowed Mr. Amodeo, who was not an officer, director, or majority shareholder of Mirabilis, to dominate and control Mirabilis, this is his fault and a direct breach of his duty as Chairman. He cannot rely upon his breach of his own job duties to control Mirabilis to assert someone else did.

### 3. EFFECT OF MIRABILIS'S PLEA OF *NOLO CONTENDERE* AND CRIMINAL CONVICTION

On June 16, 2010, Mirabilis pleaded *nolo contendere* to the allegations against it, asserting that Mirabilis was part of a conspiracy between Mr. Amodeo and certain named and unnamed co-conspirators to misdirect payroll taxes from Presidion, a client of AEM, a Mirabilis subsidiary. *See Transcript of June 16, 2010 Hearing on Change of Plea* (Case No. 6:08-cr-231-Orl-28KRS) (Exhibit 32). "A plea of nolo contendere is a mere statement of unwillingness to contest and no more. It is not receivable in another proceeding as evidence of guilt." *Mickler v. Fahs*, 243 F.2d 515, 517 (5th Cir. Fla. 1957). Specifically, as provided in Rule 410, Federal Rules of Evidence, a *nolo contendere* plea is not admissible in any civil or criminal action, case, or proceeding against the person who made the plea. *See* Fed. R. Evid. 410. By entering a *nolo contendere* plea, a defendant actually resolves the litigation in question in a manner which

---

[15] "The essential elements of estoppel are '(1) a representation as to a material fact that is contrary to a later-asserted position, (2) reliance on that representation, and (3) a change in position detrimental to the party claiming estoppel, caused by the representation and reliance thereon.'" *Curci Village Condo. Ass'n v. Maria*, 14 S.3d 1175, 1177 (Fla. 4th DCA 2009) (quoting *State v. Harris*, 881 So.2d 1079, 1084 (Fla. 2004).

specifically avoids an admission of any guilt in subsequent litigation. *See United States v. Williams*, 642 F.2d 136 (5th Cir. 1981).

This Court has already opined as to the collateral estoppel effect of this specific *nolo contendere* plea and subsequent conviction entered by the Defendants in this case. *See United States v. AEM, Inc.*, 718 F. Supp.2d 1334 (M.D. Fla. 2010). In providing consent for the Defendants to change their previous plea and enter a plea of *nolo contendere*, this Court stated:

> In this instance, the Receiver believes that pleas of guilty would result in his being legally estopped from pursuing civil actions for professional malpractice on behalf of the Corporate Defendants, whereas nolo pleas will not have the same effect. This Court would be skeptical of such an argument if the civil case were for the benefit of the criminal Defendants. That, however, is not the situation here. The only potential beneficiaries of the civil action are the innocent creditors of the Corporate Defendants, including the Government. Under the circumstances of this case, there is value in allowing the civil litigation to proceed on its merits.

*See id.* This Court also reasoned that the entry of a *nolo contendere* plea in this case and subsequent conviction would not impair the Government's ability to recover assets. In fact, this Court found the opposite to be true, and provided:

> Due to its forfeiture judgment, the Government has a 97% interest in any assets received by the Receiver. The Corporate Defendants' only assets are potential causes of action for malpractice against professionals who might have breached their duty to the Corporate Defendants. Counsel for the Corporate Defendants argues – and counsel for the Government does not deny – that pleas of guilty will extinguish any hope for recovery.

*See id.*

In their *Motion*, Defendants do not advise this Court of the previous review of the collateral estoppel effects of the exact *nolo contendere* pleas in question. Furthermore, Defendants, on the face of their *Motion,* do not attempt to argue that Mirabilis' *nolo contendere* plea is admissible to prove Mirabilis' guilt.[16] Rather, in their *Motion*, Defendants purport to make some arbitrary distinction in arguing that Mirabilis' **conviction** based on the plea of *nolo contendere*, and the

---

[16] See Motion, fn. 25 (providing that Defendants are not relying on any preclusive effect of Mirabilis' plea of *nolo contendere*).

