**1**

```
              IN THE CIRCUIT COURT OF THE NINTH JUDICIAL
               CIRCUIT IN AND FOR ORANGE COUNTY, FLORIDA

                      CASE NO:  08-CA-31333 (32)

FRANK L. AMODEO,

          Plaintiff,

vs.

BERMAN, KEAN & RIGUERA, P.A.,
and RICHARD E. BERMAN,
          Defendants.
_____/


                 UNITED STATES DISTRICT COURT
                  MIDDLE DISTRICT OF FLORIDA
                      ORLANDO DIVISION

                 CASE NO: 6:09-cv-175-Orl-31DAB

MIRABILIS VENTURES, INC.,

          Plaintiff,

vs.

RICHARD E. BERMAN, BERMAN, KEAN &
RIGUERA, P.A., ELENA WILDERMUTH,
          Defendants.
_____/


            DEPOSITION OF MARTIN C. FLYNN, JR.
                 VOLUME I, MORNING SESSION
              390 North Orange Avenue, Suite 1500
                      Orlando, Florida
                 Monday, September 27, 2010
                 9:32 a.m. - 5:10 p.m.


            (Stenographically) Reported By:
                 JOAN COMPARATO, FPR
              FLORIDA PROFESSIONAL REPORTER
```

**2**

```
 1                      APPEARANCES:

 2    On Behalf of the Plaintiff Frank L. Amodeo:

 3         J. BRENT SMITH, ESQUIRE
           MAHER LAW FIRM
 4         631 West Morse Boulevard, Suite 200
           Winter Park, Florida 32789
 5
      Behalf of the Plaintiff Mirabilis Ventures, Inc.:
 6
           NICOLETTE VILMOS, ESQUIRE
 7         BROAD & CASSEL
           390 North Orange Avenue, Suite 1400
 8         Orlando, Florida  32801

 9    On Behalf of Defendants Richard E. Berman, Berman, Kean &
      Riguera, P.A. and Elena Wildermuth:
10
           D. DAVID KELLER, ESQUIRE
11         KELLER LANDSBERG, P.A.
           100 Southeast Third Avenue, Suite 1050
12         Fort Lauderdale, Florida  33394

13    On Behalf of the Deponent Martin C. Flynn, Jr.:

14         MELANIE A. HINES, ESQUIRE
           BERGER SINGERMAN
15         125 South Gadsden Street, Suite 300
           Tallahassee, Florida  32301
16
      ALSO PRESENT:   Adam Azoulay, Videographer
17

18

19

20

21

22

23

24

25
```

**3**

```
 1                         I N D E X

 2    DIRECT EXAMINATION                                  5
      BY MR. KELLER
 3
                       E X H I B I T S
 4
      Exhibit No. 1, Letter                              6
 5

 6

 7

 8

 9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

**4**

```
 1         Deposition taken before Joan Comparato, Court

 2    Reporter and Notary Public in and for the State of

 3    Florida at Large, in the above cause.

 4         THE VIDEOGRAPHER:  Today is the -- today's date

 5    is September 27, 2010 and the time is approximately

 6    9:32 a.m.

 7         This is the videotaped deposition of Martin C.

 8    Flynn, Jr., in the matter of Frank Amodeo versus

 9    Berman, Kean & Riguera, P.A., and Richard Berman, as

10    well as the matter of Mirabilis Ventures, Incorporated

11    versus Richard Berman, Berman, Kean & Riguera, P.A.,

12    and Elena Widermuth.

13         This deposition is being conducted at 390 North

14    Orange Avenue, Suite 1500 in Orlando, Florida.  The

15    court reporter is Joan Comparato for U.S. Legal

16    Support.  The videographer is Adam Azoulay for U.S.

17    Legal.

18         Will counsel please announce their appearance for

19    the record.

20         MR. SMITH:  Brent Smith on behalf of the

21    Plaintiff, Frank Amodeo.

22         MS. VILMOS:  Nicolette Vilmos on behalf of

23    Mirabilis.

24         MR. KELLER:  David Keller on behalf of Richard

25    Berman, Elena Wildermuth and Berman, Kean & Riguera.
```

EXHIBIT 10

5

1      MS. HINES:  And Melanie Hines on behalf of the

2   witness, Martin C. Flynn, Jr.

3      THE VIDEOGRAPHER:  Will the court reporter please

4   swear in the witness.

5      THE COURT REPORTER:  Sir, can I ask you to raise

6   your right hand for me, please?

7      Do you solemnly swear to tell the truth, the

8   whole truth and nothing but the truth, so help you

9   God?

10      THE WITNESS:  I do.

11   Thereupon:

12            MARTIN C. FLYNN, JR.

13   having been first duly sworn or affirmed, was examined and

14   testified as follows:

15            DIRECT EXAMINATION

16   BY MR. KELLER:

17      Q.   What is your name?

18      A.   Martin C. Flynn, Jr.

19      Q.   What's your current residence address, please?

20      MS. HINES:  Excuse me just a moment, please,

21   Counsel, if I may make a statement for the record.

22      MR. KELLER:  Oh, of course.

23      MS. HINES:  Thank you very much.  I'd appreciate

24   it.

25      For all counsel involved today, I'd like the

6

1   record to reflect that I have received communication

2   from the U.S. Attorney's Office here in the Middle

3   District advising me that the United States Government

4   is invoking its investigative privilege relating to

5   any oral or written communications between Mr. Flynn

6   and any representative of the United States Government

7   and with respect to any documents to the extent that

8   those documents were provided to the United States or

9   by the United States to Mr. Flynn.  This includes

10   anything discussed or provided during any proffered

11   session.  I have a copy of the letter which was

12   provided to me today.  I think we should go ahead and

13   have it marked as an exhibit and attached to the

14   deposition for future reference, but here is a copy

15   for -- that's one copy.

16      MR. KELLER:  That's fine.  Let's mark it.

17      MR. SMITH:  Yeah, we need to mark it.

18      MR. KELLER:  Exhibit 1.

19      (Exhibit No. 1, Letter was marked for

20   identification.)

21      MS. HINES:  Thank you.  And I would ask Mr.

22   Keller and counsel if during the deposition, and I'm

23   sure you'll respect this and I've instructed Mr. Flynn

24   as well, that if at any time he believes that his

25   answers to your questions are about to violate this

7

1   direction from the United States Government, that he

2   is to consult with me and I'm sure you'll allow us the

3   opportunity to do that.

4      I have also been informed that if we have any

5   questions the Assistant United States Attorney

6   assigned to the case is making himself available to

7   answer any questions we may have as we go through the

8   deposition and so I've already asked for the

9   opportunity to have a break, say around 10:00 or 10:30

10   as we go through this to call about a question that

11   has already come up in my consultation with Mr. --

12   with Mr. Flynn.

13      So again, he's been counseled to consult with me

14   during the -- during the deposition.

15      Thank you.

16      MR. KELLER:  Okay.

17      THE WITNESS:  Answer the question?

18   BY MR. KELLER:

19      Q.   What's your residence address?

20      A.   14556 St. Georges Hill Drive, Orlando, Florida

21   32828.

22      Q.   How long have you lived there?

23      A.   Around 11 years.

24      Q.   Are you married?

25      A.   I am.

8

1      Q.   What is your wife's name?

2      A.   Tracy H. Flynn.

3      Q.   Do you have any children?

4      A.   I have three children.

5      Q.   How old?

6      A.   My daughter is 21.  My son is 19 and I have

7   another son who is 18.

8      Q.   Are you currently employed?

9      A.   Yes.

10      Q.   Where are you employed?

11      A.   Sherwood Construction.

12      Q.   Sherwood?  Is that a yes?

13      A.   Yes.

14      Q.   What business are you in?

15      A.   We buy, renovate and sell houses.

16      Q.   Who's in that business with you?

17      A.   My partner is Woody Johnson.

18      Q.   Is he the only other partner in the business?

19      A.   Yes, we have employees but he's the only partner.

20      Q.   He used to work with you at Mirabilis?

21      A.   Yes.

22      Q.   Mr. Flynn, have you ever given a deposition

23   before?

24      A.   No.

25      Q.   I'm going to explain a couple of ground rules and

9

1    some of the procedure for you and if at any time you have
2    any questions you can stop and consult with your lawyer if
3    you need to.
4         I'm going to ask you some questions.  The court
5    reporter is going to take down everything I say.  When you
6    answer, the court reporter is going to take down
7    everything you say so the first rule of the deposition
8    session is that we can't talk over each other and I know
9    sometimes if I might think a witness is finished with an
10   answer I might start another question before they're
11   finished.
12        So if I do that, I want you to know two things:
13   First, it's inadvertent, I don't mean to do it.  Second,
14   if you'll just hold up your hand to let me know and signal
15   me that you weren't finished with your answer, I will stop
16   so that you may finish your answer.
17        A.   Okay.
18        Q.   Likewise, with you, sometimes witnesses will
19   start to answer a question before a lawyer has finished
20   asking it, so if that happens I'm going to do the same
21   thing, I'm going to hold up my hand and say, wait a
22   minute, I wasn't finished with the question and if you'd
23   let me finish, I'd appreciate it and then you can answer.
24   Because sometimes in more informal settings we anticipate
25   what someone's question is and we start to answer it right

10

1    away.
2         I'm going to ask that you not do that mostly for
3    the benefit of the court reporter because she can't take
4    down both of us speaking at the same time, fair enough?
5         A.   Yes.
6         Q.   If I ask you any question you don't understand
7    you just tell me and I'll ask you a different question.
8         A.   Okay.
9         Q.   So if you answer my question I'm going to assume
10   that you've understood me.  Fair enough?
11        A.   Okay.
12        Q.   One other rule is that if I ask you a question
13   that calls for a yes or no, I'm going to request that you
14   give a verbal out loud answer to make sure that when the
15   court reporter records your response it accurately says
16   yes or no rather than uh-huh or uh-uh or a nod of the head
17   so that the record will be clear.  All right?
18        A.   Yes.
19        Q.   So if I ask you to do that it's not because I'm
20   being impolite, it's just to make sure that we have a
21   proper record with the court reporter.  All right?
22        A.   Okay.
23        Q.   If at any time you need a break for any reason
24   you let me know and we will stop with one caveat, the one
25   exception is I can't stop in the middle of a question and

11

1    answer.  After you finished whatever answer you have to
2    the last question, if you need a break let me know and,
3    likewise, as your lawyer has mentioned, if you need to
4    consult with your lawyer about privilege issues or the
5    like, you let me know and as long as we're not in the
6    middle of a question, we'll stop, we'll break and you can
7    speak to your lawyer, fair enough?
8         MS. HINES:  Excuse me just a second, but then how
9         do you envision with that direction, Mr. Keller, that
10        I would be able to instruct him before he answers and
11        thereby protect a privilege?
12        MR. KELLER:  You know what, you're right.
13        MS. HINES:  Okay.
14        MR. KELLER:  And perhaps I misspoke.  If he needs
15        a break for some other reason I'm going to ask that he
16        answer the question.  If you need a break after a
17        question to consult with your lawyer about privilege
18        issues that's fine and either you or your lawyer will
19        let me know that.
20        THE WITNESS:  Okay.
21        MR. KELLER:  All right?
22        MS. HINES:  Thank you.
23   BY MR. KELLER:
24        Q.   Do you have any questions?
25        A.   No.

12

1         Q.   What did you do to prepare for your deposition
2    today?
3         MS. HINES:  May I give him some guidance, please,
4         Mr. Keller?
5         MR. KELLER:  Yes, ma'am.
6         MS. HINES:  Without relating communications that
7         you and I may have had, please answer the question for
8         Mr. Keller.
9         THE WITNESS:  I went through your request for
10        documents and went through all the documents that I
11        have so that I could -- and bundled them together so I
12        could provide them to you and that's all I've done to
13        prepare.
14   BY MR. KELLER:
15        Q.   Did you read some of the documents?
16        A.   Yes.
17        Q.   What documents did you read in preparation for
18   your deposition?
19        A.   I read through some of -- all of them I guess.  I
20   had to look at the documents to see if they were what you
21   were asking for, so --
22        Q.   Okay.  Some of the documents that you produced
23   relate to Mirabilis, is that right?
24        A.   Yes.
25        Q.   Some of them relate to Common Paymaster?

13

1    A.    Yes.

2    Q.    Of which you were the president?

3    A.    Yes.

4    Q.    You did not produce any documents between

5    yourself and your lawyer Ms. Hines, is that right?

6         MS. HINES:  Would you repeat the question,

7    please?

8    BY MR. KELLER:

9    Q.    Yes.  You haven't produced any documents between

10   yourself and your own lawyer, is that right?  I haven't

11   asked for those.  I just want to make sure because I want

12   to get a universe of what we have and what we don't have.

13        MS. HINES:  Okay.  If I may clarify for the

14   record --

15        MR. KELLER:  Sure.

16        MS. HINES:  -- your subpoena does seem to call

17   for documents that were exchanged between myself --

18   between Mr. Flynn and me, but you and I had a

19   discussion before coming here today that that was not

20   your intent to invade our attorney-client privilege.

21        MR. KELLER:  Right.  And let me clarify that --

22        MS. HINES:  Yes.

23        MR. KELLER:  -- for you, Ms. Hines.

24        I think where the misunderstanding may have come

25   is I asked for copies of correspondence between Mr.

14

1    Flynn and/or his lawyer with other third parties,

2    parties to this lawsuit, 'Mr. Amodeo, his counsel,

3    Mirabilis and its counsel, and that was what I was

4    distinguishing from communications with you which I

5    agree I am not requesting, didn't mean to request and

6    to the extent you interpreted it that way, that's not

7    what I was looking for.

8         MS. HINES:  Okay.

9         MR. KELLER:  So I want to make sure the documents

10   that have been produced to me do not include any

11   documents between Mr. Flynn and you, as far as you

12   know.

13        MS. HINES:  Well, the difficulty with that is

14   that during the course of my representation of Mr.

15   Flynn he provided me with some of the same documents

16   which he has brought here today, which just because

17   they were given to me does not make them privileged,

18   right?

19        MR. KELLER:  That's not what I'm talking about.

20        MS. HINES:  Okay.

21        MR. KELLER:  I'm talking about communication

22   between him and you.

23        MS. HINES:  That's right.  Okay.

24        MR. KELLER:  And I want to clarify.  I'm not

25   interested in that.  All right?

15

1         THE WITNESS:  As far as I know I haven't provided

2    any of that to you.

3    BY MR. KELLER:

4    Q.    And if I saw any of those I would immediately

5    give them back.  I haven't so far in the materials you

6    produced now.

7         You produced some materials to me on disk last

8    week through your lawyer.  Do you recall that?

9    A.    Yes, sir.

10   Q.    And you gave me a list and all of the documents

11   that you produced electronically on a disk on Thursday

12   last week in response are documents that you maintain that

13   are not communications between you and any lawyer

14   representing you, is that correct?

15   A.    Not that I know of.

16   Q.    Okay.  The documents that you have and that you

17   have produced electronically on disk, are those documents

18   you received from other people with whom you worked at

19   Mirabilis?

20   A.    During the wind-up of Mirabilis when we were

21   closing down all the companies and consolidating those

22   documents to the warehouse and then to electronic storage,

23   the electronic documents that I have are things that I had

24   for one reason or another from that time period.

25   Q.    All right.  What period of time are we talking

16

1    about when you're referring to the wind-up of Mirabilis,

2    during 2007?

3    A.    2007 and 2008.

4    Q.    Where were you employed during that time?

5    A.    I worked for Acme Strategy.

6    Q.    Were you being paid?

7    A.    Yes.

8    Q.    Who was funding Acme Strategy so that you could

9    be paid?

10        MR. SMITH:  Object to the form.

11        THE WITNESS:  What does that mean?

12        MS. HINES:  It means that he is objecting to the

13   form of the question but as I understand it you're

14   permitted to answer the question.  So if we have no

15   further objection, go right ahead and answer the

16   question.

17        THE WITNESS:  Can you ask it again?  I'm sorry.

18        MR. KELLER:  Yes, sir.

19   BY MR. KELLER:

20   Q.    Who was funding Acme Strategy so that you could

21   be paid?

22        MR. SMITH:  Same objection.

23        THE WITNESS:  I'm not sure who it was.

24   BY MR. KELLER:

25   Q.    Where was the revenue coming from to operate Acme

17

1  Strategy at that time?

2     A.   I'm not sure where the revenue came from.

3     Q.   Who owned Acme Strategy?

4     A.   Frank Amodeo.

5     Q.   Do you know whether during that time in 2007 and

6  2008 Acme had any active business operations generating

7  revenue?

8     A.   As far as I know the main business was winding

9  down; Mirabilis.

10    Q.   Okay.  So do you have any information about where

11 the money came from to fund the operations of Acme

12 Strategy Corp. during the wind-down period during which it

13 had no business and no sources of revenue?

14    A.   Not that I know of.

15    Q.   Do you know if the money came from stolen payroll

16 tax funds?

17    A.   Not that I know.

18    Q.   Do you know how Acme was funded before 2007?

19    A.   Acme -- as I understand it, Acme collected fees

20 for work that it did.

21    Q.   What work did it do?

22    A.   It would take consulting cases.

23    Q.   What kind of consulting?

24    A.   I don't know all the specifics of it, but

25 whatever case came along.  Usually distressed entities.

18

1     Q.   Did Acme have any employees other than Frank

2  Amodeo

3     A.   I don't know that Frank was an employee of it.

4     Q.   He owned it?

5     A.   As I understand it, yes.

6     Q.   He controlled it?

7     A.   Yes.

8     Q.   He was the sole stockholder?

9     A.   I don't know that but as I understand it that was

10 -- I haven't seen documents to that effect but that was my

11 understanding.

12    Q.   That's what you were told?

13    A.   Correct.

14    Q.   By Frank?

15    A.   Yes.

16    Q.   And by others?

17    A.   Yes.

18    Q.   And you never understood anything differently?

19    A.   No.

20    Q.   Do you know when Acme Strategy was formed?

21    A.   No.

22    Q.   Do you know who formed it?

23    A.   No.

24    Q.   Do you have any reason to believe it was formed

25 by someone other than Frank?

19

1     A.   I'm -- well, I'm assuming that someone formed it

2  for him, but beyond it.

3     Q.   By that I mean that he was the original

4  shareholder who formed the company even if he had someone

5  else do that for him?

6     A.   That was my understanding, that Acme Strategy was

7  Frank's company.

8     Q.   It was all Frank and always Frank?

9     A.   That was my understanding.

10    Q.   Do you know what Acme's first consulting

11 engagement was?

12    A.   No.

13    Q.   Do you know how it got paid?

14    A.   My understanding is it got paid fees for its

15 consulting engagements.

16    Q.   Do you know whether Acme had consulting

17 agreements in place?

18    A.   I believe that I've seen some in the wind-down

19 period.

20    Q.   With Presidion Corporation?

21    A.   I don't remember who it was with but I believe

22 I've seen a consulting agreement from Acme in that

23 wind-down.

24    Q.   And with Mirabilis?

25    A.   I don't remember specifically who it was with.

20

1     Q.   Do you know of any revenue coming into Acme

2  Strategy that came from anything other than collected

3  payroll tax funds that were not remitted to the

4  government?

5     A.   My understanding is that the funds came into Acme

6  through consulting agreements.

7     Q.   Do you know whether any of those consulting

8  agreements related to Frank providing tax advice to

9  Presidion or other entities?

10    A.   I understand that Frank -- that he was a

11 consultant for Presidion providing tax advice.

12    Q.   Okay, and he held himself out as a tax expert?

13    A.   Yes.

14    Q.   And he was a former lawyer?

15    A.   Yes.

16    Q.   And he had run businesses?

17    A.   Yes.

18    Q.   Did you know he had run a company called Sin

19 Entree?

20    A.   Yes.

21    Q.   Did you know he ran a company called Professional

22 Bookkeeping?

23    A.   Yes.

24    Q.   Did you know that he failed to pay payroll taxes

25 for those companies?

21

```
1          MR. SMITH:  Object to the form.
2   BY MR. KELLER:
3       Q.   You can answer it.
4       A.   I understood that he paid payroll taxes on those
5   companies but I wasn't involved in the specifics of that.
6       Q.   Did you know that after not paying payroll taxes
7   he paid taxes under Internal Revenue Code 66-72 as a
8   responsible person for those entities because they -- the
9   taxes had not been paid?
10      A.   I don't understand the question.  I'm sorry.
11      Q.   Yes, sir.  Did you understand or come to know at
12  some time that those two companies were delinquent on
13  their payroll taxes and that Frank Amodeo acknowledged
14  being a responsible person under the Internal Revenue Code
15  who had the responsibility to pay those taxes?
16      A.   No, I did not know that.
17      Q.   Did you know that he did so through Dan Myers?
18      A.   No, I did not know that.
19      Q.   And did you know that he did that in 2004?
20      A.   I didn't know that he had said he was a
21  responsible party, so no.
22      Q.   Did you know that he was delinquent on the
23  payroll taxes for those companies to the tune of almost a
24  half a million dollars?
25      A.   No.
```

22

```
1       Q.   Did you know that he paid that money before
2   Mirabilis and Presidion got into any issues whatsoever
3   regarding collected payroll taxes?
4       A.   I'm sorry.  Will you repeat that?
5       Q.   Yes, sir.  Did you know that he was having issues
6   with the government over unpaid payroll taxes before
7   Mirabilis started up with Presidion and Professional
8   Benefit Solutions and Paradyme?
9       A.   I knew that he took cases with companies that had
10  payroll tax issues and -- but it was my understanding that
11  he resolved those.
12      Q.   That's what he told you?
13      A.   Yes.
14      Q.   Okay.  So if that wasn't true then he told you a
15  lie?
16      A.   Okay.
17      Q.   Do you know Dan Myers?
18      A.   I do.
19      Q.   Dan Myers is a certified public accountant?
20      A.   Yes.
21      Q.   Dan Myers worked with you at Mirabilis?
22      A.   Yes.
23      Q.   He was in the office every day?
24      A.   Most days.
25      Q.   He was in the office on a daily basis except when
```

23

```
1   he was traveling on business or on vacation?
2       A.   He was in the office regularly, yes.
3       Q.   He didn't work in some remote location, he worked
4   here in Orlando?
5       A.   Yes.
6       Q.   And he worked side by side with Frank?
7       A.   Yes.
8       Q.   And he had powers of attorney for Frank to act
9   for him with the IRS, you knew that, right?
10      A.   I didn't know that.
11      Q.   You didn't know that?  You knew that he had the
12  capability and background to deal with the IRS?
13      A.   It was my understanding that he was the point
14  person dealing with the IRS in that case.
15      Q.   Yes, sir.  And you knew that he knew as a
16  certified public accountant that the legal obligations of
17  companies to collect, report and pay the payroll taxes for
18  employees --
19          MR. SMITH:  Object to the form.
20          MS. HINES:  Excuse me just a second.  And I don't
21  -- I don't mean to interrupt your flow, but I really
22  would prefer that you not ask a question like that, if
23  he knew something when he's already -- I'd rather you
24  ask the question did he know that particular thing,
25  rather than you knew.
```

24

```
1          It's just a form of the question but it's making
2   it sound like you've got information about something
3   he knew and we're here to find out whether he did know
4   or not, if you don't mind.
5          Thank you.
6          MR. KELLER:  Ms. Hines, I do mind.  Your client
7   has signed an affidavit in this case accusing my
8   client of conspiring to commit criminal acts under the
9   Internal Revenue Code.  That's the import of his
10  testimony by affidavit.  He's an adverse witness, I'm
11  entitled to lead him.
12          MS. HINES:  Well, if I may say, the document that
13  he signed speaks for itself.  I'm not in agreement
14  with you that it says what says, but my opinion is not
15  at issue here.
16          Certainly you're entitled to test what he knew
17  with respect to what he put in the affidavit and the
18  circumstances surrounding him coming to the
19  conclusions which he makes reference to in the
20  affidavit, but you just asked a question that made it
21  sound as if Mr. Flynn had knowledge that I'm not
22  certain that he has and I think it was an unfair way
23  to put it, if we need to get down to the mat on it.
24          And so I would really prefer that you not lead
25  him in the way that you are planting words in his
```

25

```
1    mouth, which I believe that question did.
2         MR. KELLER:  I think I'm entitled to lead him and
3    you're entitled to object to the form of any question.
4         MS. HINES:  Okay.  We'll handle it that way.
5    BY MR. KELLER:
6         Q.   And let me reiterate, Mr. Flynn, if I ask you any
7    question that is in any way unclear to you, you don't
8    understand for some reason, please let me know and I'll
9    rephrase it.
10        A.   Okay.
11        Q.   You still keep in touch with Frank Amodeo?
12        A.   I do.
13        Q.   You correspond with him by e-mail?
14        A.   Yes.
15        Q.   You go visit him in prison?
16        A.   Yes.
17        Q.   You help him with his lawsuit?
18        A.   Yes, but very limited.  You know, mailing
19   something for him.
20        Q.   You help him with evidence issues?
21        A.   No, not usually.
22        Q.   You have?
23        A.   I have in the past and that's what I worked on
24   during the wind-down.
25        Q.   During 2007 and 2008 while you were employed by
```

26

```
1    his company, Acme Strategy, you assisted him in preparing
2    to file lawsuits against professionals that he blamed for
3    his predicament with the government, is that fair to say?
4         A.   I assisted him in gathering and preserving
5    evidence.  I didn't prepare any lawsuits.
6         Q.   Right, but you were helping him prepare to sue
7    people?
8         A.   I was helping to preserve the evidence.
9         Q.   During the time you helped him preserve evidence,
10   did you have a computer?
11        A.   Yes.
12        Q.   Did you have a computer before that while you
13   worked for Mirabilis and Common Paymaster?
14        A.   Yes.
15        Q.   By the way, Common Paymaster was a corporation
16   formed for the purpose of providing HR and payroll
17   services to Mirabilis for its employees, is that right?
18        A.   Payroll, HR and benefits.
19        Q.   Right, so that if someone said I worked for
20   Mirabilis, that meant that they got paid by Common
21   Paymaster?
22        A.   Yes.
23        Q.   And they got W-2s or 1099s from Common Paymaster?
24        A.   Yes.
25        Q.   For the work they did on behalf of Mirabilis?
```

27

```
1         A.   Yes.
2         Q.   And Common Paymaster processed their payroll?
3         A.   Yes.
4         Q.   And withheld their payroll taxes?
5         A.   Yes.
6         Q.   Did Common Paymaster pay its payroll taxes?
7         A.   Yes.
8         Q.   Who was the person in charge of ensuring
9    compliance with federal payroll withholding tax laws for
10   Common Paymaster?
11        A.   I was the responsible party for Common Paymaster.
12        Q.   And who was advising Common Paymaster in a
13   professional capacity as an accountant in that function?
14        A.   Jenny Freeman was my CPA for Common Paymaster.
15        Q.   All right.  So you had a different CPA and
16   accountant for Common Paymaster than they had at Mirabilis
17   and all of its related companies?
18        A.   Mirabilis had many accountants.
19        Q.   Yes, sir.
20        A.   And each of the big companies had their own, you
21   know, accountant that was assigned to that project.
22        Q.   Actually they had accounting departments, didn't
23   they?
24        A.   Some that were really big, yes.
25        Q.   Right, but you had -- what was her name, Jenny
```

28

