## UNITED STATES DISTRICT COURT
## MIDDLE DISTRICT OF FLORIDA
## ORLANDO DIVISION

In re:

MIRABILIS VENTURES, INC.
Bankruptcy Case No. 6:08-bk-04327-KSJ
Adversary Proceeding No. 6:08-ap-223-KSJ

_____/

MIRABILIS VENTURES, INC.,

    Plaintiff,

v.                                      CASE NO. 6:09-cv-271-Orl-31DAB

RACHLIN COHEN HOLTZ, LLP, a Florida
limited liability partnership n/k/a RACHLIN, LLP;
LAURIE S. HOLTZ, an individual,

    Defendants.

_____/

### PLAINTIFF'S RESPONSE TO DEFENDANTS' MOTION TO
### EXCLUDE THE TESTIMONY OF PLAINTIFF'S EXPERT,  BARRY J. EPSTEIN

Plaintiff Mirabilis Ventures, Inc. ("Mirabilis" or "MVI") files this response in opposition to

*Defendants' Motion to Exclude the Testimony of Plaintiff's Expert, Barry J. Epstein* (Doc. 72,

"*Motion*").  In the *Motion*, Defendants seek to exclude the testimony of Barry J. Epstein.  The

*Motion* should be denied because Dr. Epstein's testimony meets the requirements of Rule 702,

Federal Rules of Evidence ("Rule(s)") and *Daubert v. Merrel Dow Pharmaceuticals*, 509 U.S.

579 (1993).  As set forth more fully herein, Plaintiff first provides background information

regarding Dr. Epstein's expert testimony.  Second, Plaintiff describes the content of Dr.

Epstein's expert report and the basis for his opinions, showing that Dr. Epstein's opinions are

reliable.  Third, Plaintiff discusses the law generally applicable to accountants under Rule 702

and *Daubert*.  Finally, Plaintiff analyzes Dr. Epstein's testimony to show that it is admissible as

expert witness testimony under the standards of Rule 702 and *Daubert*.

## I.  Content of Expert Reports and Basis for Dr. Epstein's Opinions

Dr. Epstein was timely disclosed as an expert witness as required by the *Case Management*

*and Scheduling Order* (Doc. 26, "*CMSO*").  On August 6, 2010, Dr. Epstein filed his expert

report which is attached to the *Motion* as Exhibit A ("*Epstein Report*").  The *Epstein Report* is an

evaluation of Rachlin Cohen & Holtz, LLP's ("Rachlin") and Laurie Holtz's duties and

responsibilities as accountants while performing certain duties for Mirabilis Ventures, Inc.  In

rendering his opinions, Dr. Epstein reviewed the salient professional standards of accountants

and certain source documents provided to him including:

- Expert Reports of David Richardson and StephenYoakum
- Depositions of Laurie Holtz, Jose Marrero, and R. W. Cuthill
- Deposition Exhibits 1-108 including various Mirabilis and Rachlin correspondence and memoranda.

*Epstein Report* at 47.

Dr. Epstein begins his report by outlining the background facts on which he bases his

opinion.  Dr. Epstein provides a summary of his opinions finding that:

- Rachlin failed to establish and/or act in accordance with a system of quality control that would have ensured compliance with professional standards, and as a consequence failed to respond appropriately to knowledge it obtained regarding apparently illegal activity taking place at Mirabilis Ventures, Inc.; and
- In his capacity as a CPA, Laurie Holtz failed to comply with appropriate professional standards while conducting engagements with Mirabilis Ventures, Inc. both during his tenure at Rachlin Cohen & Holtz, LLP, and during his retention by Mirabilis Ventures, Inc. as Chairman of the Board.

*Id.* at 10.    Dr. Epstein then analyzes the relevant specific professional standards and

responsibilities imposed on Rachlin and Mr. Holtz as accountants.  Dr. Epstein reviews the

actions taken, or not taken, by Rachlin and Mr. Holtz in light of these professional standards and

responsibilities to determine whether Rachlin and Mr. Holtz violated their professional standards and responsibilities. As noted above, Dr. Epstein concludes that Rachlin and Mr. Holtz violated specific professional standards and responsibilities in performing services to Mirabilis.

## II. Rule 702 and *Daubert*

Rule 702 and *Daubert* govern the admissibility of expert testimony. Rule 702 provides as follows:

> If scientific, technical, or specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training, or education, may testify thereto in the form of an opinion or otherwise, if (1) the testimony is based upon sufficient facts or data, (2) the testimony is the product of reliable principles and methods, and (3) the witness has applied the principles and methods reliably to the facts of the case.

Fed. R. Evid. 702. Rule 702 "is one of admissibility rather than exclusion." *Arcoren v. United States,* 929 F.2d 1235, 1239 (8th Cir.1991).

To be admissible, the expert testimony must constitute scientific, technical, or specialized knowledge, and that knowledge must assist the trier of fact. *Daubert,* 509 U.S. at 592-93. "This entails a preliminary assessment of whether the reasoning or methodology underlying the testimony is scientifically valid[1] and of whether that reasoning or methodology properly can be applied to the facts at issue." *Id.*[2] While *Daubert* teaches that the District Court has a gatekeeper role applying these principles, that role is limited, and it remains in the traditional province of the jury to weigh challenges to reliability. *See Quiet Tech. DC-8, Inc. v. Hurel-Dubois UK Ltd,* 326 F.3d 1333, 1341 (11th Cir 2003) (stating that "a district court's gatekeeper role under *Daubert* is

---

[1] In *Daubert,* the Court identified four non-exclusive factors to consider the scientific validity of an expert's proposed testimony: whether the theory or technique has been tested; whether it has been subjected to peer review; its known or potential error rate; and the degree of acceptance within the scientific community. *Daubert,* 509 U.S. at 593-94. In the context of a nonscientific expert, like an accountant, these factors are not particularly helpful.

[2] In *Kumho Tire Co. v. Carmichael,* 526 U.S. 137, 149 (1999), the Supreme Court extended the principles of *Daubert* to all expert testimony.

3

not intended to supplant the adversary system or the role of the jury") (internal quotation and citation omitted). "A review of the caselaw after *Daubert* shows that the rejection of expert testimony is the exception rather than the rule." Fed. R. Evid. 702, Comm. Note (2000).

Interpreting *Daubert*, the United States Court of Appeals for the Eleventh Circuit has explained that a three-part inquiry applies to determine whether an expert has met the requirements of Rule 702: "(1) [whether] the expert is sufficiently qualified to testify on the issues he intends to address; (2) [whether] the expert's methodology is 'sufficiently reliable as determined by the sort of inquiry mandated in *Daubert*; and (3) [whether] the testimony assists the trier of fact, through the application of scientific, technical, or specialized expertise, to understand the evidence or to determine a fact in issue.'" *Guinn v. Astrazeneca Pharmaceuticals, LP*, 602 F.3d 1245, (11th Cir. 2010) (quoting *United States v. Frazier*, 387 F.3d 1244, 1258 (11th Cir. 2004)).

## III. Analysis

Defendants do not challenge Dr. Epstein's general qualifications as an accountant. *Motion* at 3. Rather, Defendants contend that Dr. Epstein does not meet the "reliability test," and that his testimony will not assist the jury. *Id.* Defendants also claim that Dr. Epstein's report contains an improper factual narrative. *Id.* at 7.

### A. Factual Narrative

Defendants claim that Dr. Epstein's report contains an improper factual narrative and therefore should be stricken. Rule 26(a)(2)(B)(i), Fed.R.Civ.Pro., requires that an expert witness' written report contain "a complete statement of all opinions the witness will express and the basis and reasons for them." In the instant matter, Dr. Epstein's report contains a set of background facts on which Dr. Epstein bases his opinion. It is Mirabilis' burden to prove each

4

of the facts found in the *Epstein Report*, which it intends on doing. It is upon these facts that Dr. Epstein's opinions are founded. Without laying the background and giving context to Dr. Epstein's opinions, Dr. Epstein's opinions would not make sense. It is upon this factual basis which forms the landscape of Dr. Epstein's opinion.[3] Furthermore, it is well established that an expert witness is permitted to base his conclusions on personal observation and hypothetical facts. *Kanaster v. Chrysler Corp.*, 199 F.2d 610, 618 (C.A. 10th 1952). To not disclose the basis of his opinion and the underlying facts supporting his opinion would subject Dr. Epstein to being stricken as an expert witness.

In support of their attempt to strike the background facts, the Defendants cite *In re Trasylol*, 709 F.Supp.2d 1323 (S.D. Fla. 2010) for the proposition that factual narratives are improper in an expert report. However, a review of *In re Trayslol* reveals that the court does not object to including the factual basis behind an expert opinion, just where the expert "does not tie them to the opinions that they are intended to support." *In re Trayslol* at 1337. Furthermore, it is clear that the expert in *In re Trayslol* had a history of merely reciting the facts without properly utilizing the facts to support her opinion. *Id. See, e.g., In re Fosamax Prods. Liab. Litig.* 645 F.Supp.2d 164, 192 (S.D.N.Y. 2009) (stating that same expert wouldn't be allowed to merely read, selectively quote from or regurgitate the evidence).