4835-2114-6632.1
43582/0004

**factual basis for the conviction**, are indeed admissible.[17]  However, in citing cases supposedly supporting this assertion, Defendants fail to point out that none of these cases apply to a conviction arising from a plea of *nolo contendere* to a defense of *in pari delicto* or any other element of any defense.  The *Wyatt* case and *Williams* case deal specifically with the use of convictions for impeachment purposes pursuant to Rule 609, Federal Rules of Evidence.  The *Wyatt* case also deals with the use of a conviction for purposes of admissibility of crimes or other bad acts to prove intent pursuant to Rule 404(b), Federal Rules of Evidence.  The *Adedoyin* case deals with the use of a conviction for the sole purpose of establishing a prior felony conviction.  Finally, the *Burrell* case simply construes Connecticut law as establishing that a conviction pursuant to an *Alford* plea is a prior conviction for purposes of 18 U.S.C. § 922(g)(1).

In their *Motion*, Defendants do not seek to use Mirabilis' conviction and the facts of the conviction for impeachment purposes or as evidence of crimes or other bad acts or to simply establish the existence of a prior conviction.  Despite Defendants' averments to the contrary, Defendants are actually trying to use Mirabilis' conviction and the facts of the conviction to establish Mirabilis' guilt and to prove the elements necessary to establish the defense of *in pari delicto* for purposes of summary judgment.  However, Defendants fail to point out in their *Motion* that applicable case law clearly provides that **convictions** based on *nolo contendere* pleas are **not admissible** for purposes of proving that the pleader is actually guilty of the crime in question.  *See Adedoyin*, 369 F.3d 344 (*citing Olsen v. Correiro*, 189 F.3d 52, 58-62 (1st Cir.

---

[17] *See Motion*, pgs. 16-17 (*citing United States v. Wyatt*, 762 F.2d 908, 911 (11th Cir. 1985) "(holding that a *nolo contendere* plea does not insulate the facts underlying it from admissibility under Fed. R. Evid. 404(b)) (*citing Williams*, 642 F.2d at 138-139 ([supposedly] explaining that a *nolo contendere* plea admits 'every element of the offense (that is) well pleaded in the charge,' and that there is a 'distinct and meaningful difference' between the evidentiary use of a plea versus a criminal conviction); *see also United States v. Adedoyin*, 369 F.3d 337, 343-44 (3d Cir. 2004) ([supposedly providing] that Fed. R. Evid. 410 does not prohibit the admission of a conviction on a plea of *nolo contendere* as opposed to the plea itself, because the plea 'has the same legal consequences as a plea of guilty and results in a conviction'); *Burrell v. United States*, 2002 WL 31051594, *3, n. 3 (E.D.N.Y. Aug. 19, 2002) (a conviction based upon a *nolo* plea is a final adjudication, and thus 'the admissibility and the collateral consequences of the conviction are not determined by Rule 410')."

1999) (providing that convictions based on pleas of *nolo contendere* are admissible to prove the fact of conviction only, and that a plea of *nolo contendere* is not an admission of guilt and thus the fact that a defendant made such a plea cannot be used to demonstrate that he was guilty of the crime in question). Furthermore, Defendants fail to point out that there is no case law in Florida supporting the use of a *nolo contendere* plea and/or conviction as a basis for the defense of *in pari delicto*. Accordingly, Defendants' attempt to establish that Mirabilis' conviction precludes its current claims is completely without merit.