```
1    Freeman?
2         A.   Yes, sir.
3         Q.   She's a CPA?
4         A.   Yes.
5         Q.   Did she work only for Common Paymaster?
6         A.   Originally she worked as a consultant.  When we
7    started Common Paymaster she became the CPA for Common
8    Paymaster and that was her only role.
9         Q.   I'm sorry, originally she worked --
10        A.   She was somebody that came in as a consultant who
11   could work on different projects.  I don't know what she
12   worked on but when we started Common Paymaster she became
13   Common Paymaster's CPA.
14        Q.   Was she the CFO for Common Paymaster?
15        A.   I don't think we had a CFO.
16        Q.   Controller?
17        A.   She handled all of the accounting functions.  We
18   only had one person that handled accounting at Common
19   Paymaster.
20        Q.   Even if she didn't have the titled did she serve
21   the function of being the CFO or controller?
22        A.   She handled all our accounting, including
23   payables, receivables, any bills that we paid, state tax
24   filings, federal tax filings.  She handled all of it.
25        Q.   And were they all in compliance?
```

1    A.   Yes, as far as I know.

2    Q.   And you were the responsible person?

3    A.   Yes.

4    Q.   Did you have signature authority over the bank

5  accounts?

6    A.   Yes.

7    Q.   You signed the checks?

8    A.   Yes.

9    Q.   Did anyone else have signature authority over the

10  Common Paymaster bank accounts?

11    A.   I don't believe so.

12    Q.   Where did you maintain bank accounts?

13    A.   Bank of America I think is the only place that we

14  had a bank account while we were operating.

15    Q.   I'm sorry, I know you just answered this, did you

16  say you don't think anyone else had signature authority

17  over the bank accounts?

18    A.   I don't think they did, no.

19    Q.   Not even Frank?

20    A.   No.

21    Q.   How often do you go to see Frank?

22    A.   Every week or two.

23    Q.   Where is he located, at Coleman?

24    A.   Yes, sir.

25    Q.   How long does it take you to get there, an hour

1  or so?

2    A.   About 45 minutes.

3    Q.   What does he talk to you about?

4    A.   We talk about his life.  He works as a paralegal

5  in the law library there, so he talks about his cases.  We

6  talk about his daughter, his family, his parents.

7    Q.   Do you know his daughter -- I'm sorry.  I didn't

8  mean to interrupt you.  Go ahead.

9    A.   The news that's out, you know, if there's an

10  article in the newspaper about Mirabilis or something

11  going on we'll talk about that or rulings from the Supreme

12  Court on some case that might have some effect on some

13  case he's working on.

14         He's really gotten interested in the law.

15    Q.   Has he expressed to you his thoughts about

16  whether or not he ultimately is going to be able to do

17  anything about his conviction or his sentence?

18    A.   We talk generally about that he has appeals out

19  there.  He's trying.  He hopes to.

20    Q.   Do you know whether there are currently any

21  appeals pending?

22    A.   I don't.  I thought that there was one, but I

23  don't know.  The details, the specifics of it are stuff

24  that I don't understand so --

25    Q.   You know that he was sentenced to 22 and a half

1  years?

2    A.   Yes, sir.

3    Q.   And he went to jail a little more than a year

4  ago?

5    A.   Yes, sir.

6    Q.   Do you think -- from your conversations with him,

7  does he have plans on getting out some time long before

8  that sentence runs it term?

9    A.   He hopes to.

10    Q.   Do you know of any reason to believe that he

11  will?

12    A.   The same reason that any other inmate who is

13  going to file an appeal and hopefully get another chance.

14    Q.   Does he maintain that he's not guilty?

15    A.   Yes.

16    Q.   What does he say to you about that?

17    A.   He says he doesn't think he's guilty.

18    Q.   Why?

19    A.   He says he doesn't think he broke the law.

20         (Thereupon, Todd Berman, Esquire, entered the

21  deposition room.)

22    MS. HINES:  Excuse me just a second.  I'm sorry.

23  I don't know you.

24    MR. NORMAN:  My name is Todd Norman and I am

25  co-counsel with Ms. Vilmos.

1    MS. HINES:  Okay.  Thank you.  I'm Melanie Hines

2  representing the witness.

3    MR. NORMAN:  Nice to meet you.

4    MS. HINES:  Same here.

5    MR. NORMAN:  I don't mean to interrupt, but I

6  always do.

7         I walked in on the stipulation regarding

8  confidential information, and  I just want to get that

9  -- who's requesting this and what's it being requested

10  for?

11    MR. KELLER:  The witness and the witness's

12  counsel because of documents they are producing.

13    MR. NORMAN:  What's being produced that is

14  subject to it?

15    MS. HINES:  Do you want to take a break at this

16  point and discuss this or do you want to discuss it --

17    MR. KELLER:  Yes, we don't need to do this on

18  videotape.

19    MR. NORMAN:  Again, we can shut the videotape

20  off, I just wanted to get it done so we can get

21  whatever needs to be produced today.

22    THE VIDEOGRAPHER:  Okay.  So the time is

23  approximately 10:04 and we're off the record.

24  (Whereupon, the following was had off the video

25  record).

33

```
 1         MR. KELLER: Thre is some personal data, including
 2    Social Security numbers and credit card numbers.
 3         MR. NORMAN: So, we've got Social Security
 4    numbers?
 5         MS. HINES:  Correct.
 6         MR. NORMAN: What else do we have?
 7         MS. HINES:  Tax information.
 8         MR. NORMAN: What tax?
 9         MS. HINES: Federal tax forms.
10         MR. KELLER: His tax returns.
11         MR. NORMAN: Anything else?
12         MS. HINES: Yes. Credit card numbers, health care
13    information, medical records.
14         MR. NORMAN: What do you mean by health care?
15         MS. HINES:  Medical records.  There is
16    information -- because the company over which he had
17    control was a payroll company there are issues --
18    there would be some financial information; 401k, that
19    type of thing, so it's information that is private
20    under the law to the individual and we're all supposed
21    to protect that.
22         MR. NORMAN:  Okay.  Understood. Social Security
23    numbers and credit card numbers, I just suggest that
24    we redact the last four numbers.
25         MS. HINES:  That would be wonderful, except it
```

34

```
 1    would take about six months.
 2         MR. NORMAN:  Well, why don't we just agree to
 3    that?
 4         MS. HINES:  I suggest that we take a look at the
 5    volume of documents. The reason that I proposed this
 6    stipulation is that it would be a very long process to
 7    do exactly what you suggest. We're talking about five
 8    boxes and a lot of them may not be even information
 9    that you need.
10         MR. KELLER: I was just going to say, Todd, I
11    think that once we look at most of the stuff that has
12    that kind of data, I'm not interested in and I doubt
13    that you will be.
14         MR. NORMAN: Are we just going to take that with
15    us today or are we going to attach it to the depo?
16         MR. KELLER: He's got them. We're going to
17    take a break and I'll look through the boxes and see
18    what, if any, of those items I want, and my guess is
19    that the ones with the personal data I'm probably not
20    going to want and I doubt that you will, either.
21         MR. NORMAN: I think that's right, so why don't we
22    plan on this issue?  Why don't we figure out if there
23    is anything confidential he wants, and if he does then
24    we'll work out a stipulation; either just to redact
25    certain information or if it's beyond that we'll just
```

35

```
 1    agree that we can keep it confidential until someone
 2    files a motion and give everyone ten days to file a
 3    motion for protective order.
 4         Does that seem like it works?
 5         MS. HINES:  I thought my idea worked, but, okay,
 6    I can be flexible.
 7         MR. NORMAN:  What we've agreed to is during a
 8    break the records are going to be produced.  Ms.
 9    Vilmos and Mr. Keller will review the records and
10    determine if any of them are necessary for this case.
11    To the extent that they do determine that some of them
12    are necessary we will determine how best to redact
13    them  at that time.  If it's a small volume we may just
14    redact information.  If it's a larger volume we will
15    agree to keep them confidential to Counsel, parties
16    and experts only until such time as a party can file a
17    motion for protective order within ten days, assuming
18    there is an issue.
19         Beyond that, we have agreed that any of his tax
20    returns are to be kept confidential.
21         MS. HINES: The only problem with that, Mr.
22    Norman, is that we're a non-party and so somebody has
23    to remember to notify us. So, that's why if I have the
24    prophylactic document in place in the first place then
25    I don't have to worry about people remembering to
```

36

```
 1    notify me.
 2         MR. NORMAN: I understand. It just makes it
 3    cumbersome to the parties.  There may be nothing that
 4    is confidential today or something that we can redact
 5    by hand and that's why -- if each witness has its own
 6    confidentiality agreement it causes difficulties.
 7    That's why I'm suggesting it.  Let's let Mr. Keller
 8    and Ms. Vilmos go through the documents.  Fair enough?
 9         MS. HINES:  That's acceptable and your name,
10    again?
11         MR. NORMAN:  My name is Todd Norman and I
12    represent Mirabilis.  Thank you so much for your time.
13         (Whereupon, Todd Norman, Esquire, leaves the
14    deposition room)
15         (Whereupon, a recess was had.)
16         THE VIDEOGRAPHER:  Okay.  The time is
17    approximately 10:18 and we're back on the record.
18    BY MR. KELLER:
19     Q.  Mr. Flynn, before you went to work with Frank
20    Amodeo and Mirabilis, you had a long 25 year career in the
21    restaurant and hospitality industry?
22     A.  Yes.
23     Q.  You worked at Ruby Tuesdays?
24     A.  Yes.
25     Q.   You worked at Cracker Barrel?
```

37

1      A.   Yes.

2      Q.   You worked for a company called R&A?

3      A.   Yes.

4      Q.   And is that the same company through which you

5   worked for Boston Market --

6      A.   I'm sorry.

7      Q.   -- as a franchisee?

8      A.   Yeah, they were the Florida franchisee for Boston

9   Market, correct.

10     Q.   So you worked with Boston Market.  And during

11  that time you won some awards?

12     A.   Yes.

13     Q.   You were in the Ruby Tuesday winner circle?

14     A.   Yes.

15     Q.   You were a winner of the Top Gun award with

16  Cracker Barrel?

17     A.   Yes.

18     Q.   That wasn't for flying planes, right?

19     A.   I wish.

20     Q.   You won the summer sales building contest while

21  you were with Boston Market?

22     A.   Yes.

23     Q.   You studied at Florida State University?

24     A.   Yes.

25     Q.   You also attended the University of Florida?

38

1      A.   Yes.

2      Q.   So on one day of the year you're a little

3   schizophrenic about who to root for?

4      A.   No, on the one day a year I root for Florida

5   State.  Every other day I root for both teams.

6      Q.   Okay, you studied computer science at the School

7   of Business?

8      A.   Yes.

9      Q.   You're not a lawyer?

10     A.   No.

11     Q.   As of the time you went to work with Mirabilis

12  you had 25 years of business management experience?

13     A.   Somewhere in that range, yes.

14     Q.   Mostly in restaurant and hospitality?

15     A.   Mostly, yes.

16     Q.   Also in printing?

17     A.   Yes.

18     Q.   And in human resource management industries?

19     A.   Yes.

20     Q.   Meaning companies that provided human resources,

21  services on an outsource basis for other corporations?

22     A.   Yes.  It was running -- handling the human

23  resources part of a company.

24     Q.   Okay.  And in handling human resources one of the

25  areas included in that area is payroll?

39

1      A.   Sometimes, yes.

2      Q.   Benefits?

3      A.   Definitely.

4      Q.   Employee claims?

5      A.   Yes.

6      Q.   Workplace disputes?

7      A.   Yes.

8      Q.   Workers' compensation issues?

9      A.   Sometimes.

10     Q.   Insurance?

11     A.   Health insurance, yes.

12     Q.   Legal compliance?

13     A.   Yes.

14     Q.   Okay.  You had turned unprofitable businesses

15  into top performers?

16     A.   Yes.

17     Q.   You had developed and implemented aggressive and

18  widely successful advertising and marketing campaigns for

19  your companies?

20     A.   Yes.

21     Q.   You built a reputation for building strong teams

22  and motivating employees?

23     A.   Yes.

24     Q.   And then you founded Common Paymaster

25  Corporation?

40

1      A.   Yes.

2      Q.   Which was in the business of providing payroll

3   benefits and human resource management for the employees

4   of Mirabilis and Mirabilis owned companies?

5      A.   Yes.

6      Q.   Why did you form Common Paymaster rather than

7   forming a human resource department within Mirabilis?

8      A.   The companies were -- may have been each their

9   own corporation but because they were commonly owned by

10  Mirabilis you could form a unified, you know, human

11  resource company.

12          So you could pull your resources for benefits and

13  for HR support.

14     Q.   So rather than having 10 employees if you had a

15  100 or 1,000, you could get better rates on insurance?

16     A.   Correct.

17     Q.   You could get better rates on unemployment taxes?

18     A.   Correct.

19     Q.   And you could realize what I think is commonly

20  referred to as economies of scale?

21     A.   Yes.  Or especially not only for those things

22  that you've just stated but for human resource management,

23  you know, handling employee complaints and stuff like

24  that.

25     Q.   Right.  A person in the position of managing

41

1   human resources for 20 people might be able to do the same
2   thing for 100 people?
3       A.   Yes.
4       Q.   And theoretically if you spread that cost over
5   100 employees it's cheaper?
6       A.   Correct.
7       Q.   What companies did Common Paymaster Corporation
8   provide payroll benefits and human resource management
9   for?
10      A.   The Mirabilis owned companies.
11      Q.   Yes, sir.  I want to know what the companies
12  were.
13      A.   There was a ton of them.  There's a list in the
14  document production I gave you of accounts receivable from
15  those companies.
16      Q.   Well, let's see if we can separate some out.
17  Who in your mind were the biggest Mirabilis owned
18  entities?
19      A.   Biggest as far as --
20      Q.   Number of employees, revenue.
21      A.   PEO had the most revenues as far as I know.
22      Q.   What PEO are you talking about?
23      A.   AEM.
24      Q.   Who owned AEM?
25      A.   Mirabilis, as far as I know.

42

1       Q.   And what companies did AEM have human resource
2   control over?
3       A.   They were a PEO company and as I understood it
4   they had 2,000 client companies.
5       Q.   Okay.  Who managed the accounting for AEM?
6       A.   I believe that that was Deborah Cole.
7       Q.   Was she a CPA?
8       A.   I don't know.  I don't remember.
9       Q.   Was she an accountant?
10      A.   She handled their accounting.
11      Q.   Did you understand her to be the CFO?
12      A.   That's what I understood her to be, yes.
13      Q.   Did you understand AEM also to do business as
14  Mirabilis HR?
15      A.   Yes.
16      Q.   All right.  So Mirabilis at least in that
17  instance of AEM owned and controlled a PEO entity?
18      A.   That was my understanding, yes.
19      Q.   And Common Paymaster handled the human resources
20  and payroll benefits for AEM?
21      A.   For AEM's internal employees.
22      Q.   But not for the client companies?
23      A.   Correct.
24      Q.   Okay.  Who were the employees of AEM?
25      A.   If I remember right there was several hundred of

43

1   them.
2       Q.   Did they all work in Orlando?
3       A.   If I remember right there was processing
4   facilities in two places in South Florida.
5       Q.   In Jupiter?
6       A.   Jupiter was one of them and some place in Miami I
7   think was the other.
8       Q.   Was AEM a company that Mirabilis acquired?
9       A.   Are you asking versus they formed it or they
10  bought it?
11      Q.   Correct.
12      A.   I believe I've seen documents that said they
13  acquired it.
14      Q.   Who was the proprietor of AEM before Mirabilis
15  acquired it?
16      A.   I'm not sure but I believe that that information
17  is in those documents I provided to you.
18      Q.   Did it have another name before it was known as
19  AEM?
20      A.   Not that I know of.
21      Q.   Was Luis Ramos also employed with AEM?  L-U-I-S.
22      A.   I've known Luis Ramos from the wind-down.  He
23  handled the accounting for AEM during the wind-down.
24      Q.   Did he work under Deborah Cole?
25      A.   I don't know.

44

1       Q.   Okay.  What if any relationship did AEM have with
2   Presidion or Presidion Solutions?
3       A.   My understanding is that AEM bought the book of
4   business from Presidion Solutions.
5       Q.   Any particular entity under the Presidion or
6   Presidion Solutions umbrella?
7       A.   If you -- the documents that I provided to you,
8   it's pretty confusing and it seems like they changed
9   courses several times.  So I'm not sure exactly which one
10  and if you read different documents it may have come from
11  different companies.
12      Q.   You're familiar with Presidion Corporation?
13      A.   I know that it's a publicly traded company or it
14  was.
15      Q.   Okay.  And the president was Craig Vanderburg?
16      A.   As I understood it, yes.
17      Q.   And general counsel was Jim Baires?
18      A.   As I understood it, yes.
19      Q.   And it owned a company called Presidion
20  Solutions?
21      A.   Yes, as I understood it that was the case.
22      Q.   And at some point in time Mirabilis acquired
23  Presidion Solutions?
24      MR. SMITH:  Object to the form.
25      THE WITNESS:  I don't know that.

45

BY MR. KELLER:

Q. What happened to Presidion Solutions? Who owned that?

A. I don't know but I would suspect it's in the documents I provided to you.

Q. Did Presidion Solutions have subsidiaries?

A. As I understood it, yes, they had.

Q. Including Presidion Solutions VI, also known as Paradyme?

A. I don't know which one was which, but they had multiple companies that they changed the names of sometimes.

Q. Okay. Well, do you remember a company known as Paradyme that became Presidion Solutions VI, and that's a Roman VI, by the way?

A. Sorry. The -- I remember a Paradyme and I don't know that it became Presidion VI, but I'm sure it's in the documents I provided to you.

Q. Do you recall a company known as Professional Benefit Solutions?

A. Yes.

Q. And that became Presidion Solutions VII?

A. I don't know that but I'm sure it's in the documents I provided to you.

Q. Who owned Paradyme?

46

A. As I understood it, Presidion Solutions did.

Q. And who owned PBS?

A. As I understood Presidion Solutions did. They bought PBS from someone.

Q. And Paradyme, they bought it?

A. As far as I know, my understanding that Paradyme was owned by Presidion Solutions before we ever knew about Presidion.

Q. We being Mirabilis?

A. Or anybody, yeah, that I knew of.

Q. All right. But you understood Paradyme and PBS to be subsidiaries of Presidion Solutions?

A. Yes, that's what I understood.

Q. What was the relationship between Mirabilis and Presidion Solutions?

A. I don't know that there was one.

Q. What was the relationship between Amodeo and Presidion Solutions?

A. As I understood it, Presidion Corporation, Presidion Solutions were the clients he was working the tax case on.

Q. So Frank was retained to provide tax advice to Presidion about these companies?

A. Yeah, and I don't know if it's Presidion Solutions or Corporation or both.

47

Q. Okay. You understood the tax advice him to be giving was payroll tax advice?

A. I understand that, yes.

Q. Have you heard of the Sunshine Companies?

A. Yes.

Q. What did you understand them to be?

A. I understood that those were subsidiaries of Presidion Solutions.

Q. Not Presidion Corp.?

A. I understand and I think there's a chart in the documents that I provided to you that explains all that, but I believe that Sunshine was -- I understood that Sunshine was a subsidiary of Solutions and Solutions was a subsidiary of Presidion Corp.

Q. All right. And what did you understand the status of the Sunshine Companies to be when you first heard of them?

A. When I first heard of them they were -- had something to do with Presidion Solutions and that there's a big tax case that Frank had been retained on.

Q. When was that?

A. I learned about it in December of 2004.

Q. What did you learn about it?

A. I learned that they had -- Frank had become the consultant on a big tax case.

48

Q. Let me stop for a moment and ask you to help me out with some e-mail identification.

Do you recall that during the time you were affiliated with Mirabilis there were two Franks that worked there, Frank Amodeo and Frank Hailstones?

A. I think there were more than that. Frank 3, 4 and 5, I think.

Q. Okay. But do you recall specifically that there was an F1 and an F2 frequently referred to in e-mails?

A. Usually, if I remember right, F2 was Frank Hailstones.

Q. Right. And F1 was?

A. Frank Amodeo.

Q. Okay. Because he was the number one guy, wasn't it?

A. He was the first Frank.

Q. Yeah. He was in charge of Mirabilis, wasn't he?

A. During different times periods, yes.

Q. During most of the time you were affiliated with Mirabilis he was the head guy, wasn't he?

A. As I understood it and the direction I got in 2006 they had its own officers and directors.

Q. Who told you that?

A. Officers and directors.

Q. All right. We'll come back to that.

49

1        What did you understand Frank's position to be
2   with Mirabilis when you first started?
3        A.   When Mirabilis first started?
4        Q.   Yes, sir.
5        A.   When I first learned about Mirabilis it was a
6   company that he wanted to get started that was going to
7   buy companies, develop them and share their resources to
8   get better economies of scale.
9        Q.   His idea?
10       A.   As I understood it, yes.
11       Q.   His company?
12       A.   As I understood it, yes.
13       Q.   He owned it?
14       A.   I don't know who owned it.  I've seen conflicting
15  documentation supporting that, but I understood it to be
16  Frank's idea and a company he wanted to get started that
17  eventually he installed a management team for.
18       Q.   Right.  But he was the guy who selected the
19  management team?
20       A.   I don't know that but I would suspect so.
21       Q.   Okay, and you always treated him as the boss,
22  didn't you?
23       A.   Yes.
24       Q.   And he always acted toward you as if he was the
25  boss, didn't he?

50

1        A.   Yes.
2        Q.   And you never had any doubt in your mind
3   regardless of what management teams -- what management
4   team members were in place as to who was calling the
5   shots, did you?
6        A.   Except in 2006.  I understood in 2006 he
7   installed a management team to run it and he was not in
8   charge of it any more.
9        Q.   Did he continue to come to the office every day?
10       A.   He had separate offices from Mirabilis.
11       Q.   Did he come to the office every day?
12       A.   Which office?
13       Q.   An office...
14       A.   Did Frank come to an office every day?
15       Q.   Yes.
16       A.   Most days.
17       Q.   Was it the same office where you worked?
18       A.   No.
19       Q.   Did you continue to get e-mails from him?
20       A.   I don't think I've ever gotten e-mails from him.
21       Q.   You got e-mails from Shane?
22       A.   Shane or --
23       Q.   Or Tessa?
24       A.   -- Tessa, yeah.
25       Q.   I'm sorry.  We were talking over each other.  Let

51

1   me see if I can straighten that out.
2        You got e-mails from Tessa Ivy?
3        A.   Yes.
4        Q.   You got e-mails from Shane Williams?
5        A.   Yes.
6        Q.   You got e-mails from Jay Stallenwork?
7        A.   Yes.
8        Q.   And whenever you got e-mails from those three
9   people did you understand that they were speaking for
10  Frank?
11       A.   Well, I mean, if they said so.
12       Q.   And that was frequently?
13       A.   Yes.
14       Q.   Because Frank didn't like to have -- he didn't
15  like to send e-mails himself.  He would have people
16  working for him do it on his behalf, is that right?
17            MR. SMITH:  Object to the form.
18            THE WITNESS:  I think he set off and he was
19       fairly incompetent with a computer.
20  BY MR. KELLER:
21       Q.   Fairly --
22       A.   Incompetent with a computer.
23       Q.   Let me back up because of the objection.
24            As a general rule when you received instructions
25  from Frank by e-mail, did they come through other people?

52

1        A.   As I said before, I don't think I've ever
2   received instructions by e-mail from Frank, so it would
3   be --
4        Q.   You mean from Frank directly?
5        A.   Correct.  So it would -- any instructions that I
6   would have received from him or any information I would
7   have received from him would have come from someone else.
8        Q.   Okay.
9        A.   Because he didn't generally send e-mails.
10       Q.   All right.  And the people who generally sent
11  e-mails on his behalf were Tessa?
12       A.   Yes.
13       Q.   Jay Stallenwork, sometimes?
14       A.   Sometimes.  At different time periods different
15  ones were responsible for it, but yes.
16       Q.   Shane Williams?
17       A.   Yes.
18       Q.   Others?
19       A.   He had an assistant named Tony Higgins at one
20  point but --
21       Q.   Any others you can think of?
22       A.   None that I can think of.
23       Q.   You said there were two offices.  What was the
24  office that Frank went to?  Where was it?
25       A.   I didn't say there were two offices but I said I

53

```
1    was in a different office than he was.
2            There were offices in the AmSouth building, the
3    SunTrust building and the Wachovia building.
4        Q.   Which one did Frank work at?
5        A.   At different times he worked at the -- at all
6    three.
7        Q.   Okay.  Well, what I'm trying to get at is -- is
8    his involvement with Mirabilis.
9            During all of 2005 was he working daily at
10   Mirabilis?
11       A.   Well, I think that it would be proper to
12   characterize it that Mirabilis is one of the things he
13   worked on daily.
14       Q.   What else did he work on?
15       A.   As I understood it, the Presidion tax case.
16       Q.   What did that have to do with Mirabilis?
17       A.   Nothing that I know of but he was working on the
18   tax case and then forming this new company called
19   Mirabilis which was his vision of corporate cooperatives.
20       Q.   Corporate what?
21       A.   Cooperation.  They would share the resources and
22   eliminate frictional cost of finding and working with
23   people who provide services so --
24       Q.   Eliminate what?
25       A.   The frictional cost of finding and providing
```

54

```
1    services.
2        Q.   Frictional?
3        A.   Yes.
4        Q.   What do you mean by that?
5        A.   If you have a company at Mirabilis who deals with
6    human resources and provides it for all of them, you can
7    provide it for all of them more cheaply than you can if
8    each one had to go get their own human resources.
9            If you had a company that specialized in
10   construction, they could provide construction services for
11   all the company more cheaply than they could out and find
12   their own construction companies.
13       Q.   Okay.  Going back to you with CPC for a minute.
14   Is it okay if I call Common Paymaster CPC, Common
15   Paymaster Corporation?
16       A.   Either one works for me.
17       Q.   Was it referred to as CPC from time to time?
18       A.   It was referred to as both, yeah.
19       Q.   You signed contracts on behalf of Common
20   Paymaster with employees?
21       A.   Yes, sir.
22       Q.   As president of the company?
23       A.   Yes, sir.
24       Q.   Did you sign the contract with yourself both as
25   president and as employee?
```

55

```
1        A.   I don't remember.
2        Q.   Do you remember being listed on your contract
3    both as president and as the employee?
4        A.   I don't remember.
5        Q.   Do you know if there is a signed version of the
6    contract between you and Common Paymaster?
7        A.   I assume there is.  I don't know of any reason
8    there wouldn't be.  But I don't know that.
9        Q.   Who reviewed the contract that you signed on
10   behalf of yourself and as president of Common Paymaster?
11       A.   I don't know.  I had an attorney that worked for
12   Common Paymaster.
13       Q.   Who was that?
14       A.   Matt Loker.
15       Q.   Did he work at Mirabilis every day?
16       A.   For the beginning part of his career that he
17   worked with Common Paymaster he was our corporate counsel
18   for Common Paymaster.
19           Then at some point in 2006 he went to work with
20   Mirabilis.
21       Q.   So during 2005 and 2006 he was in the Mirabilis
22   for Common Paymaster offices on a daily basis?
23       A.   Yes.
24       Q.   And he was one of many attorneys --
25       A.   Actually, can I correct that?  Because I'm not
```

56