In the instant matter, the report is not just a "regurgitation" of the evidence. Dr. Epstein lays the groundwork for his opinions by stating the basis for his opinions as required by Rule 26(a)(2)(B)(i), Fed.R.Civ.Pro. Failure to disclose the basis for his opinion and include them in

---

[3] It appears that the Defendants wish for Dr. Epstein to prove the background facts before he is allowed to rely upon them. This is not his function. Dr. Epstein opines as to the facts that he has been given. To the extent that the Defendants are requesting to strike Dr. Epstein's testimony because of his reliance on certain facts, this would also be improper. "The pertinent inquiry under Rule 703 is whether the facts are of a type reasonably relied on by experts in the particular field." *Bauman v. Centex Corp.*, 611 F.2d 1115, 1120 (C.A. 5th 1980). The materials relied on by Dr. Epstein include depositions, corporate memoranda, and corporate correspondence and corporate documents. These are the types of facts relied upon by accountants and the Defendants have not argued otherwise.

the *Epstein Report* would violate Rule 26(a)(2)(B)(i), Fed.R.Civ.Pro. and could serve as a basis for striking Dr. Epstein as an expert witness. Therefore the inclusion of the background facts is not impermissible and is necessary to understand the basis of his opinions.

**B.  Reliability**

With respect to reliability, Defendants first argue that Dr. Epstein's reliance on certain AICPA standards in supporting his opinion is impermissible. Specifically, the Defendants state that it was impermissible for Dr. Epstein to base a portion of his opinion on AICPA's Statement of Quality Control Standards No. 7 ("SQCS No. 7") dealing with establishing a system of quality control in an accounting firm. Defendants complain that SQCS No. 7 applies only to attestation services and not other services provided by a CPA firm and therefore Dr. Epstein's methodology is "unreliable."[4]

As explained by Dr. Epstein, although SQCS No. 7 is expressed in the language of attestation services, "the fundamental premises underlying quality control standards are obviously of great relevance to other service offerings by the firm." *Epstein Report* at 14. Dr. Epstein goes on to explain that all of the quality control standards apply equally to non-attest services unless clearly irrelevant. *Id.* As further explained by Dr. Epstein SQCS No. 7 requires a firm to implement "a system of quality control, which address policies and procedures that deal with leadership responsibilities, ethical requirements, the acceptance and continuance of clients, human resources, engagement performance, and the process of monitoring compliance with the standards" and these are "directly echoed in standards imposed on those engaging in tax services or consulting services." *Id.* at 15. Dr. Epstein testified that based on his forty-three (43) years in

---

[4] The Defendants do not dispute that Rachlin was required to have a system of quality control in its attestation services, just that it did not have to adhere to this system when performing other services, such as consultation services. Apparently it is the Defendants' position that when performing consulting services, Rachlin could ignore this system even while it was in place.

4847-5696-4616.1_43582/0004

public accounting, "It's my experience in my career that you would not carve out attest issues services as subject to quality standards and then have no standards apply to the rest of the practice." *Deposition of Barry Epstein* p. 294, l. 1-4 (*"Epstein Deposition"*) (Exhibit B to *Motion*, Doc. 72). Dr. Epstein further supports his opinion by citing to other publications which support this position. Specifically Dr. Epstein cites to the authoritative text of *Principals of Auditing and Other Assurance Services* which states:

> Technically the Statement of Quality Control apply only to auditing, other attestation, and accounting services for which professional standards have been established by the AICPA. As a practical matter, however, every CPA firm should have quality control procedures applicable to *every aspect of its practice*. In the broad sense the concept of "quality control" means that CPA firms should establish controls to provide assurance that they meet their responsibilities to their clients and to the public.

O. Ray Whittington and Kurt Pany, *Principals of Auditing and Other Assurance Services*, McGraw-Hill Irwin, 2008, at pp. 47-48 (emphasis in original). Dr. Epstein also cited to the Code of Professional Conduct at ET §57 at paragraph 02 which states, in part, "members should practice in firms that have in place quality control procedures to ensure that services are competently delivered and adequately supervised." As Dr. Epstein notes, this provision is not limited to attestation services. *See Epstein Deposition* at p. 295, l. 2-12. Based on his own experience and his reliance on established published materials including the Code of Professional Conduct, Dr. Epstein's methodology is not "unreliable" and forms the basis of a valid, admissible opinion.[5]

Defendants next argue that Dr. Epstein's methodology is unreliable since he considers the conduct of Rachlin and Mr. Holtz regarding the Sunshine Plan. The Defendants claim that the

---

[5] It should be noted that Defendants' rebuttal expert, Mr. Daniel Hevia, does not cite any treatises or outside opinions to bolster his opinion that SQCS No. 7 should not apply to other services provided by an accountant firm. His rebuttal is merely is opinion that on its face, SQCS No. 7 does not apply. Unlike Dr. Epstein's opinion, Mr. Hevia's rebuttal opinion contains no backup for his conclusion and makes no analysis of whether the industry applies that standard outside the attestation context. Mr. Hevis simply ignores the Code of Professional Conduct at ET§57 and fails to rebut the clears statements in the authoritative text.

Sunshine Plan was not wrongful or illegal and that the I.R.S. purportedly did not take action.[6]
This is simply not true. The I.R.S. has sought recovery of payroll taxes not paid under the
Sunshine Plan. The amounts sought by the I.R.S. included damages for the Sunshine Plan upon
which Rachlin in its reply admit it provided tax work. *See Indictment of Frank Amodeo* (listing
amounts not paid by the Sunshine Companies for the 4th Quarter of 2004 which total over $9
million as monies owed to the IRS in calculating $200 million claim) (Exhibit 4 to *Defendants'
Motion for Summary Judgment on Liability and Damages*, Doc. 64); see also *Superseding
Indictment* January 21, 2009 (stating that Amodeo and co-conspirators failed to remit payroll
taxes including amounts of Sunshine Companies III and Sunshine Staff Leasing) (Exhibit 5 to
*Defendants' Motion for Summary Judgment on Liability and Damages*, Doc. 64). The final
assessment of the Sunshine Plan tax liabilities is approximately $52 million. *See The United
States Notice of Statement of Facts Which the United States Contends it Would Prove at Trial*,
June 15, 2010 (Exhibit 8 to *Defendants' Motion for Summary Judgment on Liability and
Damages*, Doc. 64). Amodeo and Mirabilis were indicted for actions taken under the Sunshine
Plan and the I.R.S.'s claim in Mirabilis' bankruptcy case includes payroll taxes taken under the
Sunshine Plan. This is hardly an unsupported, personal assumption that Amodeo's conduct was
wrongful or illegal. He was indicted in part because of the Sunshine Plan.

The Defendants also attempt to "cherry pick" a quote from Dr. Epstein's deposition to
support the position that Dr. Epstein found nothing wrong with the Sunshine Plan.[7] However,

---

[6] Whether the advice given regarding the Sunshine Plan was legal or illegal is an issue for this Court to determine.
This advice regarding the attempt to separate the assets from tax liabilities may possibly run afoul of Sections 7201,
7212, and 7215 of the Internal Revenue Code, as well as fraudulent conveyance statutes and various other United
States statutes. Again, this is an open issue which would be for the Court to decide.

[7] The Defendants also state that Mr. Cuthill testified that the Sunshine Plan was not improper. This is both
inaccurate and immaterial. What Mr. Cuthill testified was that just the idea of separating assets from liabilities may
not be improper. *See Deposition of R.W. Cuthill* ("*Cuthill Deposition*") at p. 140-41, l. 18-01 (Exhibit 15 to
*Plaintiff's Response to Defendants' Motion for Summary Judgment on Liability and Damages*, Doc. 79). However,

this is a gross mischaracterization of Dr. Epstein's testimony.  Dr. Epstein stated that he found the "unsavory" and "reprehensible." *Epstein Deposition* at p. 200, l. 9-10; p. 203, l. 1-6.  Dr. Epstein testified that even if were not illegal, "the mere fact that they were engaging in that scheme, that series of actions to isolate the liability that they clearly had to the I.R.S...is a very unsavory activity, even if not illegal." *Epstein Deposition* at p. 201, l. 4-12.[8]  Finding that the attempt to remove the assets of a company in order to conceal the liability in its financial reports and avoid a liability to the I.R.S. to be wrong, unsavory, and reprehensible is not a basis to determine that Dr. Epstein's methodology is "unreliable."  In fact, finding that such a scheme is permissible and ethical would render his methodology "unreliable."

The Defendants next argue that Dr. Epstein's opinion that Defendants breached their duties regarding consulting services and tax service duties is undermined by his testimony regarding the due diligence services provided by Rachlin.  However this is a mischaracterization of Dr. Epstein's testimony.  Dr. Epstein evaluated the consulting provided by Rachlin and Mr. Holtz while performing the due diligence services and Sunshine Plan.  Although he was not evaluating the due diligence accounting work per se, he was evaluating the consulting services that were being provided, especially as to the Sunshine Plan.  It is these consulting services to which Dr. Epstein opines.  When asked if he had any issues with the *accounting* work done on the due

---

when asked whether the Sunshine Plan is legal or illegal or improper, Mr. Cuthill goes on to testify "I'm not into legal or illegal" and that he didn't know if the Sunshine Plan was improper. Id. at p. 177-78, l. 21-06.  Furthermore, Mr. Cuthill's after-the-fact opinion is immaterial.  Mr. Cuthill is not a lawyer or tax expert.  His opinion on the legality of the Sunshine Plan is truly irrelevant.