Even if this Court were to allow the use of the *nolo contendere* conviction for some issue preclusive effect,[18] Defendants have not established that any issues it could preclude would bar the current claims. Issue preclusion is limited to issues which were "critical and necessary" for a decision in the matter. *See Christo*, 223 F.3d at 1339. Here the specific allegations against Mirabilis in the *Government's Statement of Facts* primarily involve allegations that in May 2006, Mirabilis passed through approximately $1.5 million dollars of payroll taxes to Hoth Holdings, Inc. and used some payroll tax funds for its last payroll in December 2006.[19] The other allegations related to Mirabilis describe what could be innocent activity of Mirabilis. Thus, even if issue preclusion is applied, the issues which Mirabilis would be precluded from relitigating are its involvement in relatively limited allegations of passing through these payroll tax funds. By comparison, the evidence tends to show that Mr. Holtz sat in conspiracy with Mr. Amodeo and

---

[18] Please also see previous Section III.B.2. of this Response addressing Issue Preclusion.

[19] The allegations in the Government's statement of the facts never identify what officer or director of Mirabilis took the illegal action. Corporations can act only through natural persons, and accordingly, any illegal action must have been undertaken by natural persons. During both times at issue, specifically the May 2006 pass through of approximately $1.5 million dollars of payroll taxes by Mirabilis to Hoth Holdings, Inc. and the December 2006 use of some payroll tax funds for Mirabilis' last payroll, Mr. Holtz was the Chairman of the Board of Mirabilis. *See 3/23/06 Board Meeting; Holtz Depo.* at 19, line 2; 25, lines 7-13. Thus, assuming facts for the purposes of issue preclusion, it cannot be assumed from these facts that it was not Mr. Holtz who permitted the illegal action on behalf of Mirabilis. This is especially true here, where the evidence clearly supports the position that while Mr. Holtz was Chairman of Mirabilis he sat in conspiracy with Mr. Amodeo, in secret from Mirabilis' officers and directors, in his plan to divert payroll taxes. *Flynn Depo.* at 123-24, lines 21-19; *Cuthill Depo.* at 171-72, lines 2-10; *10/14/10 Amar Depo.* at 23, lines 3-24; 78-80, lines 4-16. Such actions would not support Mr. Holtz's reliance on these facts for his defense.

Mr. Berman to hide a much larger payroll tax scheme from the officers and directors of Mirabilis and its subsidiary AEM. Thus, these are not the same acts, nor is the culpability of Mirabilis necessarily the same as that of Mr. Holtz and his firm. Such factual disputes clearly would bar summary judgment as the precluded issues (if any) do not support the defense of *in pari delicto* for all such activity. *See Moecker*, 144 F. Supp.2d at 1350.

### 4. ADDITIONAL EXCEPTIONS TO THE *IN PARI DELICTO* DEFENSE

#### a. Innocent Successor Exception

In a typical bankruptcy case, the commencement of the case creates an estate which consists of all legal and equitable interests of the debtor in property, among other things. *See* 11 U.S.C. § 541. Because the language of § 541 provides that the estate consists of all interests of the debtor in property "as of the commencement of the case," courts have held that post-petition events should not be considered when evaluating a claim in bankruptcy. *See, e.g., Official Comm. of Unsecured Creditors of PSA, Inc. v. Edwards*, 437 F.3d 1145, 1150 (11th Cir. 2006); *Lafferty & Co.*, 267 F.3d at 355-37. Therefore, claims brought by a bankruptcy trustee standing in the shoes of a debtor typically are subject to the same defenses that could be raised against the debtor. *See id.*

There is an important difference between this case and the typical bankruptcy case, however. Here, Mr. Cuthill was validly installed as president of Mirabilis prior to the filing of the Chapter 11 petition. *See Order Affirming Denial of Dismissal* at 5-6. As such, any of Mirabilis's previous corrupt management team was replaced with an innocent successor prior to the commencement of the bankruptcy case. In such circumstances, the *in pari delicto* defense does not apply. *Compare Edwards*, 437 F.3d 1145 at 1150 *with Freeman v. BDO Seidman, LLP (In*

*re Bankest, L.C.)*, Adv. No. 06-1220-BKC-AJC-A, 2010 WL 2926203 at *2 (Bankr. S.D. Fla.