```
1    sure when he started.  He didn't start at the beginning of
2    2005 or anything like that, so whenever he started, yes,
3    he was in the offices on a regular basis.
4        Q.   Was he one of the many attorneys who reported to
5    work daily at Mirabilis or Common Paymaster?
6        A.   Yes.
7        Q.   Dan Myers says there were somewhere between 20 to
8    30 attorneys who worked there on a daily basis.  Is that
9    consistent with your recollection?
10       A.   I don't know but it wouldn't surprise me.
11       Q.   Dan Myers said there were some 40 accountants who
12   went to work at Mirabilis every day.  Is that consistent
13   with your recollection?
14       A.   I don't know how many there were but that
15   wouldn't surprise me.
16       Q.   There were a lot?
17       A.   There were a lot.
18       Q.   When you were running restaurants as a member of
19   the management team, do you recall that it was accountants
20   on staff who were responsible for maintaining compliance
21   with federal payroll tax laws?
22       A.   In the restaurant companies that I worked for the
23   payroll entering was an operations function, you know,
24   entering the payroll and turning it in.
25       Q.   Right.
```

57

1    A.    And the -- all of the compliance stuff was
2 something that was handled at the headquarters, centrally.
3    Q.    In an administration and accounting department?
4    A.    An administration department.  I assume it was
5 accounting, but I don't know that.
6    Q.    Where accountants worked?
7    A.    I assume, yes.
8    Q.    A CFO was employed?
9    A.    All the companies that I worked for had CFOs.
10    Q.    And you as a member of the management team relied
11 on the CFOs to ensure the tax laws were complied with?
12    A.    Yes.
13    Q.    You didn't look to outside general counsel
14 handling litigation matters, did you?
15    A.    We had internal and external counsel for
16 litigation matters.
17    Q.    Right.  But you didn't rely on them for payroll
18 tax compliance issues?
19    A.    I never knew of any so if there was one I --
20         MS. HINES:  Did you want to finish that answer?
21         THE WITNESS:  If there was payroll tax issues I
22    would assume that they would have, you know, legal
23    representation somehow.
24 BY MR. KELLER:
25    Q.    What do you mean by if there were issues?  What

58

1 kind of issues are you talking about?
2    A.    If they were investigated for, did they pay their
3 payroll taxes or report them properly, I would assume they
4 would have had legal counsel for that.
5    Q.    Did that ever happen --
6    A.    Not that I know of.
7    Q.    -- in any of the times --
8    A.    Sorry.
9    Q.    -- you were employed in the restaurant industry?
10    A.    Not that I know of.
11    Q.    So as I understand it, while you're speculating
12 that if there was a compliance issue a lawyer might have
13 gotten involved, that never happened?
14    A.    Not that I know of.
15    Q.    And that's because, as far as you knew, all of
16 the payroll tax compliance issues at the companies where
17 you worked before Mirabilis were handled by accounting
18 departments competent to do that sort of work?
19    A.    Administrative departments, yes.  I'm assuming
20 that accounting did it, but I don't know that for a fact.
21    Q.    Okay.  I want to make sure that we're on the same
22 page.  When you say administrative departments, you don't
23 mean to distinguish that as a department that doesn't have
24 an accountant in it, do you?
25    A.    No, I assume there was accountants there.

59

1    Q.    Right.  So when you say administration and I say
2 accounting, we're basically talking about the same thing,
3 aren't we, although maybe administration is a little
4 broader?
5    A.    That's what I would say.
6    Q.    Okay.  So as you understood it at the restaurant
7 companies you worked with, there were administration
8 department within which there were accounting departments?
9    A.    That was my understanding.
10    Q.    And it was your understanding always that the
11 accounting department was responsible for reporting
12 payroll tax compliance and for making sure the payroll
13 taxes were collected and paid to the government?
14    A.    My understanding was that administration was
15 responsible for that.  I don't know that it was the
16 accounting department, but everything is either operations
17 or administration overhead, so it wasn't something that I
18 was directly involved in.
19    Q.    It wasn't operations, it was administration?
20    A.    Exactly.
21    Q.    And within administration you did understand that
22 there were accountants?
23    A.    I did.
24    Q.    And you relied on those people to make sure that
25 issues relating to withholding payroll taxes and paying

60

1 them to the government and reporting them accurately was
2 all taken care of?
3    A.    Yes.
4    Q.    And during the whole time that you were in these
5 other companies, Ruby Tuesdays, Cracker Barrel -- what was
6 the other one?
7    A.    R&A, Boston Market.
8    Q.    Boston Market, you were never aware of any issue
9 arising with respect to paying payroll taxes to the
10 government, were you?
11    A.    No.
12    Q.    And during that entire time you never knew of any
13 instance whatsoever where a lawyer got involved?
14    A.    Where a lawyer got involved in what?
15    Q.    In any payroll tax issues.
16    A.    I wasn't involved -- aware of any payroll tax
17 issues.
18    Q.    Okay.  But that wasn't my question.  My question
19 was during the entire time of your employment with Cracker
20 Barrel, Ruby Tuesdays and why am I having trouble --
21    A.    Boston Market.
22    Q.    -- and Boston Market, you were never aware one
23 time of any lawyers getting involved with payroll tax
24 issues --
25    A.    Yes.

61

1   Q.   -- as far as you knew?

2   A.   No.

3   Q.   As president of Common Paymaster who did you

4   report to?

5   A.   For different functions I would report to

6   accounting which at one point was Paul Glover.

7   Q.   He was a CPA?

8   A.   Yes.

9   Q.   And the CFO of the company?

10  A.   Yes.

11  Q.   What period of time were you reporting to Paul

12  Glover.

13  A.   A short time in the first quarter.

14  Q.   First quarter of?

15  A.   2006, I'm sorry.

16       I reported to different people on different

17  functions because we covered so many facets of people's

18  employment.

19       There was benefits which Laurie Andrea handled

20  the benefits.  The CFO of Mirabilis handled the accounting

21  so anything to do with accounting would be there

22  Q.   During the time you were affiliated with CPC and

23  Mirabilis, there were several CFOs at Mirabilis, is that

24  right?

25  A.   Yes.

62

1   Q.   One of them was Dan Myers?

2   A.   I don't know that he was, but I believe you if

3   you tell me and if it's the documents.

4   Q.   Well, he testified that he was for a time.

5   A.   Okay.

6   Q.   He was also a senior vice president of the

7   company for a time?

8   A.   He testified that he was in 2006?

9   Q.   I don't recall.

10  A.   Okay.

11  Q.   I'm being honest with you.  I'm just not sure.

12  A.   Okay.

13  Q.   But he did say that at one time he was the CFO.

14  A.   Okay.

15  Q.   Do you have any reason to doubt that?

16  A.   I don't.

17  Q.   Did it appear to you that at some point in time

18  he was acting as the CFO of Mirabilis?

19  A.   For all the times I know Dan was involved in

20  accounting issues with the company, so it would not

21  surprise me that he would be -- he was CFO at one point.

22  Q.   And at some point in time Paul Glover was also

23  the CFO?

24  A.   That was my understanding, yes.

25  Q.   And at one point in time I think towards the end

63

1   Bill Walsh was the CFO?

2   A.   Yes.

3   Q.   Any other people you can identify who acted as

4   the CFO for Mirabilis?

5   A.   I don't recall who -- I know there was a period

6   when Paul was not the CFO and Bill Walsh hadn't come on

7   yet.  I don't know who was the CFO during that time.

8   Q.   Okay.  You also said earlier I think that Dan

9   Myers was the point person on taxes.  Do you remember

10  that?

11  A.   As I understood it, he was the person

12  communicating with the IRS.

13  Q.   What was he communicating -- what did you

14  understand he was communicating with the IRS about?

15  A.   I understood that there was a plan to

16  rehabilitate Presidion's book of business and sell it to a

17  public entity and repay the taxes and he was the one

18  communicating progress on that plan with that IRS.

19  Q.   Who else was involved in that effort with

20  communicating with the IRS besides Dan Myers?

21  A.   From documents that I've seen Jose Marrero

22  communicated with them at one point.

23  Q.   Did you know him to be a former IRS CIE person?

24  A.   I do now, yes.  I do now, yes.

25  Q.   What do you mean you do now?

64

1   A.   I've seen the e-mails that say that.

2   Q.   Did you know that at the time?

3   A.   I don't recall when I learned it but I don't

4   think I knew it.  I wasn't involved in it at the time.

5   Q.   Who else were you advised was dealing with the

6   IRS on this tax issue?

7   A.   I understood that Roy Holtz or someone in his

8   office, Sharmila Khanorkar, was responsible for dealing

9   with IRS communication.

10       MS. HINES:  For the court reporter, do you happen

11  to know the spelling of that person's name?

12  BY MR. KELLER:

13  Q.   I'll try.

14       MS. HINES:  Okay.

15  BY MR. KELLER:

16  Q.   Go ahead if you know.

17  A.   I think it's K-H-A-N-O-R-K-A-R.

18  Q.   I think that's right.

19  A.   Is that right?

20  Q.   Yeah, and Sharmila is S-H-A-R-M-I-L-A.

21  A.   Is it two Ls?

22  Q.   Does that sound right?  No, I think it's just

23  one.

24  A.   Okay.  All right.

25  Q.   All right.  Now, what is it you understood the

65

tax issue to be that Dan Myers was spearheading with the
IRS along with these other people?

A. I understood that there was a plan to
rehabilitate Presidion, delay paying some of the payroll
taxes to clean up the company and make it presentable to
sell to the public entity and in the process repay the
payroll taxes and make a profit.

Q. Did you understand this to be the Sunshine
Company's tax issue?

A. I understood that in the beginning -- well, I
wasn't aware of what -- exactly what the plan was in the
beginning during the Sunshine Company's time frame, but
that was my understanding that there was a Sunshine tax
liability and then a PDS tax liability.

Q. Let's just confine ourselves to Sunshine for a
moment if we could.

A. Okay.

Q. You understood that Sunshine was owned in some
form or fashion by the Presidion Corporation or Presidion
Solutions?

A. That was my understanding.

Q. You understood that Frank was acquiring the
Sunshine Companies from Presidion?

A. I understand that he acquired the Sunshine
Companies as part of whatever that plan was.

66

Q. And you knew that he acquired them as of the end
of 2004?

A. The documents I've seen say December 31, 2004.

Q. And you know that that deal was actually
negotiated and worked out and reported sometime before
that closing date of 12-31-04?

A. I have seen that there were meetings late --
earlier in December, yes.

Q. And, in fact, Presidion reporting that
transaction to the SEC on December 8, do you recall that?

A. I didn't know that.

Q. Do you have any reason to believe that's not
true?

A. No.

Q. All right. Now, did you understand that the
Sunshine Companies at the time Frank acquired had certain
unpaid delinquent tax obligations?

A. I understand that.

Q. What did you understand Frank's plan to be for
the Sunshine Companies once he acquired them?

A. As I understood it, it was just to close them
down.

Q. Yes, sir. And who told you that?

A. I've seen it in the documents, in the process of
the wind-down we've discussed it, you know, as we go

67

through and find different documents and put the whole
picture together and discussed it.

Q. Did Frank tell you that?

A. In the process of the wind-down and gathering
documents, what is there, I explained it all.

Q. So your understanding today as you sit here, both
from what you learned at the time and what you learned
during the wind-down, looking at documents and speaking to
Frank, was that he was going to acquire the Sunshine
Companies along with the tax liabilities, negotiate with
the IRS and shut the companies down?

A. Correct.

Q. Did you also understand that part of the plan was
to consider taking the Sunshine Companies into bankruptcy
court if he couldn't resolve the creditor problems,
including the IRS tax issues?

A. I understood that there was a -- you know, from
seeing documents now, seeing e-mails that there was a
backup plan for bankruptcy, but I didn't know if it was
for Sunshine or for PBS, Presidion. I don't know exactly
how the bankruptcy plan related.

Q. Let's put PBS to the side for a moment and just
focus on Sunshine Companies.

Do you recall that at the end of 2004 and into
early 2005 one of the lawyers involved in these

68

discussions was Hans Beyer?

A. I know that he was involved somehow now. I
didn't at the time.

Q. Do you know that he's a bankruptcy lawyer?

A. Yes. Oh, yes.

Q. Do you know that he assisted in preparing some
bankruptcy schedules?

A. I don't think I knew that.

Q. Do you know that the alternative --

A. I'm sorry, can I --

Q. Yes.

A. -- go back to that?

Related to the Presidion case you mean, or to the
Sunshine Companies?

Q. Sunshine Companies.

A. Yeah, I don't think I knew that he had prepared
filings for them.

Q. Okay. In any event, you knew him to be a
bankruptcy lawyer consulting with Frank on these tax
issues for distressed companies?

MR. SMITH: Object to form.

BY MR. KELLER:

Q. Let me rephrase that. Thank you, you're right.
Bad question.

Did you understand Hans Beyer to be a lawyer who

69

```
1    was consulting with Frank with respect to his business
2    plan to acquire distressed entities?
3         A.   My understanding of Hans Beyer was that he was
4    the bankruptcy lawyer on distressed entities that might
5    either go into bankruptcy or did go into bankruptcy.
6         Q.   Right.  And I think that's what I asked you.
7              He was a bankruptcy lawyer retained to consult
8    with Frank on potential bankruptcy issues for companies he
9    was acquiring?
10        A.   I understood him to be the bankruptcy attorney
11   for those cases.
12        Q.   Right.
13        A.   So if they got fired.  He wasn't hired to consult
14   with Frank on companies that might go into bankruptcy.  He
15   was hired to be the bankruptcy attorney for those
16   companies.
17        Q.   Well, did any of them go into bankruptcy?
18        A.   There were some bankruptcies, yeah.
19        Q.   Okay.
20        A.   The Sunshine Companies I don't -- not that I know
21   of.
22        Q.   But in any event, you knew him to be a bankruptcy
23   lawyer?
24        A.   I did.
25        Q.   You knew Frank hired him for bankruptcy counsel
```

70

```
1    advice?
2         A.   I did.
3         Q.   And you knew that that was one of the
4    considerations that Frank looked at for these distressed
5    companies he was acquiring?
6         A.   Yes.
7         Q.   And one of the options he considered if he was
8    unable to work out some deal with creditors?
9         A.   Yes.  Can I comment?  As I understood it -- the
10   point of it was to try and resolve the problem outside of
11   bankruptcy.
12        Q.   Right.
13        A.   Where it costs less, but then to handle it
14   exactly as it would have been in a bankruptcy.
15        Q.   Right.  And Hans was brought on to help with that
16   process?
17        A.   Exactly.
18        Q.   Okay.  Now, do you know whether Frank continued
19   to operate the Sunshine Companies after -- on or after
20   January 1, 2005?
21        A.   I don't believe so.
22        Q.   Is there anything else you can tell me that you
23   know about what you understand to be the elements of the
24   Sunshine Companies' plan?
25        A.   You mean more specifics on the wind-down or --
```

71

```
1         Q.   I think we've established that the Sunshine
2    Companies' plan, as you understand it, even today, from
3    Frank, from documents and from what you knew at the time,
4    was for Frank to acquire the Sunshine Companies, shut them
5    down, negotiate with the IRS and creditors and try and
6    make a profit.
7         A.   Right.
8         Q.   Did you understand that he acquired the Sunshine
9    Companies through an entity called Wellington Capital?
10        A.   That's my understanding, yes.
11        Q.   And that was a wholly owned company of Frank
12   Amodeo?
13        A.   That's my understanding, yes.
14        Q.   All right.  Do you know who handled the
15   transaction involving Wellington's acquisition of the
16   Sunshine Companies?
17        A.   The attorney?  I don't know who the attorney was.
18        Q.   Let me digress for a minute and ask you about
19   someone else.
20             We talked I think quite a bit about some of the
21   accountants who worked at Mirabilis.
22        A.   I'm sorry, can you repeat the last part,
23   accountants that worked --
24        Q.   That worked at Mirabilis.
25        A.   At Mirabilis, okay.
```

72

```
1         Q.   There was also a fellow by the name of Jim
2    Sadrianna.  Do you remember him?
3         A.   I do.
4         Q.   Jim was the president of Mirabilis.
5         A.   I believe he was at some point.
6         Q.   All right.  Jim is also an accountant?
7         A.   A CPA, as I understand it.
8         Q.   And also a licensed CPA in Florida.
9         A.   Okay.
10        Q.   Also a licensed CPA in New York.
11        A.   I didn't know that, but okay.
12        Q.   Also a lawyer admitted to practice law in the
13   State of New York.
14        A.   I understand that he's a lawyer also, yes.
15        Q.   Okay.  So you knew him to be at one time the
16   president of Mirabilis?
17        A.   I understand that he was the president at one
18   point, yes.
19        Q.   A CPA?
20        A.   Yes.
21        Q.   And a lawyer?
22        A.   Yes.
23        Q.   Did you understand him to be intimately involved
24   with the Mirabilis strategy of acquiring other companies?
25        A.   I believe that his role was working with
```

73

1  acquisitions and making sure the paperwork was done right.

2      Q.   You perceived him to be a competent businessman?

3      A.   Yes.

4      Q.   With advanced professional degrees?

5      A.   Yes.

6      Q.   With substantial knowledge about taxes, law and

7  compliance issues?

8      A.   I understood that he had -- he was very competent

9  in business law.

10     Q.   And business law to you as a restaurant and

11 hospitality management person and a human resource

12 management person would include payroll tax compliance

13 issues, wouldn't it?

14     A.   I always knew Jim to be more of an acquisitions

15 kind of specialist.  He was good at contracts and good at

16 negotiating deals and making sure all the Is were dotted

17 and the Ts were crossed.  That was my understanding of

18 what his role was, because he was good at that.  He was

19 very anal retentive about that stuff.

20     Q.   He was anal retentive meaning --

21     A.   About making sure that the contracts were done

22 right and I understood that's why that was his role.

23     Q.   Meaning he was a little compulsive like most

24 lawyers?

25     A.   Okay.

74

1      Q.   Meaning he paid attention to details?

2      A.   Yes.

3      Q.   And you certainly never perceived him to be an

4  unsophisticated person without worldly knowledge about the

5  operation of a business?

6      A.   I always think of Jim Sadrianna as being

7  competent.

8      Q.   And while he may not have been involved in

9  responsible at Mirabilis for the accounting department

10 itself, you understood him to be a licensed CPA?

11     A.   I understood he was a CPA.

12     Q.   Although you didn't realize he had licenses in

13 two states?

14     A.   No.

15     Q.   I started to ask you before and I think we got

16 sidetracked about who you reported to.

17          When you were president of -- when did you become

18 president of Common Paymaster?

19     A.   When I formed it at the end of August in 2005.

20     Q.   Who did you report to in August 2005 through the

21 end of that year?

22     A.   It was in a formative state.  We didn't have any

23 employees right at the beginning so typically I reported

24 to Frank during that time period.

25     Q.   Okay.  And as you were forming the corporation

75

1  and getting it up and running, you reported to Frank?

2      A.   Yes.

3      Q.   Through Tessa or Shane, typically?

4      A.   Typically.

5      Q.   Or in person?

6      A.   Or in person.

7      Q.   Or over the telephone?

8      A.   Yes.

9      Q.   You saw him essentially on a daily basis?

10     A.   Yes.

11     Q.   He had a big office?

12     A.   I believe at that time yes, he had a big office

13 at AmSouth.

14     Q.   Did you work in the same office with him at that

15 time?

16     A.   No.

17     Q.   You were working in which building?

18     A.   Wachovia.

19     Q.   And he was working in?

20     A.   AmSouth at that time, I believe.

21     Q.   How far were those offices from each other?

22     A.   Right down the street.

23     Q.   Could you walk?

24     A.   Usually I did.

25     Q.   And even though you were in different offices did

76

1  you see him essentially every day?

2      A.   Usually.  We were pretty small at that time so

3  usually, yes.

4      Q.   And then in 2006 did something change?

5      A.   In 2006 I installed a management team.  My

6  reporting went more to that group of people than to Frank.

7      Q.   So who is it that you've been describing as the

8  management team?

9      A.   Frank Hailstones.

10     Q.   He was the president of Mirabilis?

11     A.   Mirabilis, yes.

12     Q.   Let's talk about Frank for a minute.  Frank is a

13 chartered accountant from the United Kingdom?

14     A.   I didn't know that.

15     Q.   Speaks with a British accent?

16     A.   Definitely he's British, yes.

17     Q.   Okay.

18     A.   I just thought he was a chartered accountant.

19     Q.   He used to work at PriceWaterhouseCoopers?

20     A.   That seems right, yes.

21     Q.   And he is the UK or European equivalent of a CPA?

22     A.   Okay.

23     Q.   Did you understand that?

24     A.   I did not understand that, no.

25     Q.   Did you understand him to be a sophisticated

77

```
1   businessman?
2         A.   He put himself out to be and seemed to be, yes.
3         Q.   Seemed to be competent to you?
4         A.   Yes.
5         Q.   Seemed to understand how to run a business?
6         A.   Yes.  What he talked about a lot was business
7   process.
8         Q.   Okay.  And who was the chairman of Mirabilis?
9         A.   In 2006 Laurie Holtz.
10        Q.   You understood him to be a CPA?
11        A.   I understood him to be the grandfather of
12   forensic accounting.
13        Q.   In Florida?
14        A.   I've heard people describe him as that.
15        Q.   He was with an accounting firm known as Rachlin,
16   Cohen & Holtz?
17        A.   Yes, sir.
18        Q.   And did you report to the president and the
19   chairman of Mirabilis?
20        A.   I did not report to the chairman.  I reported to
21   the president.
22        Q.   How often did you report to him?
23        A.   In 2006 they began having weekly operations
24   meetings so we'd go to those meetings with the various
25   heads of the operations groups.
```

78

```
1         Q.   Who would attend those weekly meetings?
2         A.   Paul Glover, Frank Hailstones, some people from
3   the accounting department.
4         Q.   Who?  Dan Myers?
5         A.   Sometimes.  I'm blanking on one of the guys'
6   names that came to all of them.
7         Q.   Stanley?
8         A.   Stanley came sometimes --
9         Q.   But that's not the one --
10        A.   -- but I believe it was later in 2006.  That's
11   not who I was thinking of, no.
12        Q.   Fernando --
13        A.   Kevin Leonard.
14        Q.   Kevin Leonard.  He's an accountant?
15        A.   Yes.  I don't know if he's a CPA.
16        Q.   Mike Stanley, is he an accountant?
17        A.   My understanding is he's a CPA.
18        Q.   Okay.  Who else attended those meetings?
19        A.   I don't remember.  There are minutes from them,
20   you know, somewhere in those documents.
21        Q.   Did Frank come?
22        A.   I don't --
23        Q.   Frank Amodeo.
24        A.   I don't remember Frank attending the operations
25   meetings.
```

79

```
1         MR. KELLER:  Excuse me for a minute.
2   BY MR. KELLER:
3         Q.   Anyone else you can remember attending those
4   weekly meetings?
5         A.   Nobody specifically.
6         Q.   What did you discuss at those weekly meetings?
7         A.   Regular weekly issues of operating a business.
8   From my perspective it was what's going on with the human
9   resources, with the projects we're working on, with new
10   companies that are being integrated into our human
11   resources, some software updates.
12        Just regular operations kind of stuff.  What is
13   the progress and -- of the business operation.
14        Q.   Did you discuss finances?
15        A.   We would discuss -- can you be more specific?
16        Q.   Did you discuss the financial status of the
17   company; income, expenses --
18        A.   Usually not, no.
19        Q.   -- profits, losses?
20        A.   Usually not, not.
21        Q.   You started to say which company.  I'm talking
22   about Mirabilis.  What company --
23        A.   Oh, okay.
24        Q.   -- are we talking about that you were having
25   weekly management meetings on?
```

80

```
1         A.   Well, I represent Common Paymaster so that's --
2         Q.   I understand.  But these were Mirabilis meetings,
3   weren't they?
4         A.   They were Mirabilis operational meetings and I
5   was there representing Common Paymaster.
6         Q.   As one of the arms of Mirabilis?
7         A.   As the human resource, payroll and benefits
8   provider for Mirabilis, yes.
9         Q.   Right.  I know I asked you this before; did you
10   tell me that Mirabilis owned Common Paymaster?
11        A.   Yes.
12        Q.   One hundred percent?
13        A.   Yes.
14        Q.   Who did you understand owned Mirabilis?
15        A.   I understood that there were a large number of
16   shareholders.
17        Q.   Who did you understand to have the voting control
18   over the stock in Mirabilis?
19        A.   I don't know.  There's a shareholders agreement
20   which I believe is in the documents I provided to you that
21   explains that.
22        Q.   During the time you were attending those weekly
23   management meetings, was Frank Amodeo discussed at those
24   meetings?
25        A.   Usually what was discussed at those meetings was
```

81

```
1    just operational issues.  It didn't have to do with the
2    overall P&L of the company or Frank Amodeo.
3         It was just purely operations issues.  We have
4    new companies coming on, we have to integrate them in
5    here, how is the progress coming along with this group.
6    There is a construction group.
7         Q.   Who determined what new companies were acquired?
8         A.   As I understood it there was an acquisitions
9    group that reviewed all companies coming in.  It wasn't
10   me.
11        Q.   You weren't involved in that?
12        A.   I was not involved in picking companies.
13        Q.   And I take it you didn't know where the money was
14   coming from for those acquisitions?
15        A.   Mirabilis I understood.
16        Q.   Well, what did you understand the source of
17   Mirabilis funding to be?
18        A.   I understand now that it was -- that payroll
19   taxes that were collected were being used to operate
20   Mirabilis.
21        Q.   Right.  But what did you understand at the time?
22        A.   At the time I understood that Mirabilis had
23   money.  I mean, they had companies and businesses.
24        Q.   Okay.  You understood Mirabilis to be a
25   successful operation?
```

82

```
1         A.   Yes.
2         Q.   A holding company?
3         A.   Yes.
4         Q.   That owned other operating companies?
5         A.   Yes.
6         Q.   That generated revenue?
7         A.   Yes.
8         Q.   And presumably profits?
9         A.   Yes.
10        Q.   That's what you were told?
11        A.   Correct.
12        Q.   And those profits were used to acquire new
13   companies to bring under the Mirabilis umbrella?
14        A.   I don't know where the source of the money came
15   from for that but I understood that Mirabilis was a
16   business and I assumed it was making money for its
17   acquisitions.
18        Q.   And you understood that even if it didn't have
19   sufficient cash flow or profits to acquire these other
20   companies that as a successful company it had access to
21   capital, lenders, investors?
22        A.   I don't know that but --
23        Q.   Well, what did Frank Amodeo tell you about all
24   that?
25        A.   I don't believe he told me anything about all
```

83

```
1    that.
2         Q.   Did Frank ever tell you it was all his company
3    and all his money?
4         A.   That Mirabilis was all his company and all his
5    money?
6         Q.   Yes.
7         A.   I know that during the wind-down he said that
8    Acme had a security position, that it had loaned money to
9    Mirabilis and that's how he took back the company, was
10   with that security position.
11        Q.   Right.  So he essentially controlled Mirabilis
12   through Acme which he owned 100 percent?
13        A.   Acme owned 100 percent?
14        Q.   He owned Acme 100 percent.
15        A.   I understood that he owned Acme 100 percent and I
16   don't know if he controlled Mirabilis or not.
17        Q.   And Acme was a senior secured lender, as he
18   expressed it to you, right?
19        A.   That he had loaned money to Mirabilis, yes.
20        Q.   Right.  And he had a security interest?
21        A.   Yes.
22        Q.   And so if Mirabilis didn't pay him back, he had
23   the right to control it?
24        A.   Yes.
25        Q.   Okay.  Did he tell you how much money he loaned
```

84