[8] As noted above, the I.R.S. has taken action against Mirabilis. Mirabilis and Mr. Amodeo were indicted.  Even though the I.R.S. has yet to take action against certain others in regards to the Sunshine Plan, Mirabilis does not concede that the Sunshine Plan is legal.  Taking no further action on the Sunshine Plan is not akin to finding it legal.  There are many reasons that the I.R.S. may have in not taking action—none of which include finding that the plan was legal.  Truth is, no one knows why the I.R.S. has not taken further action. .  The I.R.S. and federal prosecutors have discretion on when to pursue an action even if the underlying conduct is illegal.  Prosecution is not mandatory.

diligence, Dr. Epstein states that he was not stating that were any. *Epstein Deposition* at p. 296, l. 5-9. He opines to the consulting work done in accordance with the due diligence. *See Epstein Report* at 32-37. The Defendants are just playing with the semantics regarding the due diligence work provided. A reading of the *Epstein Report* and Dr. Epstein's deposition in total reveal that Dr. Epstein does question the consulting services provided regarding the due diligence transactions.

The Defendants state that the due diligence work was performed from April, 2005 through "early" 2006. The Defendants claim that this is important because Rachlin and Mr. Holtz might not have known about the plan to use payroll taxes to fund operations when performing work during this time period. The Defendants claim that the due diligence work was performed before Mr. Holtz was appointed chairman of the board and also attempts to mischaracterize Dr. Epstein's testimony by claiming he relies solely on that time period to determine when Mr. Holtz became aware of the plan not to pay payroll taxes. However, Dr. Epstein also points to Rachlin's and Mr. Holtz's involvement with the Sunshine Plan[9] regarding the consultant work performed by Rachlin and Mr. Holtz—a plan specifically designed to remove a liability off of a corporation's books and to avoid the payment of the liability. As pointed out by Dr. Epstein, Rachlin's and Mr. Holtz's involvement with the Sunshine Plan should have put Rachlin and Mr. Holtz on a heightened state of alertness as to the payment of payroll taxes. Despite this knowledge, Rachlin and Mr. Holtz still violated their duty of care regarding the consulting services provided by Rachlin and Mr. Holtz.[10]

---

[9] It is undisputed that the Sunshine Plan occurred in 2004 and 2005 while Rachlin was performing its due diligence work.

[10] Although the *Motion* refers to Dr. Epstein's opinions regarding both the consulting services and tax services, their argument only deals with the consulting services performed as to the due diligence work. The Defendants don't address the tax services provided regarding the Sunshine Plan and negotiations with the I.R.S.

Furthermore, the Defendants do not define what includes "early" 2006. Therefore it is impossible to tell when the Defendants claim that the due diligence services were performed. Testimony from at least three different parties indicates that Mr. Holtz was aware of the using of payroll taxes for operation expenses in early 2006 and a fair reading of the evidence can place it much earlier than that. As stated in previous motions, in early 2006, Martin Flynn, spoke with Mr. Amedeo and Mr. Holtz regarding the Presidion Plan and the plan not to pay payroll taxes. *Deposition of Martin Flynn ("Flynn Deposition")* at p. 103-04, l. 21-10; p. 104, l. 6. (Exhibit 10 to *Plaintiff's Response to Defendants' Motion for Summary Judgment on Liability and Damages*, Doc. 78)[11] Mr. Holtz assured Mr. Flynn there was nothing to worry about. *Id.* at p. 102-03, l. 24-1; p. 104, l. 9-10. That they've got it covered. *Id.* at p. 103, l. 9; p. 104, l. 10. They said it was their (Mr. Holtz's and Mr. Berman's) responsibility. *Id.* at p. 103, l. 10; *see also id.* p. 153-54, l. 21-19. Based solely on Mr. Flynn's testimony and assuming Defendants' alleged dates of "early 2006", it is not clear whether Mr. Holtz knew of the plan while the "due diligence work" was being completed. Under Mr. Flynn's testimony early 2006 is the latest Mr. Holtz could have known, not the latest. However, the evidence of Mr. Myers below would allow the fact finder to place a much earlier date on Mr. Holtz's knowledge.

This is further bolstered by Yaniv Amar's sworn testimony. Mr. Holtz and the Chief Operating Officer, Fernando Simo, met with Mr. Amar in his office in Doral, Florida. *October 5, 2004 Deposition of Yaniv Amar ("10/5/10 Amar Deposition")* at p. 101, l. 7-20 (Exhibit 11 to *Plaintiff's Response to Defendants' Motion for Summary Judgment on Liability and Damages*, Doc. 78). Mr. Amar told Mr. Holtz of this troubling "correlation" he had discovered regarding

---

[11] A more detailed description of the plan to use the payroll taxes for other expenses being discussed with Mr. Holtz and others can be found at pages 104-05, lines 18-14. Early 2006 is the latest date that Mr. Flynn testifies that Mr. Holtz would know about the plan. There may have been earlier meetings with Mr. Flynn and others. The fact finder can certainly infer that Mr. Holtz was aware of the plan much earlier than the meeting discussed.

4847-5696-4616.1_43582/0004

the "burn rate" without the appearance of income and said, "please, give me some assurances that everything is okay." *Id.* at p. 97, l. 14-25; p. 100, l. 7-13; p. 102-03, lines 19-2. In a self-assured tone, Mr. Holtz said "Yaniv, I'm here to make sure everything will be ship shape, nothing to concern yourself with." *Id.* Mr. Amar pressed on because of his fears and responsibilities, saying "I'm not an accountant or qualified here, assure me that there's no correlation between the burn rate in Orlando [Mirabilis' main office], from what I'm told is eight to ten million a month and the payroll taxes from this company." *Id.* p. 103, l. 4-8. Mr. Holtz ended the matter saying "No, no, I'll get back to you on that, but I assure you everything is in fine order." *Id.* p.103, l. 9-11. Mr. Holtz didn't get back to Mr. Amar. *Id.* p. 110, l. 12-23.

Finally, Daniel Myers, the CFO of Mirabilis, also has parallel evidence that Mr. Holtz was well aware of the Presidion Plan, and he even notes that Mr. Holtz and Amodeo "were at multiple meetings where we discussed payroll taxes", that they "sat in meetings where they would document the [Presidion] [P]lan, what the [Presidion] [P]lan was", and that "[t]hey would review memos, sign off on memos that were going out." *See* July 20, 2009 Unsworn Statement of Daniel Myers *("Myers Statement")* at p. 9, Section 0022, lines 3-8 (Exhibit 1).[12] Mr. Myers states that Mr. Holtz "absolutely" had knowledge of the Presidion Plan and the actual non-payment of payroll taxes. *Id.* at p. 14, Section 0032, lines 7-9. Mr. Myers further states that the

---

[12] On December 10, 2010, Plaintiff's counsel attended the deposition of Daniel Myers in the matter of *Mirabilis Ventures, Inc. v. Richard E Berman, et al.* Case No.: 6:09-cv-175-Orl-31DAB. The day before the deposition, Plaintiff was first informed of a transcript of the Myers Statement. The transcript is admissible in the instant matter as a statement against the interest of Mr. Myers pursuant to Rule 804(b)(3) of the Federal Rules of Evidence. By refusing to testify as to the contents of the statement, Mr. Myers is "unavailable" under Rule 804(a). Rule 804(b)(3) allows for the admission of hearsay evidence if a declarant is unavailable when a statement is one that:

> a reasonable person in the declarant's position would have made only if the person believed it to be true because, when made it was so contrary to the declarant's proprietary or pecuniary interest or had so great a tendency to invalidate the declarant's claim against someone else or to expose the declarant to civil or criminal liability statement.

In the instant matter, the Transcript contains multiple admissions that would subject Mr. Myers to criminal prosecution. Therefore, the statements are against his interest pursuant to Rule 804(b)(3). *See United States v. Saget,* 377 F.3d 223 (2nd C.A. 2004).

Presidion Plan went into effect in July, 2005 and that Rachlin had vetted the plan.  Id. at p. 6 Section 0014, l-20-1 and at p. 7, Section 0016, l. 15-17.  Based on just the testimony outlined above, there is substantial evidence that Mr. Holtz actually knew of the plan prior or during the "due diligence work" performed by Rachlin and Mr. Holtz.  However, these are facts that will have to be determined by a fact-finder.

Furthermore, this also misses the mark of the Dr. Epstein's testimony.  Dr. Epstein opines that Rachlin and Mr. Holtz should have been alerted by red flags while performing consulting work in connection with the due diligence. See *Epstein Report* at p. 32-36; *Epstein Deposition* at p. 197, l. 7-11; p. 250, l. 4-9.  Specifically, Rachlin's and Mr. Holtz's involvement in the Sunshine Plan and negotiations with the I.R.S. should have added to their concern while providing consulting services and "due diligence work."