July 23, 2010) *(Bankest II)*

At least two federal courts to consider the issue within the last two years, a United States

District Court, and a United States Bankruptcy Court in the Southern District of Florida, have

applied the innocent successor exception in circumstances similar to those here. *See Kirschner v.*

*Wachovia Capital Markets, LLC (In re Le-Nature's, Inc.)*, MDL No. 2021, W.D. Pa. No. 2:09-

mc-162, Civil Action No. 08-1518, 2009 WL 3571331 (W.D. Pa. Sept. 16, 2009)

*reconsideration denied* 2009 WL 3526569 (W.D. Pa. Oct. 23, 2009); *Bankest II,* 2010 WL

2926203 at *2 (following *Le-Nature*).  In *Le-Nature*, a custodian ran the debtor-corporation for a

short period of time prior to the filing of the corporation's bankruptcy petition.[20]  *Kirschner*,

2009 WL 3571331 at *3.  The court found that the corporation "essentially rid itself of corrupt

influence of certain corporate officers *prior* to the bankruptcy filing . . . ."  *Id.* at *6 (emphasis in

original).  The court concluded that the application of the *in pari delicto* defense is inappropriate

in circumstances where a corporation's previous wrongdoers are replaced with innocent

successors prior to the filing of the bankruptcy petition.  *Id.*; *see also Bankest II,* 2010 WL

2926203 at *2.

Cuthill is in a position similar to Kirschner.  *Cf. Kirschner*, 2009 WL 3571331 (Sept. 16,

2009) at *5-6; *see also Lafferty & Co.*, 267 F.3d at 358 (stating in the receivership context that

"several courts have declined to apply in pari delicto to bar the receiver from asserting the claims

of an insolvent corporation on the ground that application of the doctrine to an innocent

successor would be inequitable"); *see also Cuthill Depo.* at 95, lines 7-15 (stating that he was

brought in to file bankruptcy as a "white knight" or "clean officer").  This is because the

---

[20]   The custodian was appointed only a matter of days prior to the initiation of an involuntary bankruptcy proceeding.  *Kirschner*, 2009 WL 3571331 at *3 (stating that the custodian was appointed on October 27, 2006, and the involuntary bankruptcy proceeding was commenced on November 1, 2006).

rationale underlying the *in pari delicto* defense "falls out [once the schemer] has been ousted

from control of and beneficial interest in the corporations." *Scholes v. Lehman*, 56 F.3d 750, 754

(7th Cir. 1995).  In *Scholes*, Judge Posner explained that when a corporate wrongdoer is removed

and replaced by an innocent successor, the taint of wrongdoing no longer exists, and the *in pari*

*delicto* defense should not apply:

> The appointment of the receiver removed the wrongdoer from the scene.  The
> corporations were no more [the schemer]'s evil zombies.  Freed from his spell they
> became entitled to the return of the moneys—for the benefit not of [the schemer] but of
> innocent investors—that [the schemer]s had made the corporations divert to unauthorized
> purposes. . . .
>
> Put differently, the defense of *in pari delicto* loses its sting when the person who is *in*
> *pari delicto* is eliminated.  Now that the corporations created and initially controlled by
> [the schemer] are controlled by a receiver whose only object is to maximize the value of
> the corporations for the benefit of their investors and any creditors, we cannot see an
> objection to the receiver's bringing suit to recover corporate assets unlawfully dissipated
> by [the schemer].

*Id.* at 755-56 (citations omitted).

Based on the foregoing, Mr. Cuthill is an innocent successor to whom the *in pari delicto*

defense does not apply.

### b.  Insider Exception

"While *in pari delicto* may be used as a defense to bar a corporation or successor bankruptcy

trustee's claims against third parties, it does not apply to bar claims against corporate insiders."