```
1    to Mirabilis?
2         A.   I don't remember how much it was.
3         Q.   Did he tell you where he got the money to loan to
4    Mirabilis through Acme?
5         A.   I understand now that it's from unpaid payroll
6    taxes.
7         Q.   Okay, he never told you that, though, did he?
8         A.   No.
9         Q.   So let me make sure I understand this.  You know
10   that Frank's in jail?
11        A.   Yes.
12        Q.   You know it's because he pled guilty?
13        A.   Yes.
14        Q.   To stealing almost $200 million of payroll taxes?
15        A.   I know he pled guilty to a variety of things,
16   yes.
17        Q.   Okay.  You know that he admitted that he
18   controlled Mirabilis?
19        A.   I didn't know that, but --
20        Q.   You know that he admitted he controlled a company
21   that owned PEOs?
22        A.   I don't know that specifically.
23        Q.   And you know that he admitted that the money to
24   run Mirabilis came from stolen payroll tax funds?
25        A.   Say that again.
```

85

```
1     Q.   You know that he admitted that the money he used
2   to run Mirabilis came from stolen payroll tax funds,
3   payroll taxes that were collected and not paid to the
4   government?
5     A.   I don't know that that's what he admitted to but
6   I understood that that's what happened.
7     Q.   Right.  During the time you worked with him on a
8   daily basis in '05 and even into '06 -- by the way, in '06
9   you continued to see him, didn't you?
10    A.   Yes.
11    Q.   On a daily basis or nearly daily?
12    A.   It was -- I would probably see him a couple times
13  a week.
14    Q.   And toward the middle and end of '06 was it even
15  more often?
16    A.   Middle and end of '06 was about the same.
17    Q.   At least several times a week throughout the
18  entirety of 2006?
19    A.   At least a couple times a week, yes.
20    Q.   And are you telling us that he never told you the
21  way he was operating this business was by taking unpaid
22  payroll taxes and funneling from PEO client companies and
23  funneling them into Mirabilis?
24    A.   I understood that sometime in -- in 2006 I
25  learned that he had been putting some of that money into
```

86

```
1   -- at least they were saying that he put some of that
2   money into Mirabilis, which I didn't understand up to that
3   point.
4     Q.   How did you -- well, let me back up.  I started
5   by asking you about what Frank told you and I want to
6   focus on that.
7          Did Frank ever tell you in 2005 that he was
8   operating the Sunshine Companies and taking collected
9   payroll taxes and not paying them to the government and
10  using those to operate companies?
11    A.   I didn't understand that he was -- I understood
12  that the Sunshine Companies closed.
13    Q.   Right.  He never told you that he continued to
14  operate them?
15    A.   I didn't understand.
16    Q.   He never told you that?
17    A.   No.
18    Q.   And he never told you that in the course of
19  operating the Sunshine Companies into 2005 that he
20  actually was utilizing collected payroll taxes to operate
21  companies.  He didn't tell you that, did he?
22    A.   No.
23    Q.   At some point in time -- strike that.
24          Did he ever tell you at any time before the end
25  of 2006 that he was using collected payroll tax funds to
```

87

```
1   funnel money into Mirabilis to operate it?
2     A.   I don't believe that Frank told me that.
3     Q.   Okay.  How did you first learn that Mirabilis was
4   being operated through the use of collected but unpaid
5   payroll taxes?
6     A.   Somewhere in the summer of 2006 when the Grand
7   Jury --
8          MS. HINES:  Excuse me just a minute.
9          MR. KELLER:  Yes, ma'am.
10         MS. HINES:  We need to consult.
11         THE VIDEOGRAPHER:  The time is 11:18 and we're
12  off the record.
13         (Whereupon, a recess was had.)
14         THE VIDEOGRAPHER:  The time is approximately
15  11:32 and we're back on the record.
16  BY MR. KELLER:
17    Q.   You can go ahead and finish your answer.
18    A.   Can you repeat the question?  I'm sorry.
19         (Whereupon, a portion of the record was read back
20  by the reporter as above recorded.)
21         THE WITNESS:  Somewhere in the summer of 2006
22  there were -- I learned about it somewhere in that
23  time frame, but there was  Grand Jury subpoenas for
24  the clients of AEM for their payroll records.  And
25  they began sending it in and going, what the heck is
```

88

```
1   all this, and then there was a lot of questions, you
2   know, where is all this, why are they doing this and
3   it became discussed that there were lots of unpaid
4   payroll taxes and that -- I'm not sure how I learned
5   it.  It may have -- Frank may have told me, but I'm
6   not sure how I learned about it, but -- and there was
7   a mock deposition at the end of it that discussed some
8   payroll taxes related to explaining why all that had
9   happened.
10  BY MR. KELLER:
11    Q.   When you learned about this in the summer of
12  2006, were you told by anyone that the collection and
13  failure to pay payroll taxes was still ongoing at that
14  time or were you told that it had stopped?
15    A.   I wasn't told either thing.  I assumed that it
16  had stopped.
17    Q.   Why did you assume it had stopped?
18    A.   It wasn't my -- it wasn't my area of
19  responsibility.
20    Q.   Well, I'm not sure that's responsive to the
21  question.  I understand that it wasn't your area of
22  responsibility, but what was it that lead you to believe
23  it was stopped?
24    A.   I don't know that it was.  I --
25    Q.   Did you assume when you learned that there was an
```

**89**

1  issue that people weren't going to continue to violate the
2  law?
3      A.   If they were violating I would assume that if
4  there was an issue they would certainly have stopped at
5  that point.
6      Q.   And you certainly knew in the summer of 2006 that
7  it was illegal to take payroll taxes and withhold them
8  from your employees and not pay them over to the
9  government?
10     A.   As I understood it, it was a civil matter.
11     Q.   Where did you get that understanding?
12     A.   That's the way it was generally discussed.
13     Q.   By whom?
14     A.   By almost anyone that was talking about the plan.
15     Q.   Well, you said you understood it was a civil
16  matter.  In other words, you knew it was wrong, but you
17  didn't know it was criminal?
18     A.   I understood that it was -- I understood that it
19  was not criminal.
20     Q.   But you knew it was wrong?
21     A.   I knew it was a civil matter.
22     Q.   You knew it was wrong?
23     A.   I knew it was a civil matter and that there were
24  penalties and interest related to it and there was
25  responsible parties for it.

**90**

1      Q.   You knew that there were laws that required the
2  payment of payroll taxes promptly to the government upon
3  being withheld from employee paychecks?
4      A.   I knew that there were laws that governed that,
5  yes.
6      Q.   And you knew that long before you went to work
7  with Mirabilis and Frank Amodeo, didn't you?
8      A.   I knew that -- yes, I knew there were laws about
9  paying payroll taxes.
10     Q.   Because -- because if nothing else it's common
11  sense?
12     A.   Yes.
13     Q.   It's common sense, isn't it?
14     A.   I knew there was laws to pay payroll taxes.
15     Q.   You knew you can't steal money from the federal
16  government?
17     A.   I -- yes.
18     Q.   Okay.  And you don't have to be, to quote Mr.
19  Amodeo's lawyer in his criminal proceeding, you don't have
20  to be a genius, you don't have to be the world's leading
21  forensic accountant and you don't have to be a lawyer to
22  know that there are rules that require when you collect
23  payroll taxes you pay them to the government, isn't that
24  right?
25     A.   I understood that that was part of the plan.

**91**

1      Q.   You knew that?
2      A.   Yes.
3      Q.   And you assumed Frank knew that?
4      A.   Yes.
5      Q.   And you assumed that all the accountants he had
6  working for him in-house knew that?
7      A.   I assumed they knew what their roles were, yes.
8      Q.   And you assumed that all the lawyers he had
9  running around the Mirabilis offices knew that?
10     A.   I assumed that that was their purpose.
11     Q.   And you relied on the lawyers and accountants
12  working at Mirabilis day in and day out serving in
13  positions like president and CFO to comply with those
14  laws?
15     A.   Yes.
16     Q.   You came to learn in 2006 in the summer that at
17  some period of time they had not been complying with those
18  laws?
19     A.   Yes.
20     Q.   And you understood or assumed that they were now
21  in compliance but that there had been some past
22  delinquencies?
23     A.   I understood that they had not been paying
24  payroll taxes.  I also understood that that was part of a
25  plan on a workout that they were doing with the

**92**

1  government.
2          I wasn't directly involved with the plan so I
3  didn't know where it was in the stage of paying or not
4  paying.
5      Q.   Well, did you understand the plan to be working
6  out the payment of past due delinquent obligations, or did
7  you understand part of the plan to be using current
8  collected payroll taxes for operations?
9      A.   I understood that they were using current -- the
10  plan was to use current collected payroll taxes to clean
11  up the liabilities of the company and fix the operation
12  and take it public.
13         I did not understand it was to pay for Mirabilis
14  operations.
15     Q.   Mr. Flynn, let me make sure I understand what you
16  just said.
17         Are you telling me that you knew that part of the
18  plan for the Mirabilis entities was to take collected
19  payroll taxes and pay them to other creditors besides the
20  government?
21     A.   That was my understanding, yes.
22     Q.   And you knew that was illegal?
23     A.   I understood that that was the plan and that had
24  been discussed -- I understood it to have been discussed
25  with the government.

93

```
1      Q.   I'm not asking you about the plan and what was
2   discussed with the government.  I'm asking you about what
3   you knew was happening.
4           Did you know that the companies were operating by
5   using collected but unpaid payroll taxes on an ongoing,
6   going forward basis?
7      A.   I understood that that was the plan, yes.
8      Q.   Mr. Flynn, I'm again, respectfully not asking you
9   about the plan.  My question is, did you know it was
10  happening?
11     A.    I was not responsible for that and I did not
12  know it was happening on specific transactions.  I
13  understood that that was the plan and it was ongoing and I
14  heard from period -- time to time that the liability had
15  gone up.
16     Q.   To what?
17     A.    I'd hear different numbers at different time
18  frames, but I heard at one point it was $72 million and --
19  from 2005.
20     Q.   $72 million from 2005?
21     A.    Yes.
22     Q.   Who told you that?
23     A.    I heard it --
24     Q.   Frank?
25     A.    -- talked about in a meeting that Frank was at,
```

94

```
1   yes.
2      Q.   And what entity owed $72 million in unpaid taxes
3   for 2005?
4      A.    I didn't know that, but I assumed it was one of
5   the Presidion companies now.  I've seen the returns that
6   were filed now.
7      Q.   What returns?
8      A.    941 returns for payroll taxes.
9      Q.   For '05?
10     A.    And for the first two quarters of '06.
11     Q.   Who besides you knew that Mirabilis was being
12  operated with collected and unpaid payroll taxes?
13          MS. HINES:  Objection.  If I may, on behalf of my
14     client, I'm not sure that's what he's testified to,
15     but I guess the transcript will reflect that but I
16     thought he made it very clear that that's not what he
17     understood.
18  BY MR. KELLER:
19     Q.   Let me back up.  I thought I had clarified that.
20  Perhaps I didn't clarify it enough.
21          Mr. Flynn, you said, I don't know how many
22  different times, you understood the plan to be to collect
23  payroll taxes and not pay them to the government
24  immediately and to use them to pay other creditors and I
25  asked you several times to try to clarify; not just
```

95

```
1   whether you knew that was the plan but whether or not you
2   knew that's exactly what was happening.  That is, that the
3   companies were operating by using collected payroll taxes
4   to pay creditors other than the government.
5           Did you know that?
6      A.    What companies?
7      Q.   Any of the companies affiliated with Mirabilis
8   and Frank Amodeo.
9      A.    I found out about that sometime in 2006, yes.
10     Q.   Who told you that?
11     A.    I don't know.  It became widely discussed when
12  the Grand Jury subpoenas came out.
13     Q.   Okay.  And your recollection is that the Grand
14  Jury subpoenas to PEO client companies started coming out
15  in the summer of 2006?
16     A.    Correct.
17     Q.   And your recollection is it was before Mr.
18  Amodeo's deposition or sworn statement or whatever it was?
19     A.    Correct.
20     Q.   When you learned that the companies had been
21  collecting payroll taxes and not paying them to the
22  government, what did you do?
23     A.    I didn't do anything.  I discussed it with people
24  as it was being discussed and there were people that were
25  in charge of handling it.
```

96

```
1      Q.   Did you discuss it with Frank?
2      A.    I may have.
3      Q.   What did he say?
4      A.    People are handling it.
5      Q.   Who did he say was handling it?
6      A.    I don't recall that he did say who was handling
7   it.  Just that he was handling it.  I assumed that Dan was
8   still handling it.
9      Q.   All right.
10     A.    Rachlin, Cohen & Holtz was still handling it.
11     Q.   You knew up until that time that the tax issue as
12  you understood it was being dealt with by people who were
13  CPAs?
14     A.    And attorneys, yes.
15     Q.   I'm first asking about accountants.
16     A.    Okay.
17     Q.   You knew that the tax issue, as you understood
18  it, was being handled for the company by some CPAs?
19     A.    Yes.
20     Q.   The CPAs included Dan Myers --
21     A.    Yes.
22     Q.   -- who was working every day in-house at
23  Mirabilis?
24     A.    Yes.
25     Q.   And who you understood to be the point person
```

97

1    dealing with the IRS on that very issue?

2        A.   Yes.

3        Q.   Did you speak to Dan Myers about this issue when

4    you learned that the company you were affiliated with was

5    collecting payroll taxes and not paying them to the

6    government?

7        A.   I don't remember a specific conversation.  I

8    probably did.

9        Q.   Do you remember what he told you?

10       A.   Whenever I asked Dan about it they said they were

11   communicating with the IRS and working on a plan.

12       Q.   Have you read his deposition?

13       A.   No.

14       Q.   Have you seen any depositions in these cases?

15       A.   I have seen -- in which cases?

16       Q.   The cases filed against my clients, Mr. Berman,

17   his firm and Ms. Wildermuth.

18       A.   I've seen -- I don't know -- I've seen the

19   deposition of Mr. Berman but I don't know if it was in

20   this case.

21       Q.   Okay.  When did you see that?

22       A.   Two weeks ago.

23       Q.   Who gave it to you?

24       A.   Jim Sadrianna.

25       Q.   Did you read the whole thing?

98

1        A.   I did.

2        Q.   Did you see what he said at the end when he was

3    asked a question about what his obligation would be if he

4    learned that collected payroll taxes were not being paid

5    to the government?

6        A.   Yes.

7        Q.   Let's go back to your discussions with Dan Myers.

8    You don't have any recollection of what he told you when

9    you said to him, Dan, what's going on with unpaid payroll

10   taxes?

11       A.   Generally, and not specifically, but generally

12   those conversations are, we're working on the plan with

13   the IRS, they're aware of what's going on and we're

14   working on a workout for it.

15       Q.   Did Dan Myers tell you that he had communicated

16   to the Internal Revenue Service that the company was being

17   operated by using collected payroll tax funds?

18       A.   No.  Well, he's told me that this year.

19       Q.   He told you that this year?

20       A.   He said at the beginning of 2006 he said that.

21       Q.   When you said this year I thought you meant 2010.

22       A.   I spoke to him this year.

23       Q.   2010?

24       A.   And he told me that he had told the IRS that the

25   beginning of 2006.

99

1        Q.   He told you that he had communicated that to Judy

2    Berkowitz at the IRS?

3             MR. SMITH:  Object to form.

4             THE WITNESS:  To someone.

5             MR. SMITH:  You can answer it.  I just made an

6    objection.

7             THE WITNESS:  That's okay.

8             MR. KELLER:  What's the objection, just her name?

9             MR. SMITH:  Well, you're assuming she were --

10            MR. KELLER:  Right.

11            THE WITNESS:  I don't know who it was.  I assume

12   it was Judy Berkowitz.

13   BY MR. KELLER:

14       Q.   Let me ask you a different question.

15            Dan Myers told you sometime in early 2010 that he

16   had communicated to the IRS this plan that was in place

17   whereby Mirabilis was operating by using collected but

18   unpaid payroll taxes?

19       A.   I -- I understood that they had been

20   communicating that all along.

21       Q.   And Dan told you that he told that to someone at

22   the IRS?

23       A.   Dan told me he told that to someone at the --

24   told someone at the IRS that -- exactly that, yes.

25       Q.   All right.  And do you know him to have dealt

100

1    with anyone at the IRS other than Judy Berkowitz?

2        A.   I know that that was his main contact.

3        Q.   Okay.  Do you know who he communicated that

4    information to at the IRS?

5        A.   No.

6        Q.   Do you have any reason to believe it was someone

7    other than Judy Berkowitz?

8        A.   No.

9        Q.   Do you have any reason to believe that even if he

10   communicated it to someone else that Judy Berkowitz wasn't

11   also present?

12       A.   Say that again.

13       Q.   I'm trying to make sure that -- strike that.

14            Do you have any reason to believe that even if he

15   was speaking to someone else at the IRS, that Judy

16   Berkowitz wasn't also present --

17       A.   I don't have any reason to believe that.

18       Q.   Okay.  As far as you knew, Judy was his point

19   person from the IRS side?

20       A.   Yes.

21       Q.   What did Dan Myers tell you the IRS said to him

22   when he told them we're using collected payroll taxes to

23   operate our companies and pay creditors?

24       A.   I don't remember what he said they said.

25       Q.   Did he tell you that the IRS said you can't do

101

1   that?
2       A.   No.
3       Q.   Do you believe him when he tells you that he told
4   the IRS what he was doing?
5       A.   I do.
6       Q.   Have you read Dan Myers' deposition?
7       A.   No.
8       Q.   Have you spoken to him about it?
9       A.   I spoke to him very briefly about it in a very
10  broad sense.
11      Q.   What did he tell you?
12      A.   He said that he took the Fifth on most of the
13  stuff.
14      Q.   Okay.  Did he also tell you what he said about
15  the affidavit -- strike that.
16           Did he also tell you what he said about his
17  discussions with Mr. Berman?
18      A.   No.
19      Q.   Have you seen his affidavit?
20      A.   No.
21      Q.   Have you spoken to Euneba Marr about any of this?
22      A.   No.
23      Q.   When's the last time you spoke to Euneba Marr?
24      A.   I think it was in 2006.  It may have been early
25  2007.

102

1       Q.   Okay.  What did you understand him to -- what did
2   you understand his position to be with Mirabilis?
3       A.   I understood he was the president of AEM.
4       Q.   Okay.  What did you understand his position to be
5   with Mirabilis?
6       A.   I didn't understand he had a position with
7   Mirabilis but AEM was owned by Mirabilis and I understood
8   that he was the president.
9       Q.   Of AEM?
10      A.   Of AEM, yes.
11      Q.   What did you understand Euneba Marr's stock
12  ownership interest in Mirabilis to be?
13      A.   He was on the list of shareholders.
14      Q.   Now, in addition to Dan Myers were there any
15  other accountants affiliated with Mirabilis or Common
16  Paymaster or AEM or Presidion with whom you discussed the
17  issue of collecting payroll taxes and using them to fund
18  operations or pay creditors other than the government?
19           Did you talk to Jim Sadrianna about it?
20      A.   At some point I'm sure I did.
21      Q.   What did he say?
22      A.   That Berman and Holtz had it covered.  I talked
23  to Laurie Holtz about it.
24      Q.   What did Laurie say?
25      A.   Laurie said, you don't need to worry about it.

103

1   We've got it covered.
2       Q.   What did you tell him in response to which he
3   said, you don't need to worry about it, we've got it
4   covered?
5       A.   I asked him how the Presidion plan was going and
6   Frank and Mr. Berman were present and they kind of looked
7   at Frank said -- made a motion like, you know, talk to
8   them, and they both said -- they said something to the
9   effect of we've got it covered.  You don't need to worry
10  about it.  This is our responsibility.
11      Q.   Was there any other discussion at that meeting?
12      A.   No.
13      Q.   When was that meeting?
14      A.   Sometime in '06.
15      Q.   Where was it?
16      A.   In Frank's office at AmSouth.
17      Q.   Was it taped?
18      A.   I don't believe that room had a tape in it.
19      Q.   Do you have any notes from that meeting?
20      A.   I don't.
21      Q.   Is that the only --
22      A.   I wasn't there to talk to him about that.  It was
23  collateral.
24      Q.   What were you there to talk to him about it?
25      A.   I don't know.  I was just over at the office to

104

1   discuss something.  I don't know what for.
2       Q.   Did you detail what you understood the Presidion
3   plan to be or did you just say, what do you guys think
4   about the Presidion plan and how's it going?
5       A.   The -- one of them asked, what do you mean, and I
6   said, the plan not to pay the payroll taxes and that's
7   when they looked at Frank and Frank looked at them and
8   said, you know, made a motion to -- that I took to mean
9   it's okay to talk and they said, you don't need to worry
10  about any of that.  We've got all that covered.
11      Q.   Well, when you said the plan not to pay the
12  payroll taxes did you make a distinction or identify
13  whether you were talking about long ago past due payroll
14  taxes from when a company was acquired, or whether you
15  were talking about current ongoing collections of payroll
16  taxes that were being used to fund operations?
17      A.   No, I didn't make any distinction.
18      Q.   Okay.  What did you understand the Presidion plan
19  to be?
20      A.   My understanding of the plan was to take some of
21  the collected payroll taxes, clean up the creditors,
22  meaning pay off the creditors and settle any debts that it
23  had so -- and get the company operating properly so that
24  it -- and profitably so that it could be taken public and
25  pay back the payroll taxes.

105

1    Q.   Who told you that that was the plan?

2    A.   I don't know.  I heard it discussed a number of

3    times.

4    Q.   Did Frank tell you?

5    A.   Sure.

6    Q.   Anyone else?

7    A.   I heard lots of -- it was discussed openly in

8    meetings.

9    Q.   Dan Myers?

10   A.   Yes.

11   Q.   Jim Sadrianna?

12   A.   Yes.

13   Q.   Laurie Holtz?

14   A.   Yes.

15   Q.   Anyone else?

16   A.   I mean, it was not like it was something that was

17   hidden or anything.  It was just something that got

18   discussed from time to time on how it was going, the plan.

19   There's a meeting coming up with the IRS.

20   Q.   And you're saying that it was common knowledge

21   among all of these professionals that the plan included

22   the collection and failure to pay payroll taxes?

23   A.   That was my belief.

24   Q.   And you understood that to be something that had

25   been disclosed to the IRS by Dan Myers?

106

1    A.   That was my understanding and belief.

2    Q.   And that Dan Myers had assured everyone that the

3    IRS was okay with this deal?

4    A.   Yes.

5    Q.   When did you first learn that the IRS was not

6    okay with this deal?

7    A.   When the Grand Jury subpoenas came out.

8    Q.   In the summer of '06?

9    A.   Right.

10   Q.   When Grand Jury subpoenas were issued to PEO

11   client companies, did you see copies of them?

12   A.   I've seen copies of them since.  I just heard

13   about it at the time.

14   Q.   Okay.  Who did you report that to when you first

15   heard that Grand Jury subpoenas were being issued in the

16   summer of 2006?

17   A.   I didn't report it to anybody.

18        THE VIDEOGRAPHER:  I need to stop to change

19   tapes.

20        The time is approximately 11:55 and we're off the

21   record.

22        (Whereupon, a recess was had.)

23        THE VIDEOGRAPHER:  The time is approximately

24   12:00 o'clock and we're back on the record.

25   BY MR. KELLER:

107

1    Q.   What happened at Mirabilis as a result of being

2    notified that PEO client companies were being subpoenaed

3    to appear before a Grand Jury -- before a Grand Jury?

4    A.   It caused a lot of discussion and worry amongst

5    everybody about what was going on and the group that was

6    handling all of it continued to handle it.

7    Q.   Who was the group that was handling it?

8    A.   Richard Berman, Laurie Holtz, and I understood

9    that Sharmila was really doing all the legwork for Laurie

10   Holtz.

11   Q.   Sharmila?

12   A.   Sharmila Khanorka.  Dan Myers.  And Katy Curry.

13   Q.   Did you -- now she's a lawyer?

14   A.   Yes.  That is my understanding, yes.

15   Q.   Did you understand at that point in the summer of

16   2006 that Dan Myers was still the lead point person on

17   this issue?

18   A.   With the IRS?

19   Q.   Yes.

20   A.   That was my understanding.

21   Q.   What was your understanding of Richard Berman's

22   involvement?

23   A.   Richard, as I understood it, Richard oversaw all

24   of the legal issues so he would work -- if they had

25   specialist attorneys or somebody that was assigned to a

108

1    case, his job was to coordinate all of the legal

2    activities.

3    Q.   Right, so he was an outside general counsel

4    working out of his office in Fort Lauderdale and coming up

5    to Orlando from time to time?

6    A.   And I also understood he was the corporate

7    counsel for Mirabilis.

8    Q.   Right.  That's what I said, general counsel?

9    A.   Oh, I'm sorry.  What does outside general counsel

10   mean?

11   Q.   Well, let me explore that with you a little bit.

12   A.   Okay.

13   Q.   Richard Berman didn't come to the Mirabilis

14   office on a daily basis?

15   A.   No.

16   Q.   Richard Berman had an office in Fort Lauderdale?

17   A.   As I understood it, yes.

18   Q.   With a law firm?

19   A.   Right.

20   Q.   And people who worked in the law firm with him?

21   A.   Yes.

22   Q.   And in addition to having the law firm in Fort

23   Lauderdale, he also became general counsel to Mirabilis?

24   A.   Yes.

25   Q.   And in that role he came up to Mirabilis from

109

```
1    time to time?
2        A.   Yes.
3        Q.   Had some meetings?
4        A.   Yes.
5        Q.   Directed some outside legal activities for
6    lawsuits?
7        A.   As I understood it he handled all of the legal
8    issues of Mirabilis.
9        Q.   Well, let me just ask you one at a time if I
10   could.
11       A.   Okay.
12       Q.   He -- he -- he supervised some outside litigation
13   where Mirabilis was a plaintiff or a defendant in
14   lawsuits.
15       A.   Yes.
16       Q.   And Mirabilis affiliates were being sued or suing
17   somebody?
18       A.   Yes.
19       Q.   He hired other counsel to handle those cases if
20   they were outside the jurisdiction where he practiced?
21       A.   Yes.
22       Q.   And his office did some other legal work for
23   Mirabilis from time to time?
24       A.   Yes.
25       Q.   Okay.  He was never your lawyer?
```

110

```
1        A.   Not that I know of.
2        Q.   Okay.  You met with him on occasion?
3        A.   On occasion, yes.
4        Q.   With other people present?
5        A.   I don't think I ever just met with him
6    individually.
7        Q.   You never had occasion to meet with him
8    individually?
9        A.   His firm was responsible for managing lawsuits
10   and I worked with one of his lawyers on those lawsuits.
11       Q.   And that would be Jose Riguera?
12       A.   Yes.
13       Q.   Okay.  So you worked with Jose from time to time?
14       A.   Regularly, yes.
15       Q.   Not on tax issues?
16       A.   No, no.
17       Q.   But on lawsuits?
18       A.   Lawsuits, yes.
19       Q.   That Jose was handling or helping handle?
20       A.   Yes.
21       Q.   Okay.  Did you deal with anyone else in the law
22   firm?
23       A.   I may have dealt with somebody named Rusty from
24   -- once or twice.  Somebody named Rusty once or twice.
25       Q.   Rusty Callison?
```

111