The Defendants also point to one provision in a due diligence report to attempt to bolster its claim regarding payroll taxes.  However, as testified by Dr. Epstein, the inclusion of payroll tax language in the first report "only underlines the fact that they would have been alert to that kind of situation." *Epstein Deposition* at p. 286-7, l. 24-01.  Dr. Epstein further explains that Rachlin's behavior was inconsistent and that "subsequently, they apparently were either negligent or deliberately turned a blind eye to activities that were going on.  They had multiple red flags.  I can't explain why later on they weren't as alert." *Id.* at p. 287-8, l. 22-02.  The inclusion of language in one (the first) report certainly does not mean that they were not as alert in performing later duties.[13]

The Defendants next argue that Dr. Epstein's opinions as to Mr. Holz's duties as chairman of the board of Mirabilis are unreliable as being outside of his expertise.  However, Dr. Epstein did

---

[13] It is interesting to note that the Defendants pick one paragraph out of one report to support while ignoring all other services provided.

not opine about Mr. Holtz's duties as the chairman of the board of Mirabilis.  Dr. Epstein opined

about Mr. Holts' actions, or inactions, as a CPA while the chairman of the board—an area in

which he is eminently qualified to render an opinion.  As explained by Dr. Epstein, as a named

partner in Rachlin and as a CPA, Mr. Holtz was still governed by the professional ethical

standards of an accountant while acting as the chairman of the board.  *Epstein Deposition* at p.

29, l. 3-13.    Whether or not he was performing additional function along with his accountant

services is irrelevant.  As a named partner in Rachlin and as a CPA Mr. Holtz could not shed is

professional responsibilities and duties the way a snake would shed its skin.

Furthermore, as outlined above, Mr. Holtz specifically took on an accounting task as

chairman of the board.  Mr. Amar specifically told Mr. Holtz "I'm not an accountant or qualified

here, assure me that there's no correlation between the burn rate in Orlando [Mirabilis' main

office], from what I'm told is eight to ten million a month and the payroll taxes from this

company." *10/5/10 Amar Deposition* at p. 103, l. 4-8.    Mr. Amar specifically looked for

assurance and Mr. Holtz said that he would look into it.  Mr. Holtz stated "No, no, I'll get back to

you on that, but I assure you everything is in fine order." *Id.* at 103, line 9-11.  Mr. Holtz

specifically accepted the task to confirm that payroll taxes were not being used to fund the

operations and he simply failed at his task.

As shown above, there is ample evidence for Dr. Epstein to have concluded that Mr. Holtz,

as chairman of the board of Mirabilis, knew Mirabilis was being funded with unpaid payroll

taxes.  There is testimony from at least three witnesses that testify to that fact.  Furthermore, as

explained by Dr. Epstein, it just isn't credible that Mr. Holtz "a nationally recognized

experienced professional in the specialized practice of forensic accounting", as chairman of the

board of Mirabilis, would be unaware of what was happening in his company. *See Epstein Report* at 40; *Epstein Deposition* at p. 217-8, l. 22-29.

The Defendants also question the information relied upon by Dr. Epstein in forming his opinions.[14]   Although the Defendants may question the specific documents and information relied upon by Dr. Epstein regarding Mr. Holtz's knowledge, there are now at least three fact witnesses who have stated that Mr. Holtz knew of the plan to utilize payroll taxes.   It is certainly reasonable for a fact finder to conclude Mr. Holtz knew.   Therefore, it is not unreliable for Dr Epstein to rely on this fact while forming portions of his opinions.   However, an expert's role is not to prove the facts upon which he relies—it is to provide expert opinions about the facts. Mirabilis intends to prove each and every material fact upon which Dr. Epstein relies.   As stated above, Defendants' attempt to strike Dr. Epstein's testimony because of his reliance on certain facts, would be improper.   "The pertinent inquiry under Rule 703 is whether the facts are of a type reasonably relied on by experts in the particular field." *Bauman* at 1120.[15]   Experts are permitted to base his conclusions on hypothetical facts. *See Kanaster* at 618.

Overall, Dr. Epstein's methods to apply a certain factual scenario based upon evidence that will be proved at trial to an accountant's responsibilities and duties to provide the services is

---

[14] Defendants complain that some of the information relied upon was compiled by Mr. Amodeo and his agents. Although this fact may make one take a closer look at the information, it would not necessarily mean that the information was unreliable or inaccurate.

It should also be noted that the Defendants' interpretation of some of the information is outside the record.  For example, the Defendants attempt to explain away Mr. Holtz's knowledge as to significant payroll liability that had been incurred during a March 23, 2006 meeting.  The Defendants do not cite to any record evidence as to its version of the events in question.  There are no cites to depositions, transcripts, testimony, or documents to bolster its "explanation"—just naked assertions as to the Defendants' claim.  This is not admissible testimony and is not a proper record to support the Defendants' *Motion*.  This is equally true as to the Defendants' "explanation" as to the April 18, 2006 meeting.  Again, all assertions, no citations, and therefore no proper foundation for argument.  These are the types of "leaps of faith" that should not be allowed by this court.

[15] Again, the Defendants don't appear to be stating that the *type* of information relied on is improper—just that it disagrees with the information.

4847-5696-4616.1_43582/0004

reliable in determining whether the accountant breached those responsibilities and duties, whether the Defendants agree to the conclusions or not.

## C.    Assistance to the Jury (Relevance)

Defendants further argue that the *Epstein Report* would not assist the jury because Dr. Epstein's reliance on general professional guidelines is not a proper subject for expert testimony and are not helpful to a jury. *See Motion* at 23 (citing *Grupo Televisa S.A. v. Telemundo Comm. Group*, No. 04-20073-CIV, 2008 WL 125601 (S.D. Fla. Jan. 7, 2008) (summarily finding that an expert who merely made "common sense" conclusions would not assist the jury)). As previously explained, however, Dr. Epstein's opinions are not mere common sense conclusions. Dr. Epstein evaluates the relevant specific professional standards that an accountant as a CPA must adhere to and the actions taken by Rachlin and Mr. Holtz. The professional duties imposed on a CPA by his profession are not solely matters of "common sense" but include a technical review of the appropriate code of conduct. Furthermore, whether actions taken by a CPA or a firm violate these imposed specific professional duties are not matters of "common sense." Dr. Epstein performs an analysis of these specific professional duties and obligations and concludes that Rachlin and Mr. Holtz violated those duties as a CPA. Therefore, this type of analysis would clearly be helpful to a jury.[16] *Cf. Berndt v. Levy*, 2010 WL 3913240 (D. Kan. 2010) (allowing an attorney to testify as to the standard of care of any attorney in handling a medical malpractice matter); *Equal Employment Opportunity Commission v. Sierra Pacific Industries*, 2010 WL

---

[16]Defendants appear to argue that the actions that they are alleged to have taken would allow a jury to conclude that they obviously violate some type of professional standard and therefore Dr. Epstein's opinion as to their actions should be stricken. It would be "common sense" that they violated their responsibilities and professional standards. Although in this instance, the actions of Rachlin and Mr. Holtz are egregious enough as to allow one to conclude that there is liability, Dr. Epstein's testimony is helpful for a jury to describe the specific standards and professional responsibilities that were violated. Without Dr. Epstein's testimony a jury could have significant unease or queasiness as to the actions taken by Rachlin and Mr. Holtz without being able to determine what specific standards and responsibilities were violated or breached to attach liability.

3941416 (E.D. Cal. 2010)(allowing an expert to testify as to whether management acted within the appropriate standard of care in acting on and responding to harassment complaints).

Although the violation of specific professional standards and responsibilities would have been apparent to sophisticated accountants like Laurie Holtz, a jury of laypeople would clearly benefit from the testimony of an expert explaining the professional responsibilities and standards under which an accountant must operate at all times. This is exactly what Dr. Epstein was hired to do, and it is exactly what the *Epstein Report* shows.

The Defendants also again question Dr. Epstein's opinion that AICPA guidelines for quality controls apply to non-auditing services. The Defendants complain that Dr. Epstein basis for this opinion is "a single quotation from a single book." *Motion* at 24. This is not true. As mentioned above, Dr. Epstein basis his opinion on his extensive experience. *Epstein Deposition* p. 294, l. 1-4. This is further supported by a citation to a learned treatise and to the Code of Professional Conduct at ET §57 at paragraph. Although Defendants complain about the lack of support for this opinion, Defendants' rebuttal expert produces no citations to the proposition that the standard should not apply.[17]

Finally, the Defendants complain that Dr. Epstein's opinion regarding the absence of quality control provisions result in a "circular inference." It should be noted that the Defendants do not cite to any record evidence that it had any quality control provisions in place. The Defendants do not even argue that any quality control provisions were in place. The Defendants merely cite to Dr. Epstein's testimony which stated that there would be no guarantee that sufficient quality control provisions would have caught the fraud. However, Dr. Epstein is just acknowledging that "there's at least some percentage chance that that's—because no system is 100 percent."

---

[17] It seems bizarre that the Defendants seem to argue that on the one hand this is somehow "common sense" but at the same time is unreliable because it's only in one authoritative text.

4847-5696-4616.1_43582/0004

*Epstein Deposition* at p. 305, l. 13-15.  However, there is no requirement that an expert by "100 percent" certainty determine the correct would work.  "But the rule for admission of expert testimony does not depend on the relative certainty of the subject matter of testimony, but rather on the assistance given by the expert testimony to the trier of fact in understanding the evidence or determining a fact in issue." *Taenzler v. Burlington Northern*, 608 F.2d 796, 798 (8th C.A. 1979) (allowing testimony of an economist to testify as to damages).   Dr. Epstein is merely testifying to the uncertainty inherent in most things human.