*Liquidating Trustee of the Amcast Unsecured Creditor Liquidating Trust v. Baker (In re Amcast*

*Indus. Corp.)*, 365 B.R. 91, 124 (Bankr. S.D. Ohio 2007) (citations omitted); *see also In re*

*Oakwood Homes Corp.*, 340 B.R. 510, 536 (Bankr. D. Del. 2006) (stating that "[*i*]n pari delicto

does not provide a defense for insiders").[21]

---

[21]  Unlike the remaining exceptions argued herein, the undersigned has found no Florida or Eleventh Circuit cases
expressly discussing the insider exception.  However, based upon the persuasive reasoning of these cases and their
consistency with Florida law, the undersigned respectfully suggests it would be adopted in Florida.

Here, Mr. Holtz was the chairman of the Board of Mirabilis.   Clearly, the director of a corporation is an insider.  *See, e.g.,* 11 U.S.C. § 101(31)(B)(i) (defining the term "insider," *inter alia*, as a director).   "[W]hen wrongful acts are committed against a corporation by its officers and directors, the wrongful nature of such acts is not imputed to the corporation."  *Official Comm. of Unsecured Creditors v. Foss (In re Felt Mfg. Co.)*, 371 B.R. 589, 610 (Bankr. D. N.H. 2007).

### c.  Accountant Exception

Furthermore, Mr. Holtz, a nationally recognized forensic accountant, took on the duty of discovering the fraud.  Mr. Amar testified that he told Mr. Holtz that he was "comforted" to have Mr. Holtz as the new Chairman of Mirabilis, as Mr. Holtz was viewed as the "dean of forensic accounting, quite qualified."  *10/14/10 Amar Depo.* at 102, lines 20-23.  Mr. Amar asked Mr. Holtz in regard to payroll taxes for "assurances that everything is okay."  *Id.* at 102, lines 23-24. Mr. Holtz responded, "Yes, Yaniv.  I'm here to make sure everything is shipshape.  There's nothing to concern yourself with.  Leave that job to us."  *Id.* at 102-03, lines 25-2.  Thus, Defendants accepted the duty to investigate this precise fraud.  Having taken on the duty to detect the fraud, Defendants cannot now benefit from the fraud they failed to detect by asserting it as the basis for his *in pari delicto* defense.  *See Bankest I*, 2010 WL 1417732 at *7 (indicating that, when an accountant accepts a duty to detect fraud, it cannot benefit from the fraud it failed to detect by asserting *in pari delicto* based on that fraud).

## C.  DAMAGES

Defendants assert that Mirabilis is unable to recover the damages that Mirabilis seeks by mischaracterizing the nature of damages that it is seeking.  Mirabilis is seeking compensatory damages based on Defendants negligent actions, intentional breach of fiduciary duties, and

negligent supervision.    *Second Amended Complaint*.    These damages include the $200,000,000.00 Unsecured Claim that Mirabilis had to consent to with the United States of America.  *See Order Approving Compromise of Controversy by and among Debtors and the United States of America* (Doc. 145 in Case No. 6:08-bk-4327-KSJ, "*Order Approving Compromise*") (Exhibit 28).   The Unsecured Claim includes penalties and interest incurred, along with payroll taxes and other miscellaneous items.  *Cuthill Depo.* at 299-300, lines 18-22.

A proper measure of damages suffered as a result of professional negligence which result in adverse tax consequences includes interest and penalties suffered as a result of those actions.[22] *Ducote Jax Holdings, LLC v. Bradley*, 335 Fed. Appx. 392, 401 (5th Cir. 2009) (holding that damages represented the difference between the amount of money plaintiffs would have paid the IRS and the amount they eventually paid); *see also P.H. Glatfelter Co. v. Lewis*, 746 F.Supp. 511, 519 (E.D. Penn. 1990) (holding that damages accrued as a result of accountant's actions upon assessment by IRS of penalties and interest).   In the instant matter, these exact types of damages are included in what Mirabilis is claiming--the interest and penalties suffered as a result of Defendants' negligence and breach of fiduciary duties.