```
1        A.   I don't remember his last name, but I remember
2    there being somebody else that was there on one case or
3    another, but it was related to a lawsuit.
4        Q.   Did you ever have any dealings with Elena
5    Wildermuth?
6        A.   Not that I recall.  I don't recall ever speaking
7    to her.
8        Q.   Now, did you know the firm wrote some tax memos?
9        A.   Yes.
10       Q.   Did you ever read any of those tax memos?
11       A.   I have read them now.
12       Q.   Did you read them at the time?
13       A.   I think I probably read one of the first ones and
14   then there's lots of memos that came out and I didn't read
15   them any more.
16       Q.   Okay.  What caused you to read one of the tax
17   memos back when it came out, one of the early ones?
18       A.   Just interest in what it was.
19       Q.   Who gave it to you?
20       A.   I got copied on an e-mail.
21       Q.   Do you recall that it was a memo about Section
22   6672 of the Internal Revenue Code?
23       A.   That's what I recall.
24       Q.   Do you recall that it addressed whether or not
25   Presidion was responsible for the unpaid payroll taxes of
```

112

```
1    the Sunshine Companies?
2        A.   I've read it since then, yes.  I understand that.
3        Q.   And do you recall that it dealt specifically with
4    the question of whether Presidion was responsible for
5    payment of the delinquent payroll taxes that had been
6    accrued before Frank took them over?
7        A.   I don't remember the specific details, but it was
8    something like that.
9        Q.   And do you recall that that memo was exactly
10   consistent with what you said regarding the fact that
11   Frank's plan for the Sunshine Companies was to acquire
12   them and shut them down?
13       A.   Uh-huh.
14       Q.   Yes?
15       A.   Yes.
16       Q.   Okay.  So that memo, as you recall it from 2005
17   when you read it and as you recall it now from having read
18   it more recently, does not address the issue of whether or
19   not Mirabilis and Frank Amodeo were going to continue to
20   operate companies in violation of payroll tax laws and use
21   collected payroll taxes for operating funds, does it?
22       A.   I don't know.  I don't understand all the
23   legalese in there, but it doesn't appear like that to me.
24       Q.   Okay.  So you didn't interpret that memo when you
25   read it in '05 or now to authorize or bless or approve of
```

---

113

```
1    this so-called plan to use payroll taxes going forward to
2    pay creditors other than the Internal Revenue Service, is
3    that right?
4        A.   The only thing that I understood was it was a
5    part of them working on the plan, so I read it the first
6    time and went, that's interesting and I don't think I read
7    it again until we were doing the wind-up.
8        Q.   Okay.  But let me go back to my question.
9             When you read that memo you did not understand it
10   to approve of the practice of using payroll taxes on a
11   going forward basis for some purpose other than payment to
12   the government, did you?
13       A.   No.
14       Q.   Okay.  Did you ever see any of the other tax
15   memos that were offered in the Berman Kean firm?
16       A.   I have seen them since, yes.
17       Q.   Have you read them?
18       A.   I don't think I've read any of them all the way
19   through.
20       Q.   Did you read the one that was authored in January
21   and February of 2006 that addressed the question of
22   whether or not secured creditors could take priority over
23   the IRS with respect to collected payroll taxes?
24       A.   No, I don't remember reading that one.
25       Q.   Do you recall reading in one of the memos that
```

---

114

```
1    Elena Wildermuth wrote that allowing secured creditors to
2    try and take priority over the government as to collected
3    payroll taxes would defeat the entire purpose of the
4    statute?
5        A.   No.
6        Q.   Do you remember reading that?
7        A.   I don't.
8        Q.   You have no reason to deny that it's in that
9    memo?
10       A.   No.
11       Q.   And certainly that language would not lead you to
12   conclude that Frank Amodeo as a creditor of Mirabilis
13   could take money out of the company from collected payroll
14   taxes as a secured creditor ahead of the IRS?
15       A.   I don't know what it means.
16       Q.   Okay.  Did you ever see a memo from Berman, Kean
17   & Riguera that sugggested in any way, shape or form that
18   it was legal or permissible to use federal payroll tax
19   withholding trust fund monies for anything other than
20   paying them to the government?
21       MR. SMITH:  Objection.  Calls for a legal
22   conclusion.
23       THE WITNESS:  I didn't see anything that -- I
24   don't understand that.  I didn't see anything that
25   said that to me.
```

---

115

```
1    BY MR. KELLER:
2        Q.   Okay.  Have you ever seen any document from my
3    client -- my clients, from Richard Berman, from Elena
4    Wildermuth, from Berman, Kean & Riguera that suggested in
5    writing that it was legal or permissible to take federal
6    payroll tax withholding trust funds and use them for
7    anything other than paying them to the government?
8        A.   Nothing I understood that way.
9        Q.   Okay.  Did Frank ever tell you that he read any
10   of those memos that way?
11       A.   Repeat it again.  Did Frank --
12       Q.   Did Frank Amodeo ever tell you that he looked at
13   any of the memos from the Berman, Kean firm and read them
14   to approve what he was doing?
15       A.   I don't think Frank told me that.  I think that
16   Frank said it was part of working on -- working with the
17   IRS.
18       Q.   Did Frank tell you that he didn't even read the
19   memos?
20       A.   I've heard him say that since, yes.
21       Q.   On more than one occasion?
22       A.   Yes.
23       Q.   So if he didn't read the memos he couldn't have
24   relied on them?
25       A.   I guess.
```

---

116

```
1        Q.   Okay.  And in any event you've never seen a memo
2    that said what he was doing was legal?
3        A.   No.
4        Q.   Did you ever see a written memo anywhere whether
5    it be by e-mail or a typed memo on paper or transmitted by
6    e-mail or in any other document or form that advised Frank
7    Amodeo or Mirabilis that using collected payroll taxes for
8    something other than paying them to the federal government
9    immediately is legal or permissible?
10       A.   Nothing that I understood that way.
11       Q.   Did Frank ever tell you that he had any such
12   document?
13       A.   No, I don't think so.
14       Q.   Okay.  Now, you said that the plan as you
15   understood it involved collecting payroll taxes and using
16   them to pay other creditors.
17            Did you ever see a memo, an e-mail, a document of
18   any sort whatsoever that outlined the plan and
19   incorporated that provision as one element of the plan?
20       A.   I'm sorry.  Repeat that.
21       Q.   Yes, sir.
22            Did you ever see a document that said the
23   Presidion plan, the PBS plan, the Sunshine Companies plan,
24   includes as one of its elements the collection and
25   nonpayment of federal payroll tax withholding trust funds?
```

117

```
 1        A.   I don't think I saw a memo that said that, no.
 2        Q.   Okay.  Mr. Flynn, I've been working on this
 3   matter for now nearly three years.  I've asked for and
 4   looked for any document from my client or otherwise that
 5   tells Frank Amodeo, Mirabilis or anyone affiliated with
 6   him or the company that it was legal and proper and
 7   permissible to take payroll tax money and use it for
 8   something other than paying it to the government.  I
 9   haven't seen any such document.
10        Are you aware of the existence of any such
11   document?
12        A.   No.
13        Q.   You signed an affidavit in this case.
14        A.   Yes.
15        Q.   Who asked you to sign the affidavit?
16        A.   Someone at Mr. Maher's law firm asked if I would
17   do an affidavit in the case.
18        Q.   Was it Mr. Smith?
19        A.   I don't remember who it was to be honest with
20   you.  It may have been Mr. Smith.  I don't remember who it
21   was.
22        Q.   Did you go to the office?
23        A.   I don't think so.
24        Q.   Have you ever met Mr. Smith before today?
25        A.   Yes.
```

118

```
 1        Q.   How many times?
 2        A.   A few times.
 3        Q.   When?
 4        A.   When -- in the process of the wind-up there may
 5   have been a time to deliver some documents over to him.
 6        Q.   Okay.  Any other times?
 7        A.   I've been to his office a couple Fridays ago.
 8        Q.   For what purpose?
 9        A.   They were just confirming about this deposition.
10        Q.   So you met with him?
11        A.   Yes, briefly.
12        Q.   Okay.  So when I asked you earlier what you did
13   to prepare for the deposition you didn't incorporate the
14   fact that you had met with Frank Amodeo's lawyer but
15   that's one of the things you did.
16        A.   I didn't meet with him to prepare for it.
17        Q.   Why did you meet with him?
18        A.   They were asking if I was still going to be able
19   to testify to what I had in the affidavit.
20        Q.   And what did you tell them?
21        A.   I was conferring with my attorney.
22        Q.   Did you tell them anything else?
23        A.   I don't think so.  I think I told them I was
24   conferring with my attorney.  We talked about specifically
25   what was in the affidavit and I had not spoken to Melanie
```

119

```
 1   yet.
 2        Q.   Now, when you signed the affidavit back in I
 3   think it was September of '09, September 2, 2009, had you
 4   ever met anyone from the Maher law firm in person?
 5        A.   I believe I had met Brent.
 6        Q.   Oh, I think you said that.  I'm sorry.  You did
 7   say that you had met him in the wind-up, during the
 8   wind-up delivering some documents.
 9        A.   Yes.
10        Q.   Okay.  Other than delivering documents in
11   connection with the wind-up of the affairs of Mirabilis
12   and Common Paymaster had you ever had any dealings
13   whatsoever with the Maher law firm?
14        A.   I don't think so.
15        Q.   By the way, something I meant to ask you before:
16   You're being represented by Melanie Hines; yes?
17        A.   Yes.
18        Q.   She's with the Berger Singerman firm?
19        A.   Yes.
20        Q.   Who's paying her fees?
21        MS. HINES:  We're going to object to that, Mr.
22   Keller.  You and I have spoken about that prior to
23   this deposition.
24        He has not -- Mr. Flynn has not waived his
25   attorney-client privilege and --
```

120

```
 1        MR. KELLER:  I'm not asking him to.  I don't
 2   think the issue of who pays you is privileged but let
 3   me ask a different question if I might, that might
 4   help --
 5        MS. HINES:  Okay.
 6        MR. KELLER:  -- resolve the issue.
 7        MS. HINES:  Okay.
 8   BY MR. KELLER:
 9        Q.   Is Frank Amodeo paying your attorney's fees?
10        A.   No.
11        Q.   Is Mirabilis?
12        MS. HINES:  I'm going to really object to this.
13   He's not --
14        MR. KELLER:  Okay.  You're asserting a privilege.
15        MS. HINES:  We are asserting a privilege --
16        MR. KELLER:  As to who's paying his fees?
17        MS. HINES:  Yes.
18        MR. KELLER:  Okay.  Let me -- and understand I'm
19   not doing this for any purpose other than to make a
20   record in case I need to file a motion on it.  And I'm
21   really trying not to do it in any disrespectful
22   manner, Ms. Hines.
23        MS. HINES:  I understand.  I don't think you're
24   being disrespectful.
25        MR. KELLER:  I do have one other question about
```

121

```
 1        that.
 2              MS. HINES:  Uh-huh.  Uh-huh.
 3    BY MR. KELLER:
 4        Q.   Is anyone -- give your lawyer a chance to object
 5    before you answer this -- is anyone other than you paying
 6    your lawyer's fees?
 7              MS. HINES:  Again, we're going to object to that
 8        and if you'll give me just a minute to confer with my
 9        client.
10              MR. KELLER:  Yes.  Do you want to go off the tape
11        for a minute?
12              MS. HINES:  Yes, please.
13              MR. KELLER:  That's fine.
14              THE VIDEOGRAPHER:  The time is approximately
15        12:17 and we're off the record.
16              (Whereupon, a discussion was had off the record.)
17        (Whereupon, the following was had off the video
18        record)
19              MS. HINES:  At this time we're going to assert
20        the attorney-client privilege and ask if we can confer
21        with other counsel during another break.
22              THE VIDEOGRAPHER:  The time is 12:23.  We're back
23        on the record.
24              MS. HINES:  We can either do that now or we can
25        do it after you --
```

122

```
 1              MR. KELLER:  No, no, we can do it during lunch.
 2              MS. HINES:  Okay.
 3              MR. KELLER:  That's fine.  I'll go on to another
 4        question and I'll come back to it.
 5    BY MR. KELLER:
 6        Q.   How many times did you attend meetings where
 7    Richard Berman was present?
 8        A.   I don't know.
 9        Q.   How many times did you attend meetings where
10    Richard Berman was present where tax issues were
11    discussed?
12        A.   I don't remember.
13        Q.   Do you have notes of any meetings you attended
14    where Richard Berman was present and tax issues were
15    discussed?
16        A.   No.  Not that I know of, anyway.
17        Q.   Is there any documentation whatsoever that you're
18    aware of regarding any meetings that you attended where
19    Richard Berman was present and taxes were discussed?
20        A.   I've seen a video of one meeting where a $72
21    million tax bill was mentioned.
22        Q.   When was that?
23        A.   In the first quarter of 2006.
24        Q.   March or April?  April would be the second
25    quarter but --
```

123

```
 1        A.   One of the two.  I'm not sure which.  I think it
 2    was March.
 3        Q.   What kind of meeting was it?
 4        A.   I believe it was a Mirabilis officers and
 5    directors meeting.
 6        Q.   Why were you there?
 7        A.   I wasn't.  I've just seen the video.
 8        Q.   I'm sorry?
 9        A.   I wasn't there.  I've just seen the video.
10        Q.   Okay.  I was asking you about documentation
11    regarding meetings where you were in attendance, sir.
12        A.   I was not in attendance on that one.
13        Q.   I understand.  So let me back up and see if we
14    can clarify the question.
15        A.   Okay.
16        Q.   I want to know if you're aware of any
17    documentation whatsoever in any form or fashion of any
18    meeting you attended where Richard Berman was present and
19    where taxes were discussed.
20        A.   None that I know of.
21        Q.   Okay.  So the meetings referenced in the
22    affidavit you signed are meetings for which you attested
23    as to what happened but for which there is no independent
24    documentation; is that right?
25        A.   By documentation do you mean video or written;
```

124

```
 1    something like that?
 2        Q.   Yes, sir.
 3        A.   No.
 4        Q.   Is that correct?
 5        A.   Not that I know of.
 6        Q.   That's right?
 7        A.   Yes.  Not that I know of.
 8        Q.   Okay.  When this affidavit was prepared it was
 9    done basically over the phone?
10        A.   Yes.
11        Q.   With someone at Mr. Smith's office?
12        A.   Yes.
13        Q.   You're not sure if it was him or someone else in
14    his firm?
15        A.   Correct.
16        Q.   I take it they typed it?
17        A.   Yes.
18        Q.   They drafted it?
19        A.   Yes.
20        Q.   They sent it to you?
21        A.   Yes.
22        Q.   You looked at it?
23        A.   Yes.
24        Q.   Did you sign it?
25        A.   Yes.
```

125

1  Q. Okay. Did you have your signature notarized?

2  A. No. I don't think so anyway.

3  Q. Oh, who notarized your signature?

4  A. If it's notarized then I had it notarized.

5  Q. Who's Mark Wing?

6  A. I have no idea.

7  Q. Do you remember having your signature notarized?

8  A. No.

9  Q. Do you remember swearing to the testimony in this

10 affidavit?

11 A. Yes.

12 Q. Were you in the presence of the notary when the

13 notary -- when you signed this affidavit?

14 A. I don't remember having it notarized so I don't

15 know. I may have had it done at Kinko's. I didn't work

16 with a notary.

17 Q. Okay. Is it possible you signed it and someone

18 notarized it outside your presence?

19 A. I guess it's possible. I don't remember having

20 it notarized.

21 Q. Where were you when you signed the affidavit?

22 A. I don't remember.

23 Q. Maybe at a Kinko's?

24 A. Maybe.

25 Q. But maybe not?

126

1  A. Well, I'm trying to think of where I would have

2  gotten a notary from.

3  Q. Well, do you ever remember going to a Kinko's to

4  sign this affidavit and have it notarized?

5  A. I remember going to Kinko's and having things

6  notarized. I don't remember having that one done.

7  Q. Do you remember where you were on September 2,

8  2009?

9  A. No.

10 Q. And you don't know anyone named Mark Wing?

11 A. That does not ring a bell.

12 Q. That's the notary who affixed his signature under

13 yours.

14 A. Right.

15 Q. All right. Did you make any changes to this

16 affidavit before you signed it?

17 A. No.

18 Q. So you signed it as drafted by the people at the

19 Maher law firm?

20 A. I believe we may have discussed something over

21 the phone and they made a change to it. I can't remember.

22 Q. But you signed --

23 A. I did not write on any changes and send it in to

24 him. It would have been something over the phone.

25 Q. You basically signed the first written one you

127

1  saw?

2  A. I don't remember if it was the first one or not.

3  Q. You did it electronically?

4  A. I did.

5  Q. And then you printed it out and signed it?

6  A. As I recall, yes.

7  Q. And then what did you do?

8  A. Then I scanned it and sent it back at some point

9  or I mailed it in. I don't remember how I got it back to

10 them.

11 Q. Where is the original?

12 A. I don't know.

13 Q. Did you send the original to the Maher law firm?

14 A. I may have. I don't know.

15 Q. Did you talk to Frank about this affidavit?

16 A. Not that I recall. Not beforehand anyway.

17 Q. Did you discuss it with him afterwards?

18 A. I've discussed it with him at some point

19 afterwards, yes.

20 Q. And what was the discussion?

21 A. Just that I had given an affidavit in the case.

22 Q. Were you concerned about giving an affidavit in

23 this case?

24 A. Concerned --

25 Q. About yourself.

128

1  MS. HINES: Do you want to consult about that?

2  THE WITNESS: Yes.

3  MS. HINES: Okay. We need a minute.

4  THE VIDEOGRAPHER: The time is approximately

5  12:30. We're going off the record.

6  (Whereupon, a discussion was had off the record.)

7  THE VIDEOGRAPHER: The time is approximately

8  12:36 and we're back on the record.

9  MS. HINES: Okay. Mr. Flynn and I have consulted

10 and at this point what we're going to do is state for

11 the record that his answer may place him in the

12 position of violating the confidentiality provisions

13 set forth in the letter from Mr. Gold that is part of

14 this deposition and at this point we're going to rely

15 on that privilege and not answer the question or at

16 least not rely on it as Mr. Flynn's privilege because

17 it is not, but to assert that we don't want to be in

18 violation of that prohibition.

19 So, again, we're trying to get Mr. Gold on the

20 phone to find out whether he views the answer to be

21 within the scope of that privilege or not. And as

22 soon as I hear back from him I'll let you know.

23 (Whereupon, a discussion was had off the record.)

24 BY MR. KELLER:

25 Q. Did you consult with personal counsel before you

129

```
 1   signed this affidavit?
 2        A.   No.
 3        Q.   At the time you signed this affidavit you had
 4   received a target letter, is that right?
 5        MS. HINES:  We're going to have to rely on the
 6   letter from Mr. Gold and not answer that question.
 7        MR. KELLER:  You're not going to answer any
 8   letter whatsoever about the target letter -- any
 9   question whatsoever about the target letter?
10        MS. HINES:  I view the letter from Mr. Gold as
11   precluding Mr. Flynn from answering any questions
12   about communications that were received by him from
13   the U.S. Attorney's Office.
14        So if there was a target letter it would fall
15   within this document, the prescriptions of this
16   document, and yes, I -- the answer to your question is
17   --
18        MR. KELLER:  Okay.
19        MS. HINES:  -- he's not going to answer that.
20        MR. KELLER:  I think maybe this is a good time to
21   take a break.  We said we'd break at 12:30 and you
22   said you don't want to go past that and we're a
23   little past so in order to accommodate you, I suggest
24   we go ahead and take that break now.
25        MS. HINES:  I appreciate it very much.
```

www.uslegalsupport.com

130