### V.  Conclusion

It is undisputed that Dr. Epstein is qualified as an expert in accounting.  Dr. Epstein's opinions, as set forth in the *Epstein*, are based on a reliable methodology of applying the professional standards and responsibilities to the actions of the Defendants.  His methodology is reliable and is based on facts that will be established at trial.  Dr. Epstein's opinions will assist the jury in understanding the specific professional standards and responsibilities under which an accountant must operate and how the Defendants' actions violated these specific standards and responsibilities.  For the foregoing reasons, the *Motion* should be denied, and Dr. Epstein should be permitted to testify as an expert witness.

**BROAD AND CASSEL**
Counsel for Mirabilis Ventures, Inc.
390 North Orange Avenue, Suite 1400
Orlando, Florida  32801
Telephone:     407-839-4200
Facsimile:     407-425-8377


By:    */s/Todd K. Norman*
　　Todd K. Norman, Esquire
　　Florida Bar No. 0062154
　　tnorman@broadandcassel.com

18

## CERTIFICATE OF SERVICE

**I HEREBY CERTIFY** that a true and correct copy of the foregoing has been furnished this 29th day of December, 2010 via CM/ECF to all parties receiving electronic service, and via U.S. Mail to: Joseph A. DeMaria, Esquire, Tew Cardenas, LLP, Four Seasons Tower, 1441 Brickell Avenue, Suite 1500, Miami, Florida 33131.

By: *  /s/Todd K. Norman*
Todd K. Norman, Esquire
Florida Bar No. 0062154
tnorman@broadandcassel.com

```
                        Dan_Myers_Unsworn_Statement.txt
0001
  1      IN RE:
  2
             FRANK AMODEO,
  3
         vs.
  4
  5          BERMAN, KEAN & RIGUERA
  6
  7
         * * * * * * * * * * * * * * * * * * * * * * * * *
  8
  9
 10
         UNSWORN STATEMENT OF:     Daniel Myers
 11
 12      DATE TAKEN:               Monday, July 20, 2009
 13
         TIME:                     4:15 p.m. to 5:00 p.m.
 14
 15      PLACE:                    The Maher Law Firm
                                   631 W. Morse Blvd., Suite 200
 16                                Winter Park, Florida  32789
 17
         REPORTED BY:              MARY ANN SCHUMACHER,
 18                                Certified Court Reporter
                                   and Notary Public
 19
 20
 21
 22
 23
 24
 25
0002
  1      A P P E A R A N C E S:
  2
  3          J. BRENT SMITH, Esquire
             The Maher Law Firm
  4          631 W. Morse Blvd., Suite 200
             Winter Park, Florida  32789
  5          407-425-7958
  6
  7          HARRISON T. SLAUGHTER, Esquire
             Leventhal & Slaughter
  8          111 N Orange Avenue, Suite 700
             Orlando, Florida 32801
  9          407-849-6161
 10
 11      ALSO PRESENT:  Cindy Harris
 12
 13
 14
 15
 16
 17
 18
 19
 20
 21
 22
 23
 24
```


EXHIBIT
A

Dan_Myers_Unsworn_Statement.txt
```
25
0003
 1                    C O N T E N T S
 2
 3     TESTIMONY
 4          Examination by Mr. Smith
 5          Examination by Mr. Slaughter
 6
 7
 8     CERTIFICATE OF REPORTER............................ 34
 9
10
11
12
13                    E X H I B I T S
14
15          (No exhibits were marked.)
16
17
18
19
20
21
22
23
24
25
0004
 1          WHEREUPON, the following proceedings were had,
 2     to wit:
 3     BY MR. SMITH:
 4          Q.   When did you first meet Frank Amodeo?  Well,
 5     hang on, let me back up.  What's your full name?
 6          A.   Daniel Lee Myers.
 7          Q.   And what is your education background, starting
 8     after high school?
 9          A.   I have a four-year college degree from the
10     University of Central Florida in economics.  Subsequently
11     I took additional course work to sit for the CPA exam and
12     subsequently passed the CPA exam.
13          Q.   So you're a licensed CPA?
14          A.   Yes, I am.
15          Q.   Are you married?
16          A.   Yes.
17          Q.   Have any children?
18          A.   One son, who turns 18 next week.
19          Q.   And I take it at some point you came to meet a
20     gentleman by the name of Frank Amodeo?
21          A.   Yes, I did.
22          Q.   When was that?
23          A.   Around November -- October, November of 2003.
24          Q.   What were you doing in October of November,
25     2003?
0005
 1          A.   I was introduced to Frank through Bob Curry,
 2     and they were -- Frank was in the process of acquiring an
 3     company, Sport Magic Team.
 4          Q.   Say that again.
 5          A.   Sports Magic Team.  And Sports Magic Team was a
 6     distressed turnaround and they needed somebody to go in
 7     and keep an eye on it and see if they could work through
 8     the numbers on it.
 9          Q.   Had you previously practiced as a CPA with a
                              Page 2
```

Dan_Myers_Unsworn_Statement.txt

10    private CPA firm, prior to meeting Frank?
11        A.   I had my private firm, it wasn't a licensed
12    CPA firm, but I had a company, Titanium Consulting, that
13    I had done tax and business consulting work in.
14        Q.   Prior to meeting Frank?
15        A.   Prior to meeting Frank.
16        Q.   And when you were introduced to Frank, did you
17    begin to work as a consultant for him?
18        A.   Yes.
19        Q.   And in the capacity of a CPA, I assume?
20        A.   Yes.
21        Q.   After Sports Magic Team, what other projects
22    did you and Frank work on?
23        A.   I worked on Matrix Orlando, Matrix Network,
24    Trafalgar Capital Group, Century -- what was that --
25    Movie Studio.  Century 3 -- something at Universal.
0006
1        Q.   Now, are these specific companies you consulted
2    for or are these projects you worked on as a consultant?
3    I mean, were you employed by Matrix Trafalgar?
4        A.   I got a W-2 from Trafalgar in 2004.  It wasn't
5    very large, it was for a couple of paychecks.  Most of
6    them it would have been consulting.
7        Q.   I take it at some point you and Frank or Frank
8    began to work, be engaged in some capacity for a company
9    called Presidion Corporation.  Do you recall when that
10    was?
11        A.   I was engaged through, I think it was through
12    my own business, Titanium Consulting, to work on
13    Presidion Corporation as a power of attorney to liaison
14    with the IRS.
15        Q.   You were brought in by Frank?
16        A.   Yes.
17        Q.   And was that in relation to what I'll refer
18    to or what I have been told as the Sunshine Companies'
19    plan?
20        A.   That's correct.
21        Q.   In your words, what was the Sunshine Companies'
22    plan?
23        A.   That was --
24        MR. SLAUGHTER:   The Sunshine Companies Plan or
25    the Presidion plan?
0007
1        THE DEPONENT:   I think the first one was the
2    Sunshine Plan.  The Sunshine Plan was -- there was
3    five companies, The Sunshine Companies 1 through 5,
4    that had some taxes due.  The amount was in
5    question, anywhere from 20 to 50 million dollars.
6    And the plan was to find --
7    BY MR. SLAUGHTER:
8        Q.   Payroll taxes due to the government?
9        A.   Payroll taxes due to the government.
10        Q.   Had returns been filed?
11        A.   I believe so.  There were various missing
12    returns out there.  I spent six months searching down,
13    getting transcripts from the IRS, searching down the
14    missing return information, wasn't getting all the
15    returns filed, but fundamentally, yes, the returns were
16    filed.
17    And the Sunshine Companies, the plan was to find
18    a way to sell those companies and their related
19    liabilities, to get them off Presidion Corporation's
20    books, to get Presidion Corporation healthy so it could

Page 3

Dan_Myers_Unsworn_Statement.txt

```
21   start making money.
22   BY MR. SMITH:
23        Q.   You were brought in from the beginning of the
24   Sunshine Companies' plan?
25        A.   It wasn't the very beginning, but it was fairly
0008
1    early on.
2         Q.   Do you have any knowledge, personal knowledge
3    of Frank Amodeo's engagement with Presidion?
4         A.   Not --
5         Q.   You don't know what he was paid or?
6         A.   I know what he was supposed to be paid, a 25
7    percent fee for any debts that were removed, but I don't
8    know that I actually saw the contract.
9         Q.   But didn't you have a separate agreement with
10   him where you were paid for your time?
11        A.   I ended up going on payroll.  In the beginning
12   of '05 he hired me back on.  I'm not even sure which
13   company I was hired under, but Presidion 7 processed the
14   paychecks.  I don't think Acme was set up yet.
15        Q.   Presidion 7 would also be known as Professional
16   Benefit Solutions?
17        A.   Correct.  It was either 7 or 6, Paradyme -- I
18   can get my W-2.
19   BY MR. SLAUGHTER:
20        Q.   Who did the due diligence for the purchase of
21   the Sunshine Companies?
22        A.   As I understand it, it was Edie Curry.  And
23   again, as I understand it, it was Berman and Holtz
24   standing behind it.  I didn't have any firsthand
25   knowledge of that, but that's what was communicated to
0009
1    me.
2    BY MR. SMITH:
3         Q.   When did you first meet Richard Berman, since
4    you just brought his name up, if you recall, and it can
5    be generally.
6         A.   Going from memory, I think I first met him in
7    2004 and had my first conversation with him in 2005.
8         Q.   Do you remember what his role was when you
9    initially met him?
10        A.   He was one of Frank's advisers.  Had been an
11   adviser of Frank's for several years, as I understand
12   it.
13   BY MR. SLAUGHTER:
14        Q.   Was he an attorney?
15        A.   He was an attorney.  He was a legal advisor.
16   BY MR. SMITH:
17        Q.   When you first were connected with Frank, did
18   you have any personal knowledge as to Frank having any
19   mental conditions or mental deficiencies or were you
20   advised of any mental problems that he may or may not
21   have?
22        A.   When I first met with him, no.
23        Q.   But at some point in time you learned?
24        A.   At some point in time he indicated that part
25   of the reason he had his issues with the Bar in Georgia
0010
1    was related to some drugs he was taking, like over-the-
2    counter medications for a cold.  I was not made aware of
3    the fact that there was actually a medical condition
4    until late in '06.
5         Q.   Let's go back to the Sunshine Companies' plan.
```