Defendants attempt to mischaracterize Mirabilis' claims as claims for indemnification.   On the Second Amended Complaints' face Mirabilis is suing for negligence, breach of fiduciary duties, and negligent supervision.   In no place in the Second Amended Complaint is Mirabilis

---

[22] Defendants emphasize that Mirabilis has not paid any of the interest and penalties incurred, and therefore no claim for damages will lie.  This is simply factually untrue.  Mirabilis had to surrender numerous real estate holding and other tangible assets after the entering of the *Order Approving Compromise*.  Furthermore, whether or not Mirabilis paid any of the damages suffered as a result of Defendants' actions is immaterial.  It is the incurring of the liability and not the payment of a liability that is the triggering point.  Florida follows the "judgment rule" and not the "payment rule" when determining if liability attaches.  *See American Fire & Cas. Co. v. Davis,* 146 So.2d 615 (Fla. 1st DCA 1962).  In the instant matter, the "payment rule" would make no sense.  Under the "payment rule", if a bad actor was efficient enough to completely destroy a company so that the company could not make any payments, he would be better off than if he only partially damaged a company so that the company could make some payments. This would be an absurd and illogical result and does not reflect the state of the law in Florida.

29

seeking indemnification.   Therefore, Defendants' case law regarding indemnification is irrelevant.

In a further attempt to try and shove Mirabilis' causes of action into an indemnification claim, Defendants cite *UCAR Int'l, Inc. v. Union Carbide Corp.*, 2004 WL 137073 (S.D.N.Y. Jan26, 2004) for the proposition that "where a corporation's damage claims against third parties are the result of a common set of operative facts through which is [sic] has already committed wrongdoing, those damages are 'nothing more than a veiled and improper attempt to seek contribution and indemnification' that will not be allowed." *Motion* at 24.   However, this is a gross mischaracterization of *UCAR Int'l, Inc.*   In *UCAR Int'l, Inc.*, the plaintiffs signed an agreement that it would not seek indemnification against defendants for certain damages regarding certain actions taken by defendants, including penalties incurred as a result of a criminal and civil liability.   *Id* at 9.   Unsurprisingly, when the plaintiffs sued defendants for damages incurred out of those actions, the court found that the gravamen of the complaint was for indemnification for the damages incurred.   *Id* at 9-10.   The court would not allow the plaintiffs to maneuver around its indemnification agreement.   This is a far cry from this matter and the proposition that the Defendants claim that the case supports.   In fact, as stated above, courts have routinely allowed plaintiffs to recover from professionals for penalties and interest incurred as a result of professional negligence without a finding that it was for "indemnification."

## <u>CONCLUSION</u>

For the reasons stated herein, Plaintiff respectfully requests the Court to deny *Defendants' Motion for Summary Judgment on Liability and Damages* (Doc. 63).

**BROAD AND CASSEL**
Attorneys for Mirabilis Ventures, Inc.

30

390 North Orange Avenue, Suite 1400
Orlando, Florida  32801
Telephone:(407) 839-4200
Facsimile: (407) 425-8377

By:____*/s/ Todd K. Norman*_____
   Todd K. Norman, Esquire
   Florida Bar No. 0062154
   tnorman@broadandcassel.com
   Roy S. Kobert, Esquire
   Florida Bar No. 777153
   rkobert@broadandcassel.com

## CERTIFICATE OF SERVICE

  **I HEREBY CERTIFY** that a true and correct copy of the foregoing has been furnished via regular U.S. Mail this 6th day of December, 2010 to: Joseph A. DeMaria, Esquire, Tew Cardenas, LLP, Four Seasons Tower, 1441 Brickell Avenue, Suite 1500, Miami, Florida 33131.

By:____*/s/ Todd K. Norman*_____
   Todd K. Norman, Esquire
   Florida Bar No. 0062154
   tnorman@broadandcassel.com
   Roy S. Kobert, Esquire
   Florida Bar No. 777153
   rkobert@broadandcassel.com

4835-2114-6632.1
43582/0004