```
 1        MR. KELLER:  Yes, ma'am.
 2        THE VIDEOGRAPHER:  The time is approximately
 3   12:38 and we're off the record.
 4        (Whereupon, a lunch recess was had).
```

www.uslegalsupport.com

Page 1

**A**
able 11:10 30:16 41:1 118:18
accent 76:15
acceptable 36:9
access 82:20
accommodate 123:24
account 29:14
accountant 22:19 23:16 27:13,16 27:21 42:9 58:24 72:6 76:13,18 78:14,16 90:21
accountants 27:18 56:11,19 57:6 58:25 59:22 71:21,23 91:5,11 96:15 102:15
accounting 27:22 28:17,18,22 42:5 42:10 43:23 57:3 57:5 58:17,20 59:2,8,11,16 61:6,20,21 62:20 74:9 77:12,15 78:3
accounts 29:5,10 29:12,17 41:14
accrued 112:6
accurately 10:15 60:1
accusing 24:7
acknowledged 21:13
Acme 16:5,8,20,25 17:3,6,11,18,19 17:19 18:1,20 19:6,16,22 20:1 20:5 26:1 83:8 83:12,13,14,15 83:17 84:4
Acme's 19:10
acquire 67:9 69:2 71:4 82:12,19 112:11
acquired 43:8,13 43:15 44:22 55:24 66:1,16,20 71:8 81:7 104:14
acquiring 65:22 69:9 70:5 72:24
acquisition 71:15
acquisitions 73:1 73:14 81:11,14 82:17
act 23:8
acted 49:24 63:3
acting 62:18
active 17:6
activities 108:2 109:5
acts 24:8
Adam 2:16 4:16
addition 102:14 108:22
address 5:19 7:19 112:18
addressed 111:24 113:21
administration 57:3,4 59:1,3,7 59:14,17,19,21
administrative 58:19,22
admitted 72:12 84:17,20,23 85:1 85:5
advanced 73:4
adverse 24:10
advertising 39:18
advice 20:8,11 46:22 47:1,2 70:1
advised 64:5 116:6
advising 6:3 27:12
AEM 41:23,24 42:1 42:5,13,17,20,24 43:8,14,19,21,23 44:1,3 87:24 102:3,7,9,10,16
AEM's 42:21
affairs 119:11
affidavit 24:7,10 24:17,20 101:15 101:19 117:13,15 117:17 118:19,25 119:2 123:22 124:8 125:10,13 125:21 126:4,16 127:15,21,22 129:1,3
affiliated 48:4,19 61:22 95:7 97:4 112:11 117:5
affiliates 109:16
affirmed 5:13
affixed 126:12
aggressive 39:17
ago 31:4 97:22 104:13 118:7
agree 14:5 34:2 35:1,15
agreed 35:7,19
agreement 19:22 24:13 36:6 80:19
agreements 19:17 26:6,8
ahead 6:12 16:16 30:8 64:16 87:17 114:14 129:24
allow 7:2
allowing 114:1
alternative 68:9
America 29:13
Amodeo 1:3 2:2 4:8 4:21 14:2 17:4 18:2 21:13 25:11 36:20 46:17 48:5 48:13 71:12 78:23 80:23 81:2 82:23 90:7 95:8 93:8 96:15 118:19 120:1 123:10
Amodeo's 90:19
analysis 73:19,20
Andrea 61:19
and/or 14:1
announce 4:18
answer 7:7,17 9:9 9:10,15,16,19,23 9:25 10:9,14 11:1,1,16 12:7 16:14,15 21:13 57:20 87:17 99:5 121:5 128:15,17 129:16,23
answered 29:15
answering 129:11
answers 6:25 11:10
anticipate 9:24
anybody 46:10
anyway 122:16 125:2 127:16
appeal 31:13
appearance 2:18 appear 62:17 107:3
appearance 5:23 9:23 129:25
APPEARANCES 2:1
APPEARANCES 2:11
appeal 31:13
applies 50:13 123:12
April 122:24,24 area 38:25 88:18 88:21

asked 7:8 13:11,25 24:20 69:6 80:9 94:25 97:10 98:3 103:5 104:15 117:3,15,16 118:12
asking 9:20 12:21 43:9 86:5 93:1,2 93:10 97:5 118:18 118:18 120:1 123:10
assert 121:19 128:17
asserting 120:14
assistant 7:5 52:19
assisted 26:1,4 68:6
assume 10:9 55:7 57:4,7,22 58:3 58:25 88:17,25 89:3 89:11
assumed 82:16 88:15 91:3,5,7,8 91:10,20 94:4 96:7
assuming 15:1 35:17 58:19 99:9
assured 106:2
attach 34:15
attached 6:13
attend 78:1 122:6 122:9
attendance 123:11 123:12
attention 78:24
attest 16:9
attested 123:22
attorney 7:5 23:8 113:10 115:14 119:12 121:16 127:11 118:21 118:24
attorneys 55:24 56:4,8 96:14 107:25
attorney's 6:2 120:9 129:13
attorney-client 113:20 119:25
arising 60:9

Page 2

121:20
August 74:15,20
authored 113:20
authority 29:4,9 29:16
authorize 112:25
available 7:6
Avenue 1:21 2:7,11 4:14
awards 37:11
aware 60:8,16,22 65:11 98:13 117:10 122:18 123:16
Azoulay 2:16 4:16
a.m 1:22 4:6

**B**
B 3:3
back 15:5 36:17 48:25 51:23 54:13 68:12 83:9 83:22 86:4 87:15 87:19 94:19 98:7 104:25 106:24 111:17 113:8 119:2 121:22 122:4 123:13 127:8,9 128:8,22
background 23:12
backup 57:19
Bad 68:24
Baireau 44:17
bank 29:4,10,12,13 29:14,17 30:14
bankruptcies 69:18
bankruptcy 67:14 67:19,21 68:4,7 68:19 69:4,5,5,7 69:8,10,14,15,17 69:22,25 70:11 70:14
basically 59:2 60:5,20
basis 22:25 38:21 55:22 56:3,8 75:9 85:8,11 93:6 108:14 113:11
began 77:23 87:25
beginning 55:16 56:1 65:10,12 76:23 98:20,25
behalf 2:2,5,9,13 4:20,22,24 5:1 26:25 51:16

52:11 54:19 55:10 94:13
belief 105:23 106:1
believe 18:24 19:18,21 25:1 29:11 31:10 42:6 43:12,16 47:12 62:12 66:12 70:21 72:5,25 75:12,20 78:10 80:20 82:25 87:2 88:22 100:6,9,14,17 103:13 103:18 123:16
believes 6:24
bell 126:11
benefit 10:3 22:8 45:20
benefits 26:18 39:2 40:3,12 41:8 42:20 61:19 61:20 80:7
Berger 2:14 119:18
Berkowitz 99:2,12 100:1,7,10,16
Berman 1:6,7,15,15 2:9,9 4:9,9,12 4:11,25,25 31:20 97:16,19 101:17 102:22 103:6 107:8 108:13,16 97:16,19 101:17 123:16
best 35:12
better 40:15,17 49:8
Beyer 68:1,25 69:5
beyond 19:2 34:25 35:19
big 27:20,24 47:22 47:25 75:11,12
biggest 41:17,19
bill 43:1,6 122:21
bills 28:23
bit 7:20 108:11
blamed 26:2
blanking 78:5
bless 112:25
book 44:3 63:16
Bookkeeping 20:22
boss 49:21,25
Boston 37:5,8,12 37:21 60:7,8,21 60:22

bought 43:10 44:3 46:4,5
Boulevard 2:4
boxes 34:8,17
break 7:9 123:23 112:1,6,15,16 121:21 129:21,21 129:24
Brent 2:3 4:20 119:5
briefly 101:9 118:11
bring 82:13
British 76:15,16
broad 2:7 101:10
broader 59:4
broke 31:19
brought 14:16 70:15
building 37:20 39:21 53:2,3,3 75:17
built 39:21
bundled 12:11
business 8:14,16 8:18 17:6,8,13 23:1 38:7,12 40:2 42:13 44:4 63:16 69:1 73:9 73:10 74:5 77:5 77:6 79:7,13 82:16 85:21
businesses 20:16 39:14 81:23
businessman 73:2 77:1
buy 8:15 49:7

**C**
C 1:19 2:13 4:7 5:2,12,18
call 7:10 13:16 54:14
called 20:18,21 37:2 44:19 53:18
calling 50:4
Callison 110:25
calls 10:13 114:21
campaigns 39:18
capability 23:12
capacity 27:13
capital 71:9 82:21
card 33:2,12,23
care 33:1,24 60:2
career 36:20 55:16
case 1:2,11 7:6 62:5

30:12,13 35:10 44:21 46:21 47:20,25 53:15 53:18 68:13 97:20 108:1 111:2 117:13,17 120:20 127:21,23
cases 17:22 22:9 30:5 69:11 97:14 97:15,16 109:19
cash 82:19
CASSEL 2:7
cause 4:3
caused 107:4 111:16
causes 36:6
caveat 10:24
centrally 57:2
certain 24:22 34:25 66:16
certainly 24:16 74:3 89:4,6 114:11
certified 22:19 23:16
CFO 28:14,15,21 51:7 57:8 61:9 61:20 62:13,18 62:21,23 63:1,4 63:6,7 91:13
CFOs 57:9,11 61:23
chairman 77:8,19 77:20
chance 31:13 121:4
change 76:4 106:18 126:21
changed 44:8 45:11
changes 126:15,23
characterize 53:12
charge 27:8 48:17 50:8 95:25
chart 47:10
chartered 76:13,18
cheaper 41:5
cheaply 54:7,11
checks 29:7
children 8:3,4
CIE 63:23
circle 37:13
CIRCUIT 1:1,1
circumstances 24:18
civil 89:10,15,21 89:23
claims 39:4
clarified 94:19
clarify 13:13,21 24:9 34:20,25 123:14

**Page 3**

clean 65:5 92:10
104:21
clear 10:17 94:16
client 24:6,8 42:4
42:22 85:22
94:14 95:14
106:11 107:2
115:3 117:4
121:9
clients 46:20
87:24 97:16
115:3
close 66:21
closed 86:12
closing 15:21 66:6
Code 21:7,14 24:9
111:22
Cohen 77:16 96:10
Cole 42:6 43:24
Coleman 29:23
collateral 103:23
collect 23:17
90:22 94:22
collected 17:13
20:2 22:3 59:13
81:19 85:3 86:8
86:20,25 87:4
92:8,10,18 93:5
94:12 95:3 98:4
98:17 99:17
100:22 104:21
112:21 113:23
114:2,13 116:7
collecting 95:21
97:5 102:17
116:15
collection 88:12
105:22 116:24
collections 104:15
cone 7:11 13:24
21:11 44:10
48:25 50:9,11,14
51:25 52:7 63:6
78:21 108:13
122:4
coming 13:19 16:25
20:1 24:18 81:4
81:5,9,14 95:14
105:19 108:4
comment 70:9
commit 24:8
common 12:25 26:13
26:15,20,23 27:2
27:6,10,11,12,14
27:16 28:5,7,7
28:12,13,14,18
29:10 39:24 40:6
41:7 42:19 54:14
54:14,19 55:6,10

55:12,17,18,22,22
56:5 61:3 74:18
80:1,5,10 90:10
90:13 102:15
105:20 119:12
commonly 40:9,19
communicated 63:22
98:15 99:1,16
100:3,10
communicating
63:12,13,14,18
63:20 97:11
99:20
communication 6:1
14:21 64:9
communications 6:1
12:6 14:14 15:13
129:12
companies 15:21
20:25 21:5,12,23
22:9 23:17 27:17
27:20 38:20
39:19 40:4,8
41:7,10,11,15
42:1,4,22 44:11
45:11 46:23 47:4
47:16 49:7 54:12
56:22 57:9 58:16
59:7 60:5 65:23
65:25 66:16,20
67:10,11,14,23
68:14,15,20 69:8
69:14,16,20 70:5
70:19,24 71:2,4
71:9,16 72:24
79:10 81:4,7,9
81:12,23 82:4,13
82:20 85:22 86:8
86:10,12,19,21
90:14 95:3 95:3,6
95:7,14,20
100:23 106:11
107:2 112:1,11
112:20 116:23
company 19:4,7
20:18,21 26:1
23:16,17 37:2,4
38:23 40:1,12
43:8 44:13,19
45:13,19 49:6,11
49:16 53:18 54:5
54:9,11,22 61:9
62:7,20 65:5
71:11 79:17,21
79:22 81:2 82:2
82:20 83:2,4,9
84:20 92:11
96:18 97:4 98:16
104:14,23 114:13

117:6
Company's 65:9,12
Comparato 1:24 4:1
4:15
compensation 39:8
competent 58:18
73:2,8 74:7 77:3
complaints 40:23
compliance 27:9
28:25 39:12
56:20 57:1,18
58:12,16 59:12
73:7,12 91:21
complied 57:11
comply 91:13
complying 91:17
compulsive 73:23
computer 26:10,12
38:6 51:19,22
concerned 127:22
127:24
conclude 114:12
conclusion 114:22
conclusions 26:19
conducted 4:13
confer 121:8,20
conferring 118:21
118:24
confidential 32:8
34:23 35:1,15,20
36:4
confidentiality
36:6 128:12
confine 65:15
confirming 118:9
conflicting 49:14
confusing 44:8
connection 119:11
consider 67:14
considerations
70:4
considered 70:7
consistent 56:9,12
112:10
consolidating
124:15
conspiring 24:8
construction 8:11
54:10,10,13 81:6
consult 7:2,13 9:2
11:4,17 69:7,13
87:10 128:1,25
consultant 20:11
72:11 79:17,21
79:22 81:2 82:2
consultation 7:11
consulted 128:9
consulting 17:22
17:23 19:10,15
19:16,22 20:6,7

contact 100:2
contest 37:20
continue 50:9,19
89:11 112:19
continued 70:18
85:9 86:13 107:6
contract 54:24
55:3,6,9
contracts 54:19
73:15,21
control 33:17 42:2
80:17 83:23
controlled 18:6
42:17 83:11,16
84:18,20
controller 28:16
28:21
conversation 97:7
conversations 31:16
98:12
conviction 30:17
Cooperation 53:21
cooperatives 53:19
coordinate 108:1
copied 111:20
copies 13:25
106:11,12
copy 6:11,14,15
Corp 17:12 47:9,14
corporate 53:19,20
55:17 108:6
corporation 19:20
26:15 39:25 40:9
41:7 44:12 46:19
46:25 54:15
65:19 74:25
corporations 38:11
correct 15:14
18:13 33:5 37:9
40:16,18 41:6
42:23 43:11 52:5
55:25 67:12
82:11 95:16,19
124:4,15
correspond 25:13
correspondence
13:25
cost 41:4 53:22,25
costs 70:13
counsel 4:18 5:21
5:25 6:22 14:2,3
32:12 35:15
44:17 55:17
57:13,15 58:4
69:25 108:3,7,8
108:9,23 109:19
121:21 128:25
counseled 7:13

**Page 4**

COUNTY 1:1
couple 8:25 85:12
85:19 118:7
course 5:22 14:14
86:18
courses 44:9
court 1:1,9 4:1,15
5:3,5 9:4,6 10:3
10:15,21 30:12
64:10 67:15
covered 61:17
102:22 103:1,4,9
104:10
co-counsel 31:25
CPA 27:14,15 28:3
28:7,13 42:7
61:7 72:7,8,10
72:19 74:10,11
74:22 99:14
78:15,17
CPAs 96:13,18,20
CFC 54:13,14,17
61:22
Cracker 36:25
37:16 60:5,19
Craig 64:15
credit 33:2,12,23
creditor 67:15
114:12,14
creditors 70:8
71:5 92:19 94:24
95:4 100:23
102:18 104:21,22
113:2,22 114:11
116:16
criminal 24:8
89:17,19 90:19
crossed 73:17
cumbersome 36:3
current 5:19 92:7
92:9,10 104:15
currently 8:8
30:20
Curry 107:12

**D**

D 2:1,0 3:1
daily 22:25 53:9
53:13 55:22 56:5
56:8 75:9 85:8
85:11,11 108:14
Dan 21:17 22:17,19
22:21 56:7,11
62:1,19 63:8,20
65:1 78:4 96:7
96:20 97:3,10
98:7,9,19 99:15
99:21,23 100:21
101:6 102:14

105:9,25 106:2
107:12,16
date 3:31 34:12,19
date 4:4 66:6
daughter 8:6 30:6
30:7
David 2:10 4:24
day 22:23 38:2,4,5
50:9,11,14 55:15
56:12 76:1 91:12
91:12 96:22
days 22:24 35:2,17
50:16
deal 23:12 66:4
70:8 106:3,6
110:21
dealing 23:14 64:5
64:8 97:1
dealings 111:4
deal 55:4 73:16
73:18,20,24 74:2
74:4 76:5 97:7
debt 54:5 73:16
debts 10:4 22:22
December 47:22
66:3,8,10
defeat 114:3
defendant 109:13
Defendants 1:8,17
2:19
Definitely 39:3
76:16
degrees 73:4
delay 65:17
delinquencies
91:22
delinquent 21:12
21:22 66:17 92:6
112:5
deliver 118:5
delivering 119:8
110:10
deny 114:8
department 40:7
57:3,4 58:23
59:8,11,16 74:9
78:3
departments 27:22
58:18,19,22 59:4
Dan 21:17 22:17,19
22:21 56:7,11
62:1,19 63:8,20
65:1 78:4 96:7
deponent 2:13
deposition 1:19
4:1,7,13 6:14,22
7:8,14 8:22 9:7
12:1,18 31:21
36:14 88:7 95:18
97:12,19 101:6
118:9,13 119:23

distinguishing
14:4
distressed 17:25
68:20 69:2,4
70:4
District 1:1,9
11:9
DIVISION 1:10
diverse 24:12
35:24 41:14
115:2 116:6,12
116:17,22 117:4
117:9,11 129:15
129:16
documentation
49:15 122:17
123:10,17,24,25
documents 6:7,8
12:10,10,15,17
12:20,22 13:4,9
13:17 14:9,11,15
15:10,12,16,17
15:22,23 18:10
32:12 34:5 36:8
43:12,17 44:7,10
45:5,18,24 47:11
62:3 63:21 66:3
66:24 67:1,3,8
67:18 71:3 78:20
80:20 118:5
119:6,10
doing 88:2 91:25
101:4 107:9
113:7 115:14
116:2 120:10
dollars 21:24
dotted 73:16
doubt 34:12,20
50:2 62:15
drafted 124:18
126:18
Drive 7:20
done 92:6 104:13
duly 5:13

**E**

E 1:7,15 2:9 3:1,3
earlier 63:8 66:8
116:12
early 67:25 99:15
101:24 111:17
economies 40:20
49:8
effect 18:10 30:12
103:9
effort 63:19
either 11:18 34:20
34:24 54:16
59:16 69:5 88:15

**Page 5**

121:24
electronic 15:22
15:23
electronically
15:11,17 127:3
element 116:19
elements 70:23
116:24
Elena 1:16 2:9
4:12,25 111:4
114:1 115:3
eliminate 53:12,24
employed 8:8,10
16:4 25:25 43:21
57:8 58:9
employee 18:3 39:4
40:23 54:25 55:3
90:3
employees 8:19
18:1 23:18 26:17
39:22 40:3,14
41:5,20 42:21,24
54:20 74:23 89:8
employment 60:19
61:18
engagement 19:11
engagements 19:15
ensure 57:11
ensuring 27:8
entered 31:20
entering 56:23,24
entire 60:12,19
114:3
entirety 85:18
entities 17:25
20:9 21:8 41:18
69:2,4 92:18
entitled 24:11,16
25:2,3
entity 42:17 44:5
63:17 65:6 71:9
94:2
Entree 20:19
envision 11:9
equivalent 76:21
especially 40:21
Esquire 2:1,6,10
2:14 31:20 36:13
essentially 75:9
76:1 83:11
established 71:1
Eunoba 101:21,23
102:11
European 76:21
event 68:18 69:22
116:1
eventually 49:17
everybody 107:9
evidence 25:20

26:5,8,9
exactly 34:7 44:9
59:20 65:11
67:20 70:14,17
95:7 99:24 112:9
EXAMINATION 3:2
5:15
examined 5:13
exception 10:25
exchanged 13:17
Excuse 5:20 11:8
23:20 31:22 79:1
87:8
exhibit 3:4 6:13
6:18,19
existence 117:10
expenses 79:17
experience 38:12
expert 20:12
experts 35:11
explain 8:25
explained 67:5
explaining 88:8
explains 47:11
80:21
explore 108:11
expressed 30:15
83:18
extent 6:7 14:6
35:11
external 57:15
e-mail 29:15 48:2
51:25 52:2
111:20 116:5,6
116:17
e-mails 48:9 50:19
50:20,21 51:2,4
51:6,8,15 52:9
52:11 64:1 67:18

**F**

facets 61:17
facilities 43:4
fact 58:20 66:9
112:10 118:14
failed 20:24
failure 88:13
105:22
fair 10:4,10 11:7
26:3 36:8
fairly 51:19,21
fall 129:14
familiar 44:12
family 30:6
far 14:11 15:1,5
17:8 29:1 41:19
41:21,25 46:6
58:15 61:1 75:21
100:18

fashion 65:19
123:17
February 113:21
federal 27:9 28:24
33:9 56:21 90:15
114:18 115:5
116:8,25
fees 17:19 19:14
119:20 120:9,16
121:6
fellow 72:1
Fernando 78:12
Fifth 101:12
figure 34:22
file 26:2 31:13
35:2,16 120:20
filed 94:6 97:16
files 35:12
filings 28:24,24
68:17
final 24:3 54:11
67:1 128:20
finding 53:22,25
fine 61:16 11:18
121:13 122:13
finish 5:16,23
57:20 87:17
finished 9:11,15
9:13,22 11:1
fired 69:13
firm 2:2,6 77:15
97:17 108:18,20
108:22 110:9,22
111:8 113:15
115:13 117:16
119:4,13,18
124:14 126:19
127:13
first 5:13 9:7,13
19:10 35:24
47:16,18 48:16
49:2,16 61:18,21
61:14 87:13 94:18
96:15 106:5,14
108:12 111:24
122:23 126:25
127:2
five 34:7 67:2
fix 92:11
flexible 35:6
Florida 1:1,10,21
1:25 2:4,8,13,15
4:3,14 7:20 37:8
37:23,25 38:4
43:4 72:8 77:13
70:18 71:3,4,11

flying 37:18
Flynn 1:19 2:13
4:8 5:2,12,18
6:5,9,23 7:12
8:22,22 13:18
14:1,11,15 24:21
25:6 36:19 92:15
93:8 94:21 117:2
119:24 128:9
129:1
Flynn's 128:16
focus 67:23 86:6
following 32:24
121:17
follows 5:14
forensic 77:12
90:21
form 16:10,13 21:1
23:19 24:1 25:3
40:6,10 44:24
51:17 65:19
68:21 99:3
114:17 116:6
123:17
formative 74:22
formed 18:20,22,24
19:1,4 26:16
43:9 74:19
former 20:14 63:23
forming 60:7 53:18
74:25
forms 33:9
Fort 2:12 108:4,16
108:22
forth 128:13
forward 93:6 113:1
113:11
found 95:9
founded 39:24
four 33:24
FPR 1:24
frame 65:12 87:23
frames 93:18
franchisee 37:7,8
Frank 1:3 2:2 4:8
4:21 17:4 18:1,3
18:14,25 19:8,8
20:8,10 21:13
23:6,8 25:11
29:15,21 36:19
45:22 47:20,24
47:24,25 48:11
48:15 50:14 63:8

**Page 6**

74:24 75:1 76:6
76:9,12,12 78:2
78:21,23,24
80:23 81:2 82:23
83:2 86:5,7 87:2
88:5 90:17 91:3
93:24,25 95:8
96:1 103:6,7
104:7,7 105:14
112:6,19 114:17
115:9,11,12,15
116:11 117:5
118:14 120:9,23
127:5
Franke 48:4
Frank's 1:7 49:1
49:16 66:19
64:10 103:16
112:11
frequency 41:9
51:13
frictional 53:22
53:25 54:2
Friday 118:7
function 27:13
28:21 56:23
functions 28:17
61:5,17
fund 17:11 102:17
104:16 114:19
funded 17:18
funding 17:10,16
81:17
funds 17:16 20:3,5
84:24 85:2 86:25
98:17 122:21
115:6 116:25
funnel 8:11
funneling 85:22,23
129:20
further 16:15
future 6:14
F1 48:9,12
F2 48:9,10

**G**

Gadsden 2:15
gathering 26:4
67:6
general 44:17
51:24 57:13
92:11,20,25 93:2
94:23 95:2,12
general 30:18
52:9,10 89:12
98:11,11
generated 82:6
genius 90:20

Georges 7:20
getting 31:7 60:23
71:2
give 10:14 12:3
15:5 35:2 121:4
given 8:22 14:17
127:21
giving 47:2 127:22
Glover 61:6,12
62:22 78:2
go 6:12 7:7,10
16:15 25:15
29:21 30:8 36:8
54:8 64:16 66:23
67:25 68:3 69:15
81:15 103:15
104:4 105:18
107:15 112:19
113:11,13 118:18
119:21 120:12
127:11 128:16
God 5:9
going 8:25 9:4,5,6
9:20,21 10:2,9
10:13 11:15
30:11,16 31:13
34:10,14,15,16
34:20 35:6 49:6
54:13 67:9 79:8
98:9,13 103:5
104:4 105:18
107:13 111:13,13
108:15 109:10
110:19
Gold 128:13,19
129:6,10
good 73:15,15,18
129:20
gotten 30:14 50:20
58:13 126:12
governed 90:4
government 6:3,6
71:1 20:4 29:6
60:8 76:8 89:6
89:9 90:2,16,23
92:1,20,23
94:23,25 95:11
97:6 98:5 102:18
113:4,13 114:2,6
97:23 99:22,23
115:7 116:6
122:23 126:15
125:9
Grand 89:7 90:11
90:12,19 125:11
106:12,15 115:20
36:13 62:21
held 20:12
help 58:25 17,20
120:10

grandfather 77:11
ground 24:25
group 76:6 81:5,6
81:9 107:5,7
groups 77:25
guess 12:19 34:18
94:15 115:25
125:19
guidance 12:3
guilty 31:14,17
84:12,15
Gun 37:15
guy 48:14,20 49:18
guys 77:24 78:5

**H**

H 3:3 8:2
Hailstones 48:5,11
76:9 78:2
half 21:24 30:25
53:6 94:13 119:16,21
34:5
handle 25:4 70:13
107:6 109:19
110:19
handled 28:17,18
28:22,24 42:10
42:19 43:23 57:2
58:17 61:19,20
71:14 96:18
109:7
handling 38:22,24
60:23 57:14
95:25 96:1,5,6,7
96:8,10 107:5,7
110:19
Hans 68:1,25 69:1
70:15
happen 58:5 64:10
happened 45:2
58:13 85:5 88:9
107:1 123:23
happening 93:1,3,10
93:12 95:2
happens 9:20
head 10:16 48:20
headquarters 57:2
heads 77:25
health 33:1,2,10
39:1
hear 93:17 128:22
heard 47:4,17,18
113:12 114:1,20
113:22 115:6,20
126:12,15 115:20
hearing 62:3
held 20:12
help 58:25 17,20
124:12

helped 26:9
helping 26:6,8
110:19
hidden 105:17
Higgins 52:19
Hill 7:20
Hines 2:14 5:1,1
5:20,23 6:21
11:14 13:16 15:22
12:6 13:5,6,13
13:16,23 14:18
14:13,20,23
16:12 23:20 24:6
24:12 25:4 31:22
32:1,1,4,15 33:5
34:4 35:5,21
33:7,9,12,15,19
33:4,21 34:5,11
34:13 68:19
94:13 119:16,21
129:5,10,19,20,25
honest 62:11
127:19
hopefully 31:13
hopes 30:19 31:9
hospitalify 36:21
37:18 38:4 41:7
hour 29:25
house 8:13
how's 104:4
HR 26:16,18 40:13
50:13
human 38:18,20,22
38:24 40:3,7,10
40:22 41:1,4
42:19 54:6,8
73:11 79:8 10
80:7
hundred 42:25

**I**

idea 35:5 49:9,16
125:6
identification
6:20 48:2
identify 63:3
104:12

**Page 7**

illegal 89:7 92:22
immediately 15:4
  19:24 116:9
implemented 39:17
impolite 10:20
import 24:9
inadvertent 9:13
include 14:10
  73:12
included 38:25
  96:20 105:21
includes 6:9
  116:24
including 28:22
  33:1 45:8 67:16
income 79:17
incompetent 51:19
  51:22
incorporate 118:13
incorporated 4:10
  116:19
independent 123:23
individual 33:20
individually 110:6
  110:8
industries 38:18
industry 36:21
  58:9
informal 9:24
information 17:10
  24:2 32:8 33:7
  33:13,16,18,19
  34:8,25 35:14
  43:16 52:6 100:4
informed 7:4
inmate 31:12
installed 49:17
  50:7 76:5
instance 42:17
  60:13
instruct 11:10
instructed 6:23
instructions 51:14
  52:2,5
insurance 39:10,11
  40:15
integrate 81:4
integrated 79:10
intent 13:20
interest 83:20
  89:24 102:12
  111:18
interested 16:25
  30:14 34:12
interesting 113:6
internal 21:7,14
  24:9 42:21 57:15
  98:16 111:22
  113:2

interpret 112:24
interpreted 14:6
interrupt 23:21
  30:8 32:5
intimately 72:23
invade 13:20
investigated 58:2
investigative 6:4
investors 82:21
invoking 6:4
involved 5:25 21:5
  58:13 59:18
  60:13,14,16,23
  62:19 63:19 64:4
  67:25 68:2 72:23
  74:8 81:11,12
  92:2 116:15
involvement 53:8
  107:22
involving 71:15
in-house 91:6
  96:22
IRS 23:9,12,14
  63:12,14,18,20
  63:23 64:6,9
  65:2 67:11,16
  71:5 97:1,11
  98:13,24 99:2,16
  99:22,24 100:1,4
  100:15,19,21,25
  101:4 105:19,25
  106:3,5 107:18
  113:23 114:14
  115:17
issue 24:15 34:22
  35:18 58:12 60:8
  64:6 65:1,9 89:1
  89:4 96:11,17
  97:1,3 102:17
  107:17 112:18
  120:2,6
issued 106:10,15
issues 11:4,18
  22:2,5,10 25:20
  33:17 39:8 57:18
  57:21,25 58:1,16
  59:25 60:15,17
  60:24 62:20
  67:16 68:20 69:8
  73:7,13 79:7
  81:1,3 107:24
  109:8 110:15
  122:10,14
items 34:18
Ivy 51:2

**J**
J 2:3
jail 31:3 84:10

January 70:20
  113:20
Jay 51:6 52:13
Jenny 27:14,25
Jim 44:17 72:1,4,6
  73:14 74:6 97:24
  102:19 105:11
Joan 1:24 4:1,15
job 108:1
Johnson 8:17
Jose 63:21 110:11
  110:13,19
Jr 1:19 2:13 4:8
  5:2,12,18
JUDICIAL 1:1
Judy 99:1,12 100:1
  100:7,10,15,18
Jupiter 43:5,6
jurisdiction
  109:20
jury 87:7,23 95:12
  95:14 106:7,10
  106:15 107:3,3

**K**
Katy 107:12
Kean 1:6,15 2:9
  4:9,11,25 113:15
  114:16 115:4,13
keep 25:11 35:1,15
Keller 2:10,11 3:2
  4:24,24 5:16,22
  6:16,18,22 7:16
  7:18 11:9,12,14
  11:21,23 12:4,5
  12:8,14 13:8,15
  13:21,23 14:9,19
  14:21,24 15:3
  16:16,19,24 21:2
  24:6 25:2,5
  32:11,17 33:1,10
  34:10,16 35:9
  36:7,18 45:1
  51:20 57:24
  64:12,15 68:22
  79:1,2 87:9,16
  88:10 94:18 99:8
  99:10,13 106:25
  115:1 119:22
  120:1,6,8,14,16
  120:7,18,20
  123:2,5 128:24
  129:7,18,20
  130:1
kept 35:20
Kevin 78:13,14
Khanorka 107:12
Khanorkar 64:8

kind 17:23 34:12
  58:1 73:15 79:12
  103:6 123:3
Kingdom 76:13
Kinko's 125:15,23
  126:3,5
knew 22:9 23:9,11
  23:15,15,23,25
  24:3,16 46:7,10
  57:19 58:15
  60:12 61:1 64:4
  66:1 68:8,16,18
  69:22,25 70:3
  71:3 72:15 73:14
  89:6,16,20,21,22
  89:23 90:1,4,6,8