Page 4

Dan_Myers_Unsworn_Statement.txt

```
 6    Do you recall who developed it or who came up with the
 7    bright idea of, hey, let's take these tax, unpaid tax
 8    liabilities off the books so this public company is
 9    profitable?
10         A.    I don't.
11         Q.    And you said earlier that Richard Berman was
12    involved with the Sunshine Companies' plan?
13         A.    I believe so.
14         Q.    From Frank's side?
15         A.    From Frank's side, yes.
16         Q.    And you recall that the accounting firm of
17    Rachlin, Cohen & Holtz was involved on the Sunshine
18    Companies' plan?
19         A.    Yes, they were.
20         Q.    In connection with the Sunshine Companies'
21    plan, you mentioned that you had some meetings with the
22    IRS.  Do you recall those meetings?
23         A.    Some of them, yes.
24         Q.    Who did you meet with?
25         A.    On the IRS side, we met with Judy Berkowitz.
0011
 1    The first meeting that we had with the IRS was actually
 2    for a different company, which was Primary Bookkeeping,
 3    Inc.  And that meeting was with Frank Amodeo, Hans Buyer,
 4    Richard Berman, there was somebody else there, and me,
 5    there were five of us.  I don't remember who the fourth
 6    one is.
 7              MR. SLAUGHTER:  The accountant was Mr. Marrero.
 8              THE DEPONENT:  Jose Marrero, thank you, from
 9         Rachlin's office.
10    BY MR. SMITH:
11         Q.    And what was the name of that, the book --
12         A.    The company name was Primary Bookkeeping, Inc.
13    BY MR. SLAUGHTER:
14         Q.    And you were making the last payment, right?
15         A.    We were making the final payment on the trust
16    funds to get them current with the IRS.
17         Q.    Why was Berman and Marrero from Holtz's company
18    there?
19         A.    Because we were talking to her specifically
20    about the Sunshine cases to find out how we would go
21    about doing the same thing on a larger scale in Fort
22    Lauderdale.
23         Q.    What did she say to do?
24         A.    She told us if we would move the companies to
25    the H's, which was Hollywood or Hallendale, we would be
0012
 1    able to retain her as our IRS agent.
 2         Q.    How many meetings did you have with her,
 3    approximately?
 4         A.    I probably met with her between six and ten
 5    times and probably had no less than a hundred phone calls
 6    with her.
 7         Q.    Prior to your meetings and after your meetings,
 8    did you consult with any legal advisors for Frank Amodeo
 9    or his related companies?
10         A.    I would talk to different legal advisors.  I
11    don't specifically remember a conversation with Richard
12    Berman, but I do remember conversations, I remember a
13    specific conversation with Laurie Holtz after one of the
14    meetings in my office.
15         Q.    You don't remember going over to Berman's
16    office before you would meet with her?
```

Page 5

Dan_Myers_Unsworn_Statement.txt

17          A.    I remember we, quote, unquote, staged at
18    Berman's office before a meeting where I believe that
19    was a meeting where Frank, Sharmilla and I participated,
20    but we sat down beforehand and went through basically the
21    presentation to the IRS as to what was going on with
22    Richard.
23          Q.    Richard who?
24          A.    Berman.
25    BY MR. SMITH:
0013
1           Q.    And were these six to ten meetings or hundreds
2     of phone calls, did these apply solely to the Sunshine
3     Companies' plan?
4           A.    They also crossed over into the Presidion
5     Corporation or Presidion Solutions plan.
6           Q.    Is that also known as the PBS plan or the
7     Presidion plan?
8           A.    Presidion plan, yes.
9     BY MR. SLAUGHTER:
10          Q.    What is the Presidion plan?
11          A.    As I remember it, the Presidion plan was to
12    get the company healthy without paying the taxes, getting
13    the rest of the insurances, everything else current, and
14    effectively either take the company public or sell it to
15    a public entity and pay the taxes off.
16          Q.    Was it mentioned that other companies were
17    purchased with payroll monies?
18          A.    It was mentioned that there were some other
19    PEOs purchased with some of the monies, not specifically
20    the payroll monies, but other companies were purchased.
21    But it wasn't communicated that -- the number of
22    companies or the other assets that were purchased.
23    BY MR. SMITH:
24          Q.    And your understanding was that they were
25    going to use the payroll tax money to fund other certain
0014
1     transactions or obligations of the company?  You
2     mentioned health insurance.
3           A.    Worker's comp.
4           Q.    Worker's comp, secured type claims.  You were
5     going to use the unsecured money to take care of the
6     secured, quote, creditors?
7           A.    That's as I understood, from a legal
8     perspective.
9           Q.    And then once the company got healthy, you
10    would, in turn, pay everything back?
11          A.    Sell the company.
12    BY MR. SLAUGHTER:
13          Q.    And as you understood it, that was from whose
14    lips?
15          A.    That was from Frank, and again, as I understood
16    it, that was part of the plan that Berman had also worked
17    on.
18    BY MR. SMITH:
19          Q.    Do you recall when that plan was established?
20          A.    The Presidion plan went into effect in July of
21    '05.
22          Q.    So that was subsequent to the Sunshine
23    Companies?
24          A.    Correct.  Again, as I understand it, the
25    Sunshine Companies' plan was effective at the end of
0015
1     '04.  And the goal was, at that point the Presidion could

                              Page 6

Dan_Myers_Unsworn_Statement.txt

```
 2   stand on its own two feet, would be profitable and they
 3   could start working on arrangements to pay it back.  They
 4   subsequently stopped making payments in May '05 and the
 5   creditors threatened --
 6   BY MR. SLAUGHTER:
 7        Q.   When you say they, who is they?
 8        A.   Presidion stopped making payments to all their
 9   creditors, trying to get the taxes current, and the
10   insurance, as I understand it, was prepared to pull the
11   plug at the end of July of '05.  And the only reason I
12   remember that is I ran around the end of July in the
13   summer sun trying to get funds from banks to pay an
14   insurance deposit.
15             MR. SLAUGHTER:  Can I ask a couple questions?
16             MR. SMITH:  Sure, go ahead.
17   BY MR. SLAUGHTER:
18        Q.   In December of '05 in the Copper Whopper
19   Building, AmSouth, was there an all-hands meeting where
20   Frank talked about the increase of the tax liability of
21   worker's comp not being paid from December '04 to
22   December '05?
23        A.   Yes.
24        Q.   And were you present?
25        A.   I believe so, yes.
0016
 1        Q.   And how was he making this demonstration, how
 2   was he showing this?
 3        A.   On white papers on the wall.
 4        Q.   And to your knowledge, who else was present?
 5   Mr. Pollack?
 6        A.   I believe Dr. Pollack was present.  I believe
 7   Richard Berman was present.  I believe Laurie Holtz was
 8   present, I believe Edie Curry was present.  There were
 9   about 14 people in the room.
10        Q.   Had there been circulated, prior to that time,
11   a document known as the Presidion Plan that had been
12   vetted by -- is it Montoya from Holtz's office?
13        A.   Marrero.
14        Q.   Marrero?
15        A.   Yes.  I don't remember if Marrero was the one
16   that did it, but I do remember it was vetted by somebody
17   at Holtz's office.
18   BY MR. SMITH:
19        Q.   What was discussed at this meeting?
20        A.   Frank talked about how the taxes had gone up,
21   how much --
22   BY MR. SLAUGHTER:
23        Q.   Meaning they hadn't been paid?
24        A.   They hadn't been paid.  How much had not been
25   paid, it was something to the effect of, I think, 50
0017
 1   million dollars at the end of '05, and the number was
 2   about up to 120 million dollars -- I'm sorry, at the end
 3   of '04 it was 59, up to about 120 million at the end of
 4   '05.
 5   BY MR. SMITH:
 6        Q.   And is this after the Presidion plan had been
 7   implemented?
 8        A.   Yes.
 9   BY MR. SLAUGHTER:
10        Q.   Before and after?
11        A.   Before and after.
12   BY MR. SMITH:
```