  90:8,14,15 91:1
  91:3,6,7,9 92:17
  100:18
know 8:16,12,14
  10:24 11:2,5,12
  11:19 14:12 15:1
  15:15 17:5,6,14
  17:15,17,18,24
  18:3,9,20,22
  19:10,13,16 20:1
  20:7,18,21,24
  21:6,11,16,17,18
  21:19,20,22 22:1
  22:5,17 23:10,11
  23:24 24:3 25:8
  25:18 27:21
  28:11 29:1,15
  30:7,9,20,23,25
  31:10,23 40:10
  40:23 41:11,21
  41:25 42:8 43:20
  43:25 44:13,25
  45:4,10,17,23
  46:6,16,24 49:14
  49:20 53:17 55:5
  55:7,8,11 56:10
  56:14,23 57:5,22
  58:6,10,14,20,23
  59:15 62:1,19
  62:20 68:2,4,6,9
  69:16 80:8,9,13
  71:14,17 72:11
  76:14 78:15,20
  80:9,19 81:13
  82:14,22 83:7,16
  84:9,12,15,17,19
  84:20,22,23 85:1
  85:5 88:2,24

**Page 8**

89:17 90:22 92:3
  93:4,9,12 94:4
  94:21 95:5,11
  97:18,19 99:11
  99:25 100:2,3
  103:7,25 104:1,8
  105:2 110:11
  111:8 112:22
  114:15 122:8,16
  123:16,20 124:5
  124:7 125:15
  126:10 127:12,14
  128:22
knowledge 24:21
  73:6 74:4 105:20
knows 43:18,22
  45:8,13,19 77:15
K-H-A-N-O-R-K-A-R
  64:17

**L**
L 1:3 2:2
LANDSBERG 2:11
language 114:11
large 4:3 80:15
larger 35:14
late 66:7
Lauderdale 2:12
  108:4,16,23
Laurie 61:19 77:9
  102:23,24,25
  105:13 107:8,9
Law 2:3 30:5,14
  31:19 33:20
  72:12 73:6,9,10
  89:2 108:18,20
  108:22 110:21
  117:16 119:4,13
  126:19 127:13
Laws 27:9 56:21
  57:11 90:1,4,8
  90:14 91:14,18
  112:20
lawsuit 14:2 25:17
  111:3
lawsuits 26:2,5
  109:6,14 110:9
  110:10,17,18
lawyer 9:2,19 11:3
  11:4,7,17,18
  13:5,10 14:1
  15:8,13 20:14
  38:9 58:12 60:3
  60:14 68:4,19,25
  69:4,7,23 72:12
  72:14,21 90:19
  96:3,10 91:23
  110:2 111:22
  121:4

lawyers 60:23
  67:25 73:24 91:8
  91:11 110:10
lawyer's 121:16
lead 24:11,24 25:2
  88:22 107:16
  114:11
leading 90:20
learn 67:23 87:3
  91:16 106:15
learned 67:22,24
  49:5 64:3 67:7,7
  85:25 87:22 88:4
  88:6,11,25 95:20
  97:4 98:4
leaves 36:13
legal 4:15,17
  23:16 39:12
  57:22 58:4
  107:24 108:1
  109:5,7,22
  114:18,21 115:5
  116:2,9 117:6
  124:1 125:16,17
  127:24 129:2
letter 3:4 6:11,19
  128:13 129:6,6,8
  129:8 130:14
let's 6:16 36:7
  41:16 65:15
  67:22 76:12 98:7
liabilities 67:10
  92:11
liability 65:14,14
  93:14
library 30:5
licensed 72:8,10
  74:10
license 74:12
lie 22:15
line 23:13
likewise 9:18 11:3
limited 25:18
list 15:10 41:13
  102:13
listed 55:2
litigation 57:14
  57:16 109:12
Little 31:3 38:2
  59:3 73:23
loan 84:5
loaned 83:8,19,25
located 29:23
location 23:3

Loker 55:14
long 7:22 11:1
  29:25 31:7 34:6
  36:20 90:6
  104:13
look 12:20 34:4,11
  34:17 57:13
looked 70:14 103:6
  104:7,7 115:12
  117:4 124:22
looking 14:7 67:8
loses 79:19
lot 34:8 56:16,17
  77:6 88:11 107:4
lots 88:3 105:7
  111:14
loud 10:14
Ls 64:21
Luis 43:21,22
lunch 122:1 130:4
L-U-I-S 43:21

**M**
Maher 2:3 119:4,13
  126:19 127:13
Maher's 117:16
mailed 127:9
mailing 25:18
main 117:8 100:2
maintain 15:12
  29:12 31:14
maintaining 56:20
making 7:6 24:1
  59:12 73:1,16,21
  82:16
managed 42:5
management 38:12
  38:18 40:3,22
  41:8 49:17,19
  50:3,3,7 56:19
  57:10 73:11,12
  123:11,21,22
managing 40:25
  110:9
manner 120:22
March 122:24 123:2
mark 6:16,17 125:5
  126:11
marked 6:13,19
Market 37:5,9,10
  37:21 60:7,8,21
  60:22
marketing 39:18
Marr 101:21,23
Marrero 63:21
married 7:24
Marr's 102:11
Martin 1:19 2:13

4:7 5:2,12,18
mat 24:23
materials 15:5,7
Matt 55:14
matter 4:8,10
  89:10,16,21,23
  130:1
mean 9:13 14:5
  16:11 19:3 23:21
  30:8 32:5 33:14
  51:11 52:4 54:4
  57:25 58:23
  63:25 68:13
  70:25 81:23
  104:5,8 105:16
  118:16,17
means 16:12 114:15
meant 26:20 98:21
  119:15
medical 33:13,15
meet 32:3 110:7
  118:16,17
meeting 93:25
  103:11,13,19
  105:19 122:20
  123:3,5,18
meetings 66:7
  77:24,24 78:1,18
  78:25 79:4,6,25
  80:2,4,23,24,25
  80:25 105:8 109:3
  122:6,9,13,18
  123:11,21,22
Melanie 2:14 5:1
  112:3 118:25
  119:16
member 56:18 57:10
members 50:4
memo 111:21 112:9
  112:16,24 113:9
  114:9,16 116:1,4
  116:15,17 117:1
memo 111:18,10,14
  111:17 113:15,25
  115:10,13,19,23
mentioned 113:22
  122:21
met 110:2,5 117:24
  118:10,14 119:4
  119:10,11
Miami 43:6
middle 110 6:2
  10:25 11:15 65:14

**Page 9**

85:16
Mike 78:16
million 21:24
  84:14 93:18,20
  94:2 122:21
mind 24:4,6 41:17
  50:2
minute 9:22 54:13
  71:18 76:12 79:1
  87:8 121:8,11
  128:3
minutes 30:2 78:19
Mirabilia 1:12 2:5
  4:10,23 8:20
  12:23 14:3 15:19
  15:20 18:11 19:4
  19:24 22:2,7,11
  22:23 25:20,25
  27:16,18 30:8
  36:12,20 38:11
  40:4,4,7,10
  41:10,17,25
  42:14,16 43:8,14
  44:22 46:9,14
  48:4,17,20 49:2
  49:3,5 50:10
  53:8,10,12,16,19
  54:5 55:15,20,21
  56:15,12 58:17
  61:20,23,23
  62:18 63:4 71:21
  71:24 72:4,14,16
  72:24 74:9 76:10
  76:11 77:8,19
  79:22 80:2,4,6,8
  80:10,14,18
  81:15,17,20,22
  81:24 82:13,15
  83:4,9,11,16,19
  83:22 84:1,4,18
  84:24 85:2,23
  86:2 87:1,3 90:7
  91:9,12 92:13,18
  94:11 95:7 96:23
  97:1,7 101:13,25
  102:7,12,15
  107:1 108:7,13
  109:13,16,23
  112:19 114:12
  116:7 117:5
  119:11 120:11
  123:4
misspoke 11:14
misunderstanding
  13:24
mock 88:7
moment 5:20 48:1
  65:16 67:22

Monday 1:22
money 17:11,15
  22:1 81:13,23
  82:14,16 83:3,5
  83:8,19,25 84:3
  84:23 85:1,25
  86:2 87:1 90:15
  124:13 127:7
monies 114:19
months 34:1
MORNING 1:20
Morse 2:4
motion 35:2,3,17
  103:7 104:8
  120:20
motivating 39:22
mouth 25:1
multiple 45:11
Myers 21:17 22:17
  22:19,21 56:7,11
  62:1 63:9,20
  65:1 78:4 96:20
  97:3 98:7,15
  99:15 100:21
  101:6 102:14
  105:9,25 106:2
  107:12,16

**N**
N 3:1
name 5:17 8:1
  27:25 31:24 36:9
  36:11 43:18
  64:11 72:1 99:8
  111:1
named 52:19 110:23
  110:24 126:10
names 45:11 78:6
nearly 85:11 117:3
necessary 35:10,12
need 6:17 9:3
  10:23 11:2,3,16
  24:23 32:17 34:9
  87:10 102:25
  103:3,9 104:9
  106:18 120:20
  123:5 127:11
needs 11:14 32:21
negotiate 67:10
  71:5
negotiated 66:5
negotiating 73:16
never 18:18 50:2
  57:18 58:13 60:8
  60:12,22 74:1
  84:7 85:20 86:13
  86:16,18 109:25
  110:7 116:1
new 53:18 112:25

79:9 81:4,7
  82:12
news 30:9
newspaper 30:10
Nice 32:3
Nicolette 2:6 4:22
NINTH 1:1
nod 10:16
nonpayment 116:25
non-party 35:22
Norman 31:24,24
  32:3,5,13,19
  33:3,6,8,11,14
  33:22 34:2,14,21
  35:7,22 36:2,11
  36:11,13
North 1:21 2:7
notarized 125:1,3
  125:4,4,7,14,18
  125:20 126:4,6
notary 4:2 125:12
  125:13,16 126:12
  126:13
notes 103:19
  107:10
notify 35:23 36:1
number 41:20 48:14
  80:13,14
numbers 33:2,2,4
  33:12,23,23,24
  93:17

**O**
object 16:10 21:1
  23:19 25:3 44:24
  51:17 68:21 99:3
  119:21 120:12
  121:4,7
objecting 16:12
objection 16:15,22
  51:23 94:13 99:6
  99:8 114:21
obligation 98:13
obligations 23:16
  66:17 92:6
occasion 110:2,3,7
  115:21
offered 113:15
office 6:2 22:23
  22:25 23:2 50:9
  50:11,12,13,14
  50:17 52:24 53:1
  64:8 75:11,12,14
  103:16,23 108:12
  108:14,16 109:20
  117:22 118:7
  70:19 81:19

officers 48:22,24
  123:4
offices 50:10
  52:22,25 53:2
  55:22 56:3 75:21
  75:25 91:9
Oh 5:22 68:5 79:23
  108:9 119:6
  125:3
okay 7:16 9:17
  10:8,11,22 11:13
  11:20 12:22
  13:13 14:8,20,23
  15:16 17:10
  20:12 22:14,16
  24:19 30:25 32:7
  33:22 35:5 36:16
  38:6,24 39:14
  42:5,24 44:11,15
  45:13 47:1 48:8
  48:14 49:21 52:8
  52:20 53:11,20
  55:6,8,17 56:3
  58:25 59:6 60:10
  61:9 63:8 64:14
  65:17 68:18
  69:19 70:18
  71:25 72:9,11,15
  73:25 74:25
  76:17 77:1 78:18
  78:18 79:23
  81:24 83:25 84:7
  84:17 87:3 90:18
  100:18 101:14
  102:1,4 104:9,18
  104:22 105:3,22
  113:2 116:16
  116:18 121:9
  125:2,10,21
  126:5,16 127:4,5
  127:8,24 128:2
  128:12 129:2,10
  129:12,18
old 88:16 112:12
open 105:7
openly 105:7
operate 16:25
  70:19 81:19

**Page 10**

86:10,14,20 87:1
  103:22 112:20
operated 87:4
  94:12 98:17
operating 29:14
  79:7 82:4 85:21
  86:8,19 93:4
  95:3 99:17
  104:23 122:21
operation 74:5
  79:13 81:25
  92:11
operational 80:4
  81:1
operations 17:6,11
  56:23 59:16,19
  77:23,25 78:24
  79:13 81:3 92:8
  92:14 102:18
  104:16
opinion 24:14
opportunity 7:3,9
options 70:7
oral 6:5
Orange 1:1,21 2:7
  4:14
order 35:3,17
  129:23
original 19:3
  127:11,13
originally 28:6,9
Orlando 1:10,21
  2:8 4:14 7:20
  23:4 43:2 108:5
outlined 116:18
outside 57:13
  70:10 108:3,9
  109:5,12,20

payment 90:2 92:6
  112:5 113:11
payroll 17:15 20:3
  20:24 21:4,6,13
  21:23 22:3,6,10
  23:17 26:16,17
  27:2,4,6,9 33:17
  38:25 40:2 41:8
  42:20 47:2 56:21
  56:23,24 57:17
  57:21 58:3,16
  59:12,12,25 60:9
  60:15,16,23 65:4
  65:7,73:11 80:7
  81:18 84:15,24
  85:22,3,22 86:9
  86:20,25 87:5,24
  91:24 92:18,10,19
  93:5 94:8,12,23
  95:13,21 97:5
  98:4,9,17 99:19
  102:6,9,24 109:3
  109:7,15,16,22
  109:24 110:13,15
  110:20,21,23
  111:1,6,13,15,21
  112:5,9,12,13,20
  113:3,8,18,23
  114:5,18 115:3,6
  116:7,13 117:7
  119:17

paying 21:6 59:25
  60:9 65:4 85:9
  90:9 91:23 92:3
  92:4 95:21 97:5
  114:20 115:7
  116:8 117:8
  119:20 120:9,16
  121:5
Paymaster 2:23
  26:13,25 27:3
  27:2,6,10,11,12
  27:14,16 28:5,7
  28:8,12,15,19
  29:10 39:24 40:6
  41:7 42:19 54:14
  54:15 55:12,18
  55:12,17,18,22
  56:1,13 57:2
  58:10 59:19 60:5
  80:1,5,9 102:10
  80:1,5,10,12,18
  81:6,9,12 82:2,6
  82:20 115:12

17:12 19:19
  61:11 63:5 74:24
  91:17 93:12,14
periods 48:10
  52:14
permissible 114:18
  115:15 116:9
permitted 16:14
person 21:8,14
  23:14 27:8 28:18
  29:2 40:25 63:9
  63:11,23 73:11
  73:12 74:4,75:5
  75:6 96:25
  100:19 107:16
  119:4
personal 33:1
  34:19 128:25
person's 64:11
perspective 79:8
phone 124:9 126:21
  126:24 128:20
picking 81:12
picture 67:2
place 19:17 29:13
  35:24,24 43:6
  50:4 99:16
picking 81:12
plan 123:12
plans 14:5
planting 24:25
please 4:18 5:5,22
  5:19,20 129:12
plaintiff 14:4,13
  2:2,4
plea 63:15
pleaded 12:16,20
  13:1,5 116:14,24
  116:18 19:23
pled 84:12,15
point 12:9 14:18
  44:22 52:20
  55:19 61:6 62:17

62:21,22,25 63:9
63:22 70:10 72:5
72:18 86:3,23
89:5 93:18 96:25
100:18 102:10
107:15,16 127:8
127:18 128:10,14
portion 87:10
position 60:25
49:1 83:8,10
102:2,4,6 128:12
positions 91:13
possible 125:17,19
potential 69:8
powers 23:8
practiced 109:20
precluding 129:21
predicament 26:3
prefer 23:22 24:24
preparation 12:17
prepare 12:11,13
26:5,6 118:13,16
prepared 68:16
124:8
preparing 26:1
68:6
prescriptions
129:15
presence 125:12,18
present 2:16
100:11,16 103:6
110:4 122:7,10
122:14,19 123:18
presentable 65:5
preserve 26:6,9
preserving 26:4
president 13:2
44:15 54:22,25
55:3,10 61:3
62:6 72:14,16,17
74:17,18 76:10
77:18,21 91:13
102:3,8
Presidion 19:20
20:9,11 22:2,7
44:2,2,4,5,6,12
44:19,23 45:2,6
45:8,14,17,22
46:1,3,7,8,12,15
46:18,19,20,23
46:24 47:8,9,14
47:19 53:15 65:4
65:19,19,23 66:9
67:20 68:13 94:5
102:16 103:5
104:2,4,18
111:25 112:4

116:23
Presidion's 63:16
presumably 62:8
pretty 44:8 76:2
PriceWaterhous...
76:19
printed 127:5
printing 38:16
prior 119:22
priority 113:22
114:2
prison 23:15
private 33:19
privilege 6:4 11:4
11:11,17 13:20
119:25 120:14,15
121:20 128:15,16
128:21
privileged 14:17
120:2
probably 34:19
85:12 97:8
111:13
problem 35:21
70:10
problems 67:15
procedure 9:1
proceeding 90:19
process 34:6 65:6
66:24 67:4 70:16
77:7 118:4
processed 27:2
processing 43:3
produce 13:4
produced 12:22
13:9 14:10 15:6
15:7,11,17 32:13
32:21 35:8
producing 32:12
production 41:14
professional 1:25
20:21 22:7 27:13
45:19 73:4
professionals 26:2
105:21
proffered 6:10
profit 65:7 71:6
profitably 104:24
profits 79:19 82:8
82:12,19
progress 43:14
79:13 81:5
prohibition 128:18
project 27:21
projects 28:11
79:9
promptly 90:2
proper 10:21 53:11
117:6

properly 58:3
104:23
psychiatric 35:24
psychiatry 35:14
proposed 34:5
proprietor 43:14
protect 11:11
33:21
protective 35:1,17
provide 12:12 41:8
44:22 46:6 42:12
46:22 53:23 54:7
provided 6:8,10,12
14:15 15:1 38:20
43:17 44:7 45:5
45:18,24 47:11
80:20
provoker 80:8
provides 54:6,11
provisions 128:12
public 4:2 22:19
23:16 63:17 65:6
92:12 104:24
publicly 44:13
pull 40:12
purely 81:3
purpose 26:16
91:10 113:11
114:3 118:8
120:19
put 24:17,23 67:1
67:22 77:2 86:1
putting 85:25
P&L 81:2
P.A 1:6,16 2:9,11
4:9,11
p.m 1:22

**Q**

quarter 61:13,14
122:23,25
quarters 94:10
question 7:10,17
9:10,19,22,25
10:6,7,9,12,25
11:2,6,16,17
12:7 13:6 16:13
16:14,16 21:10
23:22,24 24:11,20
25:1,3,7 60:18
60:18 68:24
87:18 88:21 93:9
98:3 99:14 112:3
113:8,21 120:3
120:25 122:4
123:14 128:15
129:6,9,16

questions 6:25 7:5
7:7 9:2,4 11:24
88:1 129:11
quite 71:20
quote 90:18

**R**

Rachlin 77:15
96:10
raise 5:5
Ramos 43:21,22
ran 20:21
range 38:13
rates 40:15,17
read 12:15,17,19
44:10 87:19
97:12,25 101:6
111:10,11,12,13
113:5,6,9,17,18
113:24 119:5,11
115:18,23
reading 113:24,25
114:6
realize 40:19
74:11
really 23:21 24:24
27:24 30:14
107:9 120:12,21
reason 10:23 11:15
15:24 18:24 25:8
31:10,12 34:5
55:7 62:15 66:12
66:15,19 77:15
114:24 116:6
116:7,9,14,17
114:8
recall 15:8 45:19
48:3,8 56:19
62:9 63:5 64:3
66:10 67:24 96:6
111:6,6,21,23,24
112:2,9,16,17
114:6,18,24,24
42:19 49:7 53:21
54:6,8 79:9,11
respect 6:7,23
24:17 60:9 69:1
69:11 113:22
125:7,9,14,19,22
126:2,5,6,7,21
respectfully 9:3
response 10:15
15:12 103:2
responsibility
21:15 88:19,22
113:3 123:24
124:6 126:14,15
129:4
Riguera 1:16 2:9
4:9,11,25 101:11

121:18,23 128:5
128:6,8,11,23
130:3
recorded 87:20
records 16:25
33:13,15 35:8,9
87:24
redact 33:24 34:24
35:12,14 36:4
reference 6:14
24:15
referenced 123:21
referred 40:20
48:9 54:17,18
referring 16:1
reflect 6:1 94:15
regarding 22:3
32:7 112:10
regulation 123:11
regardless 50:3
regular 56:3 79:7
79:12
regularly 23:2
110:14
rehabilitate 63:16
65:4
reiterate 25:6
relate 12:23,25
related 20:8 27:17
67:21 68:13 88:8
89:24 111:13
relating 6:4 12:6
59:25
relationship 44:1
44:16,17
relied 57:10 59:24
91:11 115:24
rely 57:17 128:14
128:16 129:5
remember 19:21,25
25:23 42:8,25
43:3 45:13,16
48:10 55:1,2,4
63:9 72:2 78:19
78:24 79:3 84:2
97:7,9 100:24
111:1,1 112:7
113:24 114:6
117:15,20 122:12
125:7,9,14,19,22
126:2,5,6,7,21
127:2,9
remembering 35:25
remitted 20:3
remote 23:3
renovate 81:15
repay 63:17 65:6
repeat 13:6 22:4
71:22 87:18

74:9 89:25 93:11
110:9 111:25
113:16
rephrase 25:9
68:23
report 23:17 58:3
61:4,5 74:20
76:22 80:22
106:14,17
reported 1:24 56:4
61:16 66:5 74:16
74:23 75:11 77:20
reporter 1:25 4:12
4:15 5:3,5 9:5,6
10:3,15,21 64:10
reporting 59:11
60:1 61:11 66:9
76:6
represent 36:12
62:1
representation
14:14 57:23
representative 6:6
represented 119:16
representing 15:14
32:2 80:5
reputation 39:21
request 8:2 25:8
25:14 26:12 34:3
requested 32:9
requesting 14:5
32:9
require 90:22
required 90:1
residence 5:19
79:12
resolve 67:15
70:10 120:6
resolved 22:11
128:16 129:5
resources 38:20,23
38:24 40:12 41:1
42:19 49:7 53:21
54:6,8 79:9,11
respect 6:7,23
24:17 60:9 69:1
69:11 113:22
125:7,9,14,19,22
126:2,5,6,7,21
respectfully 9:3
response 10:15
15:12 103:2
responsibility
21:15 88:19,22
113:3 123:24
124:6 126:14,15
129:4
Riguera 1:16 2:9
4:9,11,25 101:11

114:17 115:16
ring 126:11
rise 87:8 72:25
73:18,22 108:25
roles 91:7
Roman 45:15
room 31:21 36:14
101:18
rook 38:3,4,5
Roy 64:7
Ruby 36:23 37:13
90:20
rule 91:7 110:12
113:24
rules 8:25 90:22
rulings 30:11
run 20:16,18 59:7
77:5 84:24 85:2
running 38:22
56:18 75:1 91:9
runs 31:8
Rumsfeld 102:23,24,25
R&A 37:2 60:7

**S**

Sadrianna 72:2
74:6 97:24
102:19 105:11
sales 37:20
saw 15:4 75:9
Schrin 111:21
saying 86:1 105:20
says 10:15 24:14
scale 40:20 49:8
scanned 127:8
schedule 68:7
schizophrenic 38:3
School 38:6
science 38:6
scope 128:21
second 9:13 11:8
23:20 31:22
122:24
Section 111:21
secured 33:17
113:22 114:1,14
security 33:2,3,22
83:8,10,20
see 12:20 29:21
34:17 41:14 51:1
76:1 85:9,12
77:21 98:2
106:11 113:14
114:16,23,24
116:4,17,22

123:13
seeing 67:18,18
seen 18:10 19:18
19:22 43:12
49:14 63:21 64:1
66:3,7,24 94:5
97:14,15,18,18
101:19 106:12
113:16 115:2
116:1 117:9
122:20 123:7,9
selected 49:18
sell 8:15 63:16
65:6
send 51:15 52:9
126:23 127:13
sending 87:25
senior 62:6 83:17
sense 90:11,13
101:10
sent 52:10 124:20
127:8
sentence 30:17
31:8
sentenced 30:25
separate 41:16
50:10
September 1:22 4:5
119:3,3 126:7
serve 28:20
Service 98:16
113:2
services 26:17
38:21 53:23 54:1
54:10
serving 91:12
session 1:20 6:11
9:8
set 51:18 128:13
settings 9:24
settle 104:22
Shane 50:21,22
51:4 52:16 75:3
shape 114:17
share 49:7 53:21
shareholder 19:4
shareholders 80:16
80:19 102:13
Sharmila 64:8,20
107:9,11,12
Sherwood 8:11,12
short 61:13
shots 50:5
shut 32:19 67:11
71:4 112:12
side 23:6,6 67:22
100:19
sidetracked 74:16
sign 54:24 117:15

124:24 126:4
signal 9:14
signature 29:4,9
29:16 125:1,3,7
126:12
signed 24:7,13
29:7 54:19 55:5
55:9 117:13
119:2 123:22
125:13,17,21
126:16,18,22,25
127:5 129:1,1,3
Sin 20:18
Singerman 2:14
119:18
six 51:5 15:9 16:18
21:11 22:5 23:15
27:19 28:2 29:24
31:2,5 41:11
49:4 54:21,23
66:23 77:17
116:21 123:11
124:2
sit 67:6
six 34:1
small 35:13 76:2
Smith 2:3 4:20,20
6:17 16:10,22
21:1 23:9 44:24
51:17 68:21 99:3
99:5,9 114:21
117:18,20,24
Smith's 124:11
Social 33:2,3,22
software 79:11
sole 18:8
solemnly 5:7
Solutions 22:8
44:2,4,6,20,23
45:2,6,8,14,20
45:22 46:1,3,7
46:12,15,18,20
46:23 47:8,13,13
47:19 65:20
somebody 28:10
35:22 107:25
109:17 110:23,24
111:2
someone's 9:25
74:22 128:10
sort 128:22
sophisticated
76:25
sorry 16:17 21:10
22:4 28:9 29:15
30:7 31:22 37:6
45:16 50:25 58:8
61:15 68:10
72:22 85:6 116:20

108:9 116:20
113:18
sort 58:18 116:18
sound 24:2,2,21
64:22
source 81:16 82:14
sources 17:13
South 2:15 43:4
Southeast 2:11
so-called 113:1
speak 11:7 97:3
speaking 10:4 51:9
67:18 100:15
111:6
speaks 24:13 76:15
spearheading 65:1
specialist 73:15
107:25
specialized 54:9
specific 79:15
93:12 97:7 112:7
specifically 19:25
48:8 79:5 84:22
98:11 112:3
118:24
specifics 17:24
21:5 30:23 70:25
speculating 58:11
spelling 64:11
spoke 98:22 101:9
101:23
spoken 101:8,21
118:25 119:22
spread 41:4
St 7:20
staff 56:20
stage 82:5
Stallenwork 51:6
52:13
Stanley 78:7,8,16
start 9:10,19,25
56:1
started 22:7 28:7
28:12 49:2,3,6
49:16 56:1,8
74:15 79:21 86:4
95:14
state 4:2 28:23
37:23 38:5 72:13
74:22 128:10
stated 40:22
statement 5:21
95:18
states 1:9 6:3,6,8
6:9 7:1,5 74:13
status 47:16 79:16
statute 114:4
steal 90:15
stealing 66:16,20

Stenographically
1:24
stipulation 32:7
34:6,24
stock 80:18 102:11
stockholder 18:8
stolen 17:15 84:24
85:2
stop 9:2,15 10:24
10:25 11:6 48:1
106:18
stopped 88:14,16
88:17,23 89:4
storage 15:22
straighten 51:1
strategy 16:5,8,20
17:1,3,12 18:20
19:6 20:2 26:1
72:24
street 2:15 75:22
strike 86:23
stuff 30:23 34:11
40:23 57:1 73:19
79:12 101:13
subject 32:14
subpoena 13:16
subpoenaed 107:2
subpoenas 87:23
92:3,6 93:19
106:10,15
subsidiaries 45:6
46:12 47:7
subsidiary 47:13
47:14
substantial 73:6
successful 39:18
81:25 82:20
sue 26:6
sued 109:16
sufficient 82:19
suggest 33:23 34:4
34:7 129:23
suggested 115:4
suggests 36:7
suggested 114:17
suing 109:16
suit 9:11 24:4,7
2:11,15 4:14
suitable 72:10

67:9,14,20,23
68:14,15 69:20
70:19,24 71:1,4
71:8,16 86:8,12
86:19 112:1,11
116:23
SunTrust 53:1
supervised 109:12
support 4:16 40:13
supporting 49:15
supposed 33:20
Supreme 30:11
sure 6:23 7:2
10:14,20 13:11
13:15 14:9 16:23
17:2 43:16 44:9
45:17,23 56:1
58:21 59:12,24
62:11 73:18,16,21
84:9 88:4,6,20
92:15 94:14
100:13 102:20
105:5 123:1
124:13
surprise 56:10,15
62:21
surrounding 24:18
suspect 45:4 49:20
swear 5:4,7
swearing 125:9
sworn 5:7 74:12
S-H-A-R-M-I-L-A
64:20

**T**

T 3:3
take 9:5,6 10:3
17:22 29:25
32:15 34:1,4,14
34:17 81:13 89:3
92:12,18 104:20
113:22 114:2,13
115:5 117:5
124:16 129:21,24
taken 4:1 60:2
104:24
talk 9:8 30:3,4,6
30:11,18 76:12
102:19 103:7,22
103:1,10,23
127:15
talked 71:20 77:6
118:24
talking 14:19,21
15:25 34:7 41:22
34:8,13 81:9,11
90:23 91:24 92:8
79:21,24 89:14
104:13,15

talks 30:5
Tallahassee 2:15
tape 103:18 121:10
taped 103:17
tape 106:19
target 129:4,8,9
129:14
tax 17:16 20:3,8
20:11,12 22:10
27:9 28:23,24
33:7,8,9,10
35:19 46:21,22
47:1,2,20,25
53:15,18 56:21
57:11,18,21
58:16 59:23
60:15,16,23 64:6
65:1,9,11 66:6
66:17 67:10,16
68:19 73:12
84:24 85:2 86:25
96:11,17 98:17
110:15 111:8,10
111:16 112:20
113:14 114:18
115:6 116:25
117:1 123:20
131:24 24:22 25:2
28:15 29:13,16
124:22
tax-exempt 65:19
taxes 20:24 21:4,6
21:7,9,13,15,23
22:3,6 23:17
23:20 66:9 67:3
83:15 118:15
126:5
tax's 9:16
terms 9:5 73:9
65:5,7 73:6
81:19 84:6,14
85:2,22 86:5,20
89:7 90:2,9,14
90:23 91:24 92:9
93:3,8 96:1,24
98:5 101:4,17,18
101:25 104:3
105:18,20,23
106:1 103:6,22
124:25 24:22 25:2
28:15 29:13,16

67:3 70:22 80:10
72:3,4,23,24
98:15 100:21,25
101:11,14,16
102:2 105:4
115:9,12,18
116:11 118:20,22
120:6
telling 85:20
92:17
tells 101:13 117:5
ten 35:2,17
term 31:8
Tessa 50:23,24
51:2 52:11 75:3
test 24:16
testified 5:14
62:4,8 96:14
testify 74:12 96:14
testimony 24:10
7:15 11:22 24:5
124:14 123:20
theoretically 41:4
thing 9:21 23:24
33:19 41:2 59:2
127:15 129:11
33:21
think 6:13 16:18,18
106:13,20,23
108:9,12,25
108:5,9 109:1,1,1
109:9,22,23
thinks 9:11 53:3
110:9,19
thinking 78:11
third 2:11 14:1
thoughts 30:22 35:5
76:18 94:16,19
98:8,18,19,24,24

thoughts 30:15
Thrace 3:1
three 6:4 51:8
53:6 113:7
Thursday 15:11
time 4:5 6:24 9:1
10:4,23 15:24,25
16:4 17:1,5
21:12 26:9 31:7
32:22 35:13,16
36:12,16 37:11
38:11 44:22 48:3
48:19 52:14
54:17,17 60:4,12
60:19,23 61:11
61:13,22 62:4,10
62:13,17,22,25
63:7 64:1,4
65:12 66:16 67:7
68:3 71:3 72:15
73:9 75:20,24
75:25 76:2 80:22
81:21,22 85:7
86:23,24 87:1,8
91:17 93:14,19
93:17 96:11
101:23 105:18,18
106:13,20,23
108:3,5,9 109:1,1
109:9,22,23
times 44:9 48:18
53:5 58:7 62:19
85:12,17,19
94:12,22 105:3
118:1,2,6,122:6
title 28:20
titled 28:20
today 4:5 5:21
6:12 12:2 13:19
14:16 32:21
24:24 28:16,19
14:4,23 15:19
117:1 118:23,24
119:3 123:1
today's 4:4
Todd 31:20,24
34:10 36:11
told 18:12 22:12
42:23 82:10,23
83:20 84:5,23
86:8,17,21,25
88:5,6,12,14,15
88:17,20,22,24
92:22 95:10 97:9
98:8,18,19,24,24

## Page 15