Page 7

Dan_Myers_Unsworn_Statement.txt

13  Q. So when you say Frank was discussing this, was
14 he discussing future plans?
15  A. Yes.
16  Q. And what were those plans?
17  A. To take the company public based on current
18 multiples, to have it sold or taken public, working on
19 an incremental value increase for a third party, like a
20 Gevity or somebody along those lines.
21  Q. One of the bigger PEOs?
22  A. One of the bigger PEOs.  And what we would do
23 is get stock based on the increased market value.
24  Q. Was there any discussion about continuing the
25 Presidion plan, where you would continue to use this
0018
1 payroll money to fund secure claims at that meeting?
2  A. I don't remember specifically.  I know the plan
3 originally was in January to start heading all the taxes
4 current, but by the end of January, that was no longer
5 the case.
6  Q. January 2006?
7  A. January 2006.
8 BY MR. SLAUGHTER:
9  Q. During that meeting did Mr. Berman or Mr. Holtz
10 express any surprise or negative thoughts as to the
11 legality of the Presidion plan?
12  A. No.
13  Q. Did they warn Frank Amodeo that it's dangerous
14 and it is illegal?
15  A. No.
16 BY MR. SMITH:
17  Q. When earlier you mentioned your meetings, your
18 six to ten meetings with the IRS, who would attend those
19 meetings with you or would you solely go by yourself?
20  A. Well, the first meeting obviously we had a
21 group of people.  The next two or three meetings I just
22 went.  It was primarily just to say hi and drop off some
23 paperwork.  They weren't formal, sit down for an hour
24 meetings, just more face to face, just to keep my face in
25 front of them.  And then the last two meetings we had,
0019
1 the first one -- the April of '06 meeting was Hans Buyer,
2 Sharmilla and myself, and the second meeting, which was
3 July of '06, was Frank, Sharmilla and myself.
4 BY MR. SLAUGHTER:
5  Q. And you met with Berkowitz's boss?
6  A. At the second one, yes.
7 BY MR. SMITH:
8  Q. Was Sharmilla aware of the Presidion plan?
9  A. Yes, she was.
10  Q. Did she ever voice any concerns or objections?
11  A. She asked questions but then basically any
12 questions she would ask me I would say, go ask Frank and
13 talk to Laurie and Richard.  And as I understand it, she
14 had talked to --
15 BY MR. SLAUGHTER:
16  Q. -- when you said Richard, you mean Richard
17 Berman?
18  A. Richard Berman, yes.
19  Q. Who was the other name?
20  A. Laurie Holtz.
21 BY MR. SMITH:
22  Q. And to your knowledge, Frank's legal advisor,
23 Frank's accounting advisor had blessed what Frank was

Page 8

Dan_Myers_Unsworn_Statement.txt

24    doing?
25        A.    Yes.
0020
 1        Q.    As far as the Presidion plan?
 2        A.    Yes.  And outward signs indicated that --
 3        Q.    What were those outward signs?
 4        A.    That Laurie Holtz became the chairman of the
 5    Mirabilis board in December '05.  Richard Berman was the
 6    chief legal officer at Mirabilis, who was the beneficiary
 7    of all the funds that were reported stolen.
 8        Q.    Did you ever have a chance to --
 9        MR. SLAUGHTER:  Can I ask a couple questions?
10        MR. SMITH:  Sure.
11    BY MR. SLAUGHTER:
12        Q.    From December of '04, beginning of '05, how
13    many employees were employed in the Amodeo-related
14    companies?
15        A.    December '04 to '05.
16        Q.    Let's just take December '04.  How many
17    employees did you have?
18        A.    I think there were 15, 20.
19        Q.    How many were there at the end of '05?
20        A.    Several hundred.
21        Q.    How many at the end of '06?
22        A.    Probably a couple thousand.
23        Q.    To your knowledge, was there any -- were
24    profits made from any companies that were purchased with
25    stolen payroll tax monies?
0021
 1        A.    To the best of my knowledge, there is only one
 2    company that was profitable and that was the new Florida
 3    Industrial Electric.  They were the only company that
 4    showed any sort of profit, and their total profit was
 5    about $800,000.
 6        Q.    Now, how often would Richard Berman come up to
 7    the main offices?
 8        A.    Every two weeks or so.
 9        Q.    How long would he stay, a day or two?
10        A.    A couple days usually.
11        Q.    He was the general counsel?
12        A.    Was the general counsel.
13        Q.    How many companies do you think Mirabilis or
14    Mirabilis-related companies purchased during those two
15    years?
16        A.    Purchased probably 40.
17        Q.    Who did the due diligence on the purchases?
18        A.    The due diligence generally was done by
19    Rachlin, Cohen & Holtz and the documentation on the
20    purchases was reviewed by Berman's office.
21        Q.    Did Mr. Holtz or Mr. Berman ever ask you where
22    was the money coming from to buy these companies?
23        A.    No.
24        Q.    Is there any question in your mind that they
25    knew where the money was coming from?
0022
 1        A.    No question at all.
 2        Q.    Why do you say that?
 3        A.    Because they sat in numerous meetings, they
 4    were at multiple meetings where we discussed payroll
 5    taxes.  Frank and Laurie and Richard Berman sat in
 6    meetings where they would document the plan, what the
 7    plan was.  They would review memos, sign off on memos
 8    that were going out.  There's no doubt at all that they
                    Page 9

Dan_Myers_Unsworn_Statement.txt

9    were in it.
10       Q.   You've seen 4-19 videotape of the accounting
11   term people meeting with Laurie Holtz when he was the
12   CEO; correct?
13       A.   Yes
14       Q.   Is it an accurate statement that he was told at
15   that time the taxes were being used to buy these
16   companies and were not being paid to the IRS?
17       A.   Yes.
18       Q.   Mr. Holtz was told?
19       A.   Yes.
20       Q.   How much money was stolen after April of '06 to
21   the end of '06 after Mr. Holtz was specifically told on a
22   tape that taxes were being used and not being paid to the
23   IRS?
24       A.   I don't know the exact number.  My educated
25   guess would be somewhere to the tune of 60 million
0023
1    dollars.
2   BY MR. SMITH:
3       Q.   To your knowledge, when Mr. Berman and
4   Mr. Holtz came on board as executives or board of
5   directors, did they continue to be Frank Amodeo's legal
6   advisor and accounting advisor this whole time?
7       A.   Yes, they did.
8       Q.   At some point in time I'm assuming everybody
9   bailed on the company.  Do you recall when?
10        MR. SLAUGHTER:  Can I ask another one?
11        MR. SMITH:  Go ahead.
12   BY MR. SLAUGHTER:
13       Q.   Did Mr. Berman ever withdraw his power of
14   attorney representing the Amodeo-related companies?
15       A.   Not that I know of.
16       Q.   Did Mr. Berman or Mr. Holtz ever call you and
17   ask you or express any concern to you about the use of
18   stolen monies?
19       A.   No.
20       Q.   Or the source of monies to purchase things?
21       A.   No.
22       Q.   Were they aware of what your position was?
23       A.   Yes, there were.
24       Q.   Were they both aware that you were meeting with
25   the IRS?
0024
1       A.   Yes, they were.
2       Q.   Had you ever told them that the IRS had
3   approved the use of stolen payroll tax monies to purchase
4   other companies?
5       A.   No, I did not.
6       Q.   Did they ever ask you?
7       A.   Not that I remember, no.
8   BY MR. SMITH:
9       Q.   And that applies both for Richard Berman and
10   Laurie Holtz?
11       A.   Yes.
12       Q.   I know there was some other accountants
13   involved at the Rachlin firm.  Would an individual by the
14   name of Matt Druckman, would he also have knowledge of
15   the Sunshine Companies' plan and Presidion plan?
16       A.   I know he would have --
17        MR. SLAUGHTER:  He vetted the Presidion plan
18      document.
19        THE DEPONENT:  I know he would have knowledge

Page 10

Dan_Myers_Unsworn_Statement.txt

```
20          of the Sunshine -- I know he left shortly, you know,
21          probably fall of '05, from the Rachlin firm.  I was
22          never made aware of exactly why he left.
23     BY MR. SMITH:
24          Q.   There was also an accountant named Sharmilla
25     Khanokar, K-H-A-N-O-K-A-R.  She was employed, to your
0025
1      knowledge, during this time with the Rachlin, Cohen &
2      Holtz?
3           A.   Yes, she was.
4           Q.   And she had knowledge of the Sunshine
5      Companies' plan?
6           A.   Yes, she did.
7           Q.   And she had knowledge of the Presidion plan?
8           A.   Yes, she did.
9           Q.   Did she ever make any objections?
10          A.   She asked some questions, just trying to
11     understand why it was good, why it worked.  And my answer
12     was that that's what I understood Laurie and Richard said
13     was good and there were legal opinions.
14               (Off the record discussion was held.)
15     BY MR. SLAUGHTER:
16          Q.   What was Sharmilla's position and when did she
17     come on board?
18          A.   I don't remember specifically when she came on
19     board, but I believe it was sometime in '06.  And her
20     position was to run around and do due diligence on the
21     Presidion plan and everything that was going on there and
22     also to kind of be eyes and ears for Laurie Holtz on
23     everything that was going on.  She lived in Orlando and
24     he was only there one week every three or four weeks, so
25     she was his eyes and ears.  And she took over from me
0026
1      after the July meeting for all of the IRS communications
2      and correspondence.
3           Q.   You had a question at sometime in your career
4      with Amodeo as to whether or not these plans were legal
5      or not.  Did you ever ask either Berman or Holtz whether
6      there were legal?
7           A.   I didn't ask them directly.  I talked to Frank
8      and other people told me --
9           Q.   -- who were those other people?
10          A.   Marty Flynn, Yaniv Amar, Y-A-N-I-V, A-M-A-R.
11          Q.   What about Dr. Pollack?
12          A.   Dr. Pollack had talked to them and confirmed.
13     BY MR. SMITH:
14          Q.   And Marty Flynn, Yaniv Amar and Dr. Flynn had
15     reported to they had --
16          A.   -- they had confirmed everything was good.
17          Q.   With either Berman or Laurie Holtz?
18          A.   With Holtz or Berman.  Ed Berman was drafting
19     memos to the effect of what was going on, where we were,
20     what potential liabilities were, so based on the -- I
21     made an inferred assumption on that, which was if
22     Laurie -- if Berman was drafting memos, Berman was
23     acting as chief legal officer.  If Holtz was reviewing
24     the Presidion case, which there were e-mails where we
25     confirmed that he could have all the documents, if Holtz
0027
1      was acting as chairman of the board of Mirabilis, where
2      all the dollars were going, I made an inference that
3      those two guys, based on other communications other
4      people had made, that those two guys were believing it
```