```
99:1,15,21,21,23
99:23,24 100:22
101:3 105:1
115:15 118:23
ton 41:13
Tony 52:19
top 37:15 39:15
touch 25:11
Tracy 8:2
traded 44:13
transaction 66:10
  71:15
transactions 93:12
transcript 94:15
transmitted 116:5
traveling 23:1
treated 49:21
trouble 60:20
true 22:14 66:13
trust 114:19 115:6
  116:25
truth 5:7,8,8
try 64:13 70:10
  71:5 94:25 114:2
trying 30:19 53:7
  100:13 120:21
  126:1 128:19
Ts 73:17
Tuesday 37:13
Tuesdays 36:23
  60:5,20
tune 21:23
turned 39:14
turning 56:24
twice 110:24,24
two 9:12 21:12
  29:22 43:4 48:4
  52:23,25 64:21
  74:13 94:10
  97:22 123:1
type 33:19
typed 116:5 124:16
typically 74:23
  75:3,4

        U
uh-huh 10:16
  112:13 121:2,2
uh-uh 10:16
UK 76:21
ultimately 30:16
umbrella 44:6
  82:13
unable 70:8
unclear 25:7
understand 10:6
  16:13 17:19 18:5
  18:9 20:10 21:10
  21:11 25:8 30:24

36:2 42:11,13
47:3,6,10,15
49:1 51:9 58:11
59:21 63:14 65:8
65:24 66:15,18
66:19 67:13
68:25 70:23 71:2
71:8 72:7,14,17
72:23 76:23,24
76:25 77:5 80:2
80:14,17 81:16
81:18,21 84:5,9
86:2,11,15 88:21
92:5,7,13,15
102:1,2,4,6,11
104:18 107:15
112:2,22 113:9
114:24 120:18,23
123:13
understanding
  18:11 19:6,9,14
  25:5 22:10 23:13
  42:18 44:3 46:6
  59:9,10,14 62:24
  65:13,21 67:6
  69:3 71:10,13
  73:17 78:17
  89:11 92:21
  104:20 106:1
  107:14,20,21
understood 10:10
  18:18 21:4 33:22
  42:3,12 44:16,18
  44:21 45:7 46:1
  46:3,11,13,19
  47:1,7,12 48:21
  49:10,12,15 50:6
  53:15 59:6 63:11
  63:15 64:7,25
  65:3,10,18,22
  66:21 67:17
  69:10 70:9 73:8
  73:22 74:10,11
  77:10,11 80:15
  81:8,15,22,24
  82:15,18 83:15
  85:6,24 86:11
  89:10,15,18,18
  90:25 91:20,23
  91:24 92:9,23,24
  93:7,13 94:17,22
  96:12,17,25
  99:19 102:3,7
  104:2 105:24
  107:8,23 108:6
  108:17 109:7
  113:4 115:8
  116:10,15
unemployment 40:17

unfair 24:22
unified 40:10
United 19 6:3,6,8
  6:9 7:1,5 76:13
universe 13:12
University 37:23
  37:25
unpaid 22:6 66:17
  84:5 85:21 87:4
  88:3 93:5 94:2
  94:12 98:9 99:18
  111:25
unprofitable 39:14
unsophisticated
  74:4
updates 79:11
use 87:4 92:10
  94:24 112:20
  113:1 114:18
  115:6 117:7
usually 17:25
  25:21 48:10
  75:24 76:2,3
  79:18,20 80:25
utilizing 86:20
U.S 4:15,16 6:2
  129:13

        V
vacation 23:1
Vanderburg 44:15
variety 84:15
various 77:24
Ventures 1:12 2:5
  4:10
verbal 10:14
version 55:5
versus 4:8,11 43:9
VI 45:8,14,15,17
vice 62:6
video 32:24 121:17
  122:20 123:7,9
  123:25
videographer 2:16
  4:4,16 5:3 32:22
  36:16 87:11,14
  106:18,23 121:14
  121:22 128:4,7
  130:2
videotape 32:18,19
videotaped 4:7
view 129:10
views 128:20
VII 45:22
Vilmoz 2:6 4:22,22
  31:25 35:9 36:18
violate 6:25 89:1
violating 89:3
  128:12

violation 112:20
  128:18
vision 53:19
visit 25:15
volume 1:20 34:5
  35:13,14
voting 80:17
vs 1:5,14

        W
Wachovia 53:3
  75:18
wait 90:21
waived 119:24
walk 75:23
walked 32:7
Walsh 63:1,6
want 9:12 13:11,11
  14:9,24 32:8,15
  32:16 34:18,20
  41:11 57:20
  58:21 86:5
  121:10 123:16
  128:1,17 129:22
wanted 32:20 49:6
  49:16
wants 34:23
warehouse 15:22
wasn't 9:22 22:1,5
  22:14 37:18
  48:14,17,20
  59:17,19 60:16
  60:18 64:4 65:11
  69:13 81:9 88:15
  88:18,18,21 94:2
  100:10,16 103:22
  123:7,9
way 14:6 24:22,25
  25:4,7 26:15
  45:15 85:8,21
  89:12 113:18
  114:17 115:8,10
  116:10 119:15
week 15:8,12 29:22
  85:13,17,19
weekly 77:23 78:1
  79:4,6,7,25
  80:22
weeks 97:22
Wellington 71:9
Wellington's 71:15
went 12:9,10 31:3
  36:19 38:11
  52:24 55:19
  56:12 76:6 90:6
  113:6
weren't 9:15 80:13
  81:11 89:1
West 2:4
```

## Page 16

```
we'll 11:6,6 25:4
  30:11 34:24,25
  48:25
we're 11:5 24:3
  32:23 33:20 34:7
  34:16 35:22
  36:17 58:21 59:2
  79:9 87:11,15
  98:12,13 100:22
  106:20,24 119:21
  121:7,15,19,22
  128:5,8,10,14,19
  129:5,22 130:3
we've 33:3 35:7
  66:25 71:1 103:1
  103:3,9 104:10
whatsoever 22:2
  60:13 116:18
  119:13 122:17
  123:17 129:8,9
When's 101:23
wholly 71:11
widely 39:18 95:11
Widermuth 4:12
wife's 8:1
Wildermuth 1:16
  2:9 4:25 97:17
  111:5 114:1
  115:4
Williams 51:4
  52:16
winding 17:8
wind-down 17:12
  19:18,23 25:24
  43:22,23 66:25
  67:4,8 70:25
  83:7
wind-up 15:20 16:1
  113:7 118:4
  119:7,8,11
Wing 125:5 126:10
winner 37:13,15
Winter 2:4
wish 37:19
withheld 27:4 90:3
withhold 89:7
withholding 27:9
  59:25 114:19
  115:6 116:25
witness 5:2,4,10
  7:17 9:9 11:20
  12:9 15:1 16:11
  16:17,23 24:10
  32:2,11 36:5
  44:25 51:18
  57:21 87:21 99:4
  99:7,11 114:23
  128:2
witnesses 9:18

witness's 32:11
won 37:11,20
wonderful 33:25
Woody 8:17
words 24:25 89:16
work 8:20 17:20,21
  23:3 26:25 28:3
  28:11 34:24
  55:15,19 56:5,12
  58:18 70:8 75:14
  76:19 90:6
  107:24 109:22
  125:15
worked 15:18 16:5
  22:21 23:3,6
  25:23 26:13,19
  28:6,9,12 35:5
  36:23,25 37:2,5
  37:10 48:5 50:17
  51:3,3 55:11,17
  56:8,22 57:6,9
  58:17 59:7 66:5
  71:21,23,24 85:7
  108:20 110:10,13
workers 39:8
working 30:13
  46:20 51:16 53:9
  53:17,22 72:25
  75:17,19 79:9
  91:6,12 92:5
  96:22 97:11
  98:12,14 108:4
  113:5 115:16,16
  117:2
workout 91:25
  98:14
Workplace 39:6
works 30:4 35:4
  54:16
world 9:20
worry 35:25 102:25
  103:3,9 109:9
  107:4
wouldn't 55:8
  56:10,15 73:13
write 126:23
writing 115:5
written 6:5 116:4
  123:25 126:25
wrong 89:16,20,22
wrote 111:8 114:1
W-2s 26:23

        X
X 3:1,3

        Y
yeah 6:17 37:8
  46:10,24 48:17
  50:24 54:18
  64:20 68:16
  69:18
year 31:3 36:20
  38:2,4 74:21
  48:18,19,21,22
  43:24 53:4,14
  55:15,19 56:5,12
  58:18 70:8 75:14
  76:19 90:6
  125:15
Yep
York 72:10,13

        S
$200 84:14
$72 93:18,20 94:2
  122:20

        0
05 85:8 94:9
  112:25
06 85:8,8,14,16
  94:10 103:14
  106:8
08-CA-31333 1:22
09 119:3

        1
1 3:4 6:18,19
  70:20
1,000 40:15
10 40:14
10:00 7:9
10:04 32:23
10:18 36:17
10:30 7:9
100 2:11 40:15
  41:2,5 83:12,13
  83:14,15
1050 2:11
1099 26:23
11 7:23
11:18 87:11
11:32 87:15
11:55 106:20
12-31-04 66:6
12:00 106:24
12:17 121:15
12:23 121:22
12:30 128:5 129:21
12:36 128:8
12:38 130:3
125 2:15
1400 2:7
14556 7:20
1500 1:21 4:14
188:7
198:6

        2
2 119:3 126:7
2,000 42:4
20 41:1 56:7
200 2:4
2004 21:19 47:22
  66:2,3 67:24
2005 53:9 55:21
  56:2 67:25 70:20
  74:19,20 86:7,19
  93:19,20 94:3
  112:16
2006 48:22 50:6,6
  55:19,21 61:15
  62:8 76:4,5 77:9
  77:23 78:10
  85:18,24 86:25
  87:6,21 88:12
  89:6 91:16 95:9
  95:15 98:20,25
  101:24 106:16
  107:16 113:21
  122:23
2007 16:2,3 17:5
  17:18 25:25
  101:25
2008 16:3 17:6
  25:25
2009 119:3 126:8
2010 1:22 4:5
  98:21,23 99:11
  218:6
22 30:25
25 36:20 38:12
27 1:22 4:5

        3
3 48:6
30 56:8
300 2:15
31 66:3
32 1:2
32301 2:15
32789 2:4
32801 2:8
32828 7:21
33394 2:12
3901 2:21 2:7 4:13

        4
4 48:6
40 56:11
401 33:18
45 30:2

        5
5 3:2 48:7
5:10 1:22
```

## Page 17

```
        6
6 3:4
6:09-cv-175-Or...
  1:11
631 2:4
66-72 21:7
6672 111:22

        8
8 66:10

        9
9:32 11:22 4:6
941 94:8
```

131

IN THE CIRCUIT COURT OF THE NINTH JUDICIAL
CIRCUIT IN AND FOR ORANGE COUNTY, FLORIDA

CASE NO:   08-CA-31333 (32)

FRANK L. AMODEO,

        Plaintiff,

vs.

BERMAN, KEAN & RIGUERA, P.A.,
and RICHARD E. BERMAN,

        Defendants.
_____/

UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
ORLANDO DIVISION

CASE NO. 6:09-cv-175-Orl-31DAB

MIRABILIS VENTURES, INC.,

        Plaintiff,

vs.

RICHARD E. BERMAN, BERMAN, KEAN &
RIGUERA, P.A., ELENA WILDERMUTH,

        Defendants.
_____/

DEPOSITION OF MARTIN C. FLYNN, JR.
VOLUME II, AFTERNOON SESSION
390 North Orange Avenue, Suite 1500
Orlando, Florida
Monday, September 27, 2010
9:32 a.m. - 5:10 p.m.

(Stenographically) Reported By:
JOAN COMPARATO, FPR
FLORIDA PROFESSIONAL REPORTER

---

132

1               APPEARANCES:

2  On Behalf of the Plaintiff Frank L. Amodeo:

3         J. BRENT SMITH, ESQUIRE

4         MAHER LAW FIRM
          631 West Morse Boulevard, Suite 200.
          Winter Park, Florida 32789

5

6  On Behalf of the Plaintiff Mirabilis Ventures, Inc.:

7         NICOLETTE VILMOS, ESQUIRE
          BROAD & CASSEL

8         390 North Orange Avenue, Suite 1400
          Orlando, Florida 32801

9  On Behalf of Defendants Richard E. Berman, Berman, Kean &
    Riguera, P.A. and Elena Wildermuth:

10        D. DAVID KELLER, ESQUIRE

11        KELLER LANDSBERG, P.A.
         100 Southeast Third Avenue, Suite 1050

12        Fort Lauderdale, Florida 33394

13  On Behalf of the Deponent Martin C. Flynn, Jr.:

14        MELANIE A. HINES, ESQUIRE
         BERGER SINGERMAN

15        125 South Gadsden Street, Suite 300
         Tallahassee, Florida 32301

16

17  ALSO PRESENT:  Adam Azoulay, Videographer

18

19

20

21

22

23

24

25

---

133

---

134

1             I N D E X

2  WITNESS:

3  MARTIN FLYNN, JR.

4  DIRECT EXAMINATION BY MR. KELLER (Continued)  136

5  CROSS EXAMINATION BY MR. SMITH  255

6  REDIRECT EXAMINATION BY MR. KELLER  270

7

8

9

10

11

12  CERTIFICATE OF REPORTER  273

13  CERTIFICATE OF OATH  274

14  READ LETTER  275

15  ERRATA SHEET  276

16

17

18

19

20

21

22

23

24

25

135

```
                    EXHIBITS

  DEFENDANT'S                                    PAGE

  2- Affidavit                                   171

  3- Document                                    252

  4 -Comon Paymaster Application                 266

  5- Employment Contract                         266

  6- Employment Contract                         266

  6- Employee Handbook                           266

  7- E-Mail                                      267
```

136

1    THE VIDEOGRAPHER:  The time is approximately 1:36
2    and we're back on the record.
3         DIRECT EXAMINATION (continued)
4    BY MR. KELLER:
5    Q.   Mr. Flynn, among the documents -- well, let me
6    back up.
7         When you were working for Acme during the wind-up
8    you were not serving as a lawyer, is that right?
9    A.   Correct.
10   Q.   Because you're not admitted to practice law?
11   A.   I'm not.
12   Q.   You weren't working at a law firm?
13   A.   No.
14   Q.   You are not --
15        (Whereupon, a discussion was had off the record.)
16   BY MR. KELLER:
17   Q.   You are not a paralegal?
18   A.   No, sir.
19   Q.   You've never worked as a paralegal?
20   A.   No, sir.
21   Q.   You've never worked in a law firm?
22   A.   No, sir.
23   Q.   Okay.  You were not employed by a law firm --
24   A.   No, sir.
25   Q.   -- at the time and you were given documents by

137

1    Mr. Amodeo from time to time.
2         MR. SMITH:  Object to the form.
3    BY MR. KELLER:
4    Q.   Were you given documents by Mr. Amodeo from time
5    to time?
6    A.   I worked on documents from time to time.
7    Q.   Did you assist Mr. Amodeo in gathering documents?
8    A.   Yes.
9    Q.   Did you assist Mr. Amodeo in moving documents
10   from place to place?
11   A.   Yes.
12   Q.   Did you assist him in moving computers from place
13   to place?
14   A.   Yes.
15   Q.   Servers?
16   A.   I don't think I physically moved the servers
17   but --
18   Q.   All right.  Did you participate in dismantling
19   computers and systems?
20   A.   I don't recall things that were dismantled as far
21   as --
22   Q.   Well, dismantled in the sense of taking the
23   computer apart and moving it somewhere, to a warehouse or
24   whatever.  I don't mean the insides of the computer.  I
25   mean, you know, disconnecting the keyboards and the

138

1    screens and ---
2    A.   I don't think I actually dismantled computers and
3    moved them but I participated in the process of taking the
4    data that's on them and moving it into Summation.
5    Q.   Okay.  At whose request did you do that?
6    A.   At Frank's.
7    Q.   Okay.  Did you ever communicate about your
8    activities on behalf of Acme with lawyers?
9    A.   Yes.
10   Q.   Who?
11   A.   Aaron Bates, Nat Mokwa and Butch Slaughter.
12   Q.   Who was Aaron Bates representing?
13   A.   Bates, Aaron Bates and Nat Mokwa had a law firm
14   called Bates, Mokwa.
15   Q.   Who did they represent?
16   A.   My understanding is they represented Frank.
17   Q.   Individually?
18   A.   That was my understanding.
19   Q.   You were not employed by Bates, Mokwa?
20   A.   No.
21   Q.   What did you discuss with them?
22   A.   Whatever we were working on as far as documents
23   at the time, if there was a memo that needed documents to
24   support it, that's what we would discuss.
25        MS. HINES:  And I'm just going to assert an

139

```
1    objection to the extent that Bates and Mokwa were
2    acting as Mirabilis' counsel for any Mirabilis
3    entities and there is a privilege that Mirabilis  the
4    entities are not waiving that privilege.
5    BY MR. KELLER:
6       Q.   Did you understand Bates and Mokwa to ever be
7    representing Mirabilis?
8       A.   I understood that they represented Frank.  I
9    don't know if they represented Mirabilis also.
10      Q.   They never told you they represented Mirabilis?
11      A.   No.
12      Q.   They never told you that the materials you were
13   collecting and collating for them were privileged?
14      A.   There were documents that I worked on that said
15   confidential and privileged.
16      Q.   But they were given to you, you were given access
17   to them?
18      A.   Correct.
19      Q.   And as a matter of fact, in addition to whatever
20   work you did at the time of the wind-up in 2007 --
21      A.   And eight.
22      Q.   -- and 2008, you've maintained copies of those
23   documents in your own personal files related to Mirabilis?
24      A.   Some of them, yes.
25      Q.   Okay, and some of them are the materials that
```

140

```
1    were produced on disk to me last week by your lawyer in
2    response to our subpoena?
3       A.   Yes.
4       Q.   You did not understand them to be privileged in
5    any way as it relates to you, is that right?
6       A.   As it --
7            MR. HINES:  I think that calls for a legal
8    conclusion whether he understood them to be privileged
9    or not.
10           MR. KELLER:  That's why I asked his
11   understanding.
12           MS. HINES:  So -- okay.
13           THE WITNESS:  They said they were privileged on
14   them but I understood --
15           MS. HINES:  Without -- without divulging what you
16   and I talked about, what was your understanding when
17   you -- when the documents were produced to Mr. Berman?
18           THE WITNESS:  My understanding is they were no
19   longer privileged.
20   BY MR. KELLER:
21      Q.   Right.  Because you were not the client --
22      A.   Right.
23      Q.   -- who was handling the documents?
24      A.   For whatever reason I understood they were no
25   longer privileged because I had worked on them.
```

141

```
1       Q.   Right.  And you were not within the
2    attorney-client privilege, you were working on those
3    documents because you were not the client and you were not
4    the lawyer.
5       A.   I understand that's the case, yes.
6       Q.   Okay.  And nobody has voiced any objection to you
7    about producing those documents?
8       A.   Nobody -- no.
9       Q.   Have you given them to anyone else?
10      A.   Not that I recall.
11      Q.   Has anyone else asked for them?
12      A.   As I recall they were given to Butch during the
13   time that we're working on the wind-up.  I saw him.
14      Q.   I'm sorry, I didn't mean to interrupt you.
15      A.   Butch Slaughter; I'm just telling --
16      Q.   During the wind-up?
17      A.   During the wind-up, they were given to him or
18   somebody at his office.
19      Q.   By whom?  By Frank?
20      A.   Well, usually someone who was working at Acme
21   would run it over to his office or e-mail it or, you know,
22   send a disk over.
23      Q.   Who was making the decision as to what to give to
24   Butch Slaughter?
25      A.   Frank.
```

142

```
1       Q.   Okay.  So if you were involved in transmitting
2    them it was only as a messenger?
3       A.   Yes.
4       Q.   Not as a client?
5       A.   As a messenger.
6       Q.   Butch was not your lawyer?
7       A.   No.
8       Q.   He never represented you?
9       A.   No.
10      Q.   And he never employed you to assist him in
11   representing Frank?
12      A.   No.
13      Q.   He did employ a computer person?
14      A.   An IT person, yes.
15      Q.   Andy Dinda?
16      A.   Are you talking about Butch or Frank?
17      Q.   Butch.
18      A.   The project person who had computer skills for
19   Butch Slaughter was Andy Dinda that I knew of.
20      Q.   Right.  How long did he work for Butch?
21      A.   I have no idea.
22      Q.   Have you read those documents?
23      A.   I have read some of them.
24      Q.   Did you help prepare any of them?
25      A.   I prepared the supporting documents that go with
```

143

```
 1    them.
 2         Q.   So they were given to you by Frank?
 3         A.   Yes.
 4         Q.   Okay.  When Frank gave them to you did he say,
 5    I'm giving these to you but they're privileged?
 6         A.   No.
 7         Q.   Were you ever under the impression in any way,
 8    shape or form whatsoever that these documents that you've
 9    produced that have notations on them that they're
10    confidential and privileged were in fact privileged after
11    you got them?
12         A.   Only that they say it on them.
13         Q.   Other than that?
14         A.   Other than that, no.
15         Q.   Did Frank ever tell you I want these to remain
16    privileged, I don't want anyone else to see them?
17         A.   No.
18         Q.   Okay.  What was your position or title with Acme
19    in '07 and '08?
20         A.   Project manager.
21         Q.   How much were you being paid?
22         A.   Five thousand a month.
23         Q.   How did that compare with what you were being
24    paid as president of Common Paymaster?
25         A.   Half.
```

144

```
 1         Q.   You earned $120,000 a year as president of Common
 2    Paymaster?
 3         A.   Yes, sir.
 4         Q.   And then you were earning $60,000 thereafter in
 5    the wind-up?
 6         A.   Yes.
 7         Q.   And again, you don't know where the money was
 8    coming from to fund Common -- to fund Acme during the
 9    wind-up?
10         A.   No.
11         Q.   Do you know that when Frank pled guilty he
12    acknowledged diverting over $180 million dollars in
13    payroll taxes?  You're aware of that?
14         A.   I'm aware that there was a tax lien or a judgment
15    lien against him for something like $180 million.
16         Q.   Actually, it was 181 and change, do you recall
17    that?
18         A.   No, I hadn't.
19         Q.   Sounds right?
20         A.   Close enough, yes.
21         Q.   Okay.  How much of that money did you receive?
22         A.   None that I know of.
23         Q.   Did you receive anything in the form of
24    compensation other than your $120,000 a year salary?
25         A.   Most of the executives of Common Paymaster or of
```

145

```
 1    Mirabilis got a bonus paid twice a year.
 2         Q.   How much did you earn in bonuses during the time
 3    you worked at Common Paymaster and Mirabilis?
 4         A.   I don't know.  It's on my tax returns though.
 5         Q.   That's in the material you've made available for
 6    us to copy?
 7         A.   Yes, sir.
 8         Q.   Can you ballpark it?
 9         A.   Something a little over $125,000, I think.
10         Q.   Over a period of what time?
11         A.   Two years.
12         Q.   So you earned about 50 percent of your base
13    salary as an additional bonus each year in rough numbers?
14         A.   Yeah, something like that.
15         Q.   Were you -- did you ever receive any other
16    compensation from Frank or from Mirabilis or from Common
17    Paymaster?
18         A.   I mean, I received salary and bonuses.
19         Q.   Any other compensation?
20         A.   No.
21         Q.   What banks accounts were you in control of or did
22    you have signature authority on?
23         A.   I had Common Paymaster and I was a signor on
24    Wellington at one point or handling the wind-down of the
25    Sunshine Companies.
```

146

```
 1         Q.   In early '05?
 2         A.   In '05, yeah.
 3         Q.   What was that account for?
 4         A.   The bank handled the wind-down of distressed
 5    entities.  Usually Wellington was the company who handled
 6    the wind-downs.
 7         Q.   You would acquire the companies and --
 8         A.   If it was one that was going to be liquidated,
 9    then it would -- you'd have to dispose of the assets and
10    take care of the creditors.
11         Q.   And why were you given signature authority over
12    that account?
13         A.   I worked with a lot of the wind-downs.
14         Q.   Can you give me the names of them?
15         A.   The Sunshine Companies.  They had lawsuits
16    involving health plans.  We had a whole list of them.  I
17    don't remember the names of them, that I worked with
18    Berman, Kean & Riguera on winding up.
19         Q.   I'm sorry?
20         A.   That I worked at Berman, Kean & Riguera on
21    winding up.  They helped me manage the lawsuits.
22         Q.   Okay.  Was that just for the Sunshine Companies?
23         A.   I believe so.  There was a time when there was
24    some -- one of the other companies, I don't remember which
25    one, that acquired and wound down and there was some
```