Dan_Myers_Unsworn_Statement.txt

```
 5   was okay because if it wasn't, they would have taken
 6   off.
 7   BY MR. SLAUGHTER:
 8        Q.   Do you know as a matter of factor whether the
 9   board members signed a Sarbanes Oxley document that was
10   drafted in October of '05?
11        A.   I understand they did, yes.
12        (Off the record discussion was held.)
13   BY MR. SMITH:
14        Q.   Did there ever come a time in December 2006
15   when Sharmilla became uncomfortable with the PBS plan?
16        A.   December of '06?  I don't remember
17   specifically.
18        Q.   Or the end of '06?
19        A.   I don't remember specifically.
20        Q.   Do you recall you mentioned earlier a guy named
21   Jose Marrero.  What was his role in all this?
22        A.   He worked for Rachlin Cohen & Holtz.  He is
23   an ex-IRS criminal investigator, ran the criminal
24   investigation division in Miami, and he subsequently
25   retired from the IRS and went to work from the private
0028
 1   side.  And Laurie Holtz used him as one of the primary
 2   advisors for Rachlin, Cohen & Holtz.
 3        Q.   In what capacity did he advise, the Sunshine
 4   Companies' plan or the Presidion plan or?
 5        A.   I don't know if he advised on the Presidion
 6   plan, I know he advised on the Sunshine plans.
 7        Q.   Do you recall who handled the trust account at
 8   First Southern Bank; do you have any knowledge of the
 9   banks?
10             MR. SLAUGHTER:  Was it a trust account, was it
11        just an account?
12             THE DEPONENT:  For?
13   BY MR. SMITH:
14        Q.   Where the payroll tax money would be
15   transferred.
16        A.   I'm trying to remember.
17             MR. SLAUGHTER:  It was in Fort Lauderdale.
18             THE DEPONENT:  Yeah, there were two accounts.
19        The trust account, I believe was handled by Richard
20        Berman and the operating account was handled by Jim
21        Sadrianna.
22   BY MR. SLAUGHTER:
23        Q.   How much money went into the regular account in
24   '05?
25        A.   The regular account in '05?  I believe 70
0029
 1   million, 68 million -- 64 million.  And the trust account
 2   was another 32 million, if I remember correctly.
 3   BY MR. SMITH:
 4        Q.   At any point in time during your involvement or
 5   association with Frank Amodeo, did you ever hear Richard
 6   Berman or Laurie Holtz claim that they were protecting
 7   Frank from himself?
 8        A.   Yes, and that was repeated to me by Frank's
 9   wife, Claire, that their job was to protect Frank from
10   himself.
11        Q.   You heard it from Claire?
12        A.   She called me on my cell phone and talked to me
13   about that.
14             MR. SLAUGHTER:  In fact, we have it on video,
15        where Holtz says that.
```

Dan_Myers_Unsworn_Statement.txt

```
16    BY MR. SMITH:
17         Q.   Did you ever hear Richard Berman ask why so
18    much money was being transferred into his trust
19    account?
20         A.   He asked what it was for, he didn't ask why it
21    was being transferred.
22         Q.   Okay.  To your knowledge, when was it known
23    that payroll taxes were being diverted to save
24    Presidion?
25         A.   By July of '05.
0030
 1         Q.   Who, in your opinion, knew about the nonpayment
 2    of payroll taxes?
 3         A.   All of the officers and directors of Mirabilis.
 4    BY MR. SLAUGHTER:
 5         Q.   Name them.
 6         A.   Name them?  Laurie Holtz, Richard Berman,
 7    Edie Curry, Tom Broadhead, Jason Carlson, Bob Pollack,
 8    Fernando Ceimo, Bill Walsh, Paul Glover, Sharmilla,
 9    Steven Holtz, Jim Sadrianna.
10              MR. SLAUGHTER:  Hans Buyer.
11              THE DEPONENT:  Hans Buyer.
12    BY MR. SLAUGHTER:
13         Q.   How do you know they knew?
14         A.   Because there were numerous meetings where
15    Frank would sit down with tax amounts and those numbers
16    would be in a consistent state of ratcheting up and he
17    would have, by quarterly, how much the taxes were.
18    BY MR. SMITH:
19         Q.   So it wasn't a secret?
20         A.   No, it wasn't a secret.
21         Q.   We touched on earlier about the Presidion plan,
22    and just a quick question on that.  What would happen to
23    Presidion Corp. if the work comp premiums wouldn't have
24    been paid?
25         A.   As I understand it, the employees would no
0031
 1    longer have worker's comp, they won't be able to process
 2    the payroll and all those employees, they would no longer
 3    be processed by Presidion, they'd have to go somewhere
 4    else.
 5    BY MR. SLAUGHTER:
 6         Q.   There would be no more business?
 7         A.   There would be no more business.  As he
 8    represented to the IRS, the goal was to protect the book
 9    of business, which was the asset.
10    BY MR. SMITH:
11         Q.   Did you personally ever make an inquiry of
12    anybody regarding the nonpayment of payroll taxes, as to
13    whether or not it was okay or not okay?
14         A.   I didn't specifically ask because there were
15    so many meetings where it was discussed that, again, I
16    kind of went by the inference that if there was anything
17    that was wrong, we would -- all of those people would
18    have said something was wrong and run out the door.  I
19    did specifically ask Jim Sadrianna in the summer of 2005,
20    right after had he came back on board, it was about
21    August, I asked him, based on what was going on and the
22    fact that taxes weren't being paid if it was legal, and
23    he said, yes, there was a -- that it was legal -- or he
24    didn't say it was legal, he said, Frank's got it, it's
25    not a problem, don't worry about it.
0032
```

Dan_Myers_Unsworn_Statement.txt

```
 1        Q.    Did you ever hear Richard Berman say, stop, you
 2   can't do this, it's illegal?
 3        A.    No.
 4        Q.    At any time did you ever hear Laurie Holtz say,
 5   stop, you can't do this, it's illegal?
 6        A.    No.
 7        Q.    And in your personal opinion, both of those
 8   individuals had knowledge as to what was occurring?
 9        A.    Absolutely.
10              MR. SMITH:  I think we're good.
11              MR. SLAUGHTER:  So the plan now is you type it
12   up, Ms. Court Reporter?
13              MR. SMITH:  Yeah, we'll just order it.
14              (Off-the-record discussion was had.)
15   BY MR. SMITH:
16        Q.    Just to conclude this statement today, you
17   voluntarily appeared here today?
18        A.    Yes, I did.
19        Q.    I didn't coerce you.
20   BY MR. SLAUGHTER:
21        Q.    And Richard Rhodes knew you were here?
22        A.    Richard knew I was here.
23   BY MR. SMITH:
24        Q.    And everybody approved you giving this
25   statement, to your knowledge?
0033
 1        A.    To the best of my knowledge.
 2              MR. SMITH:  All right.
 3              MR. SLAUGHTER:  All right.  Thanks.
 4              (Unsworn statement concluded at 5:00 p.m.)
 5
 6
 7
 8
 9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
0034
 1                    REPORTER'S CERTIFICATE
 2
 3   STATE OF FLORIDA
 4
     COUNTY OF ORANGE
 5
 6        I, MARY ANN SCHUMACHER, Certified Court Reporter, a
     notary public in and for the aforesaid county and state,
 7   do hereby certify that I was authorized to and did
     stenographically report the aforementioned statement and
 8   it was thereafter reduced to typewritten form by me or
```

Page 14

Dan_Myers_Unsworn_Statement.txt

9    under my direction and supervision, that the foregoing
transcript is a true and accurate record of the testimony
given to the best of my understanding and ability.

10

11       I FURTHER CERTIFY that I am neither counsel for,
related to, nor employed by any of the parties to the
action in which this proceeding was taken; and, further,

12    that I am not a relative or employee of any attorney or
counsel employed by the parties hereto, nor financially

13    interested, or otherwise, in the outcome of this action.

14

       DATED this 22nd day of July, 2009.

15

16

17

18

19

                _____

20    MARY ANN SCHUMACHER
Notary Public, State of Florida
Commission No. DD 854074

21    My commission expires: April 26, 2013

22

23

24

25