**UNITED STATES DISTRICT COURT**
**MIDDLE DISTRICT OF FLORIDA**
**ORLANDO DIVISION**

**IN RE: MIRABILIS VENTURES, INC.,**
**Bankruptcy Case No. 6:08-BK-4327**

**MIRABILIS VENTURES, INC.,**

           **Plaintiff,**

**-vs-**     Case No. 6:09-cv-271-Orl-31DAB

**RACHLIN COHEN & HOLTZ, LLP and**
**LAURIE S. HOLTZ,**

           **Defendants.**

## ORDER

This matter comes before the Court on the Motion for Summary Judgement (Doc. 63) filed by the Defendants, Rachlin Cohen & Holtz, LLP[1] ("Rachlin" or the "Firm") and Laurie Holtz ("Holtz"), the response (Doc. 78) filed by the Plaintiff, Mirabilis Ventures, Inc. ("Mirabilis"), and the reply (Doc. 90) filed by the Defendants.

**I.     Background**

Mirabilis was one of a web of entities that played a role in a scheme by Frank Amodeo ("Amodeo") to misappropriate payroll taxes that should have been paid over to the Internal Revenue Service. The scheme involved professional employer organizations ("PEOs"), which provided human resources and payroll services to client companies. The PEOs would, among

---

[1] According to the Defendants' most recent filings, the Firm has changed its name. For the sake of simplicity, however, this opinion will continue referring to it by its previous name.

other services, calculate the payroll taxes that ought to be withheld from the paychecks of each client company's employees. The PEOs would then collect those sums from the client companies. Rather than being turned over to the IRS, as the law required, the funds would be diverted to other ends, including funding operations of Amodeo-linked businesses or buying real estate, vehicles and other property. Mirabilis owned a number of companies in various lines of business.[2] One of its subsidiaries, AEM, Inc. ("AEM"), owned two of the PEOs whose payroll tax funds were diverted pursuant to Amodeo's scheme.

On September 23, 2008, Amodeo pled guilty to a number of felonies, including a failure to collect and remit payroll taxes. (Doc. 41 in Case No. 6:08-cr-176). He was sentenced to 22 and a half years in prison and ordered to pay restitution to the IRS of approximately $180 million. (Doc. 125 in Case No. 6:08-cr-176). After originally pleading guilty, Mirabilis was permitted to plead *nolo contendere* to charges of conspiracy and wire fraud (Doc. 149 in Case No. 6:08-cr-231). The company has been ordered to pay restitution in the amount of $200 million as a consequence of the role it played in Amodeo's scheme.

The instant suit was brought at the direction of R.W. Cuthill ("Cuthill"), who was appointed as president of Mirabilis in May 2008. (Doc. 139 at 1 in Case No. 6:08-cr-231). In Mirabilis's criminal case, Judge Antoon stated that Cuthill was not involved with Mirabilis or the

---

[2] According to the indictment in Amodeo's criminal case, Mirabilis was a company that "specialized in acquisitions of and mergers with other businesses in various industries" and by late 2006 had "grown to be a conglomerate of approximately 70 companies involved in various industries, including consulting, corporate security, employee leasing and hotel ownership." (Doc. 1 in Case No. 6:08-cr-176 at 7-8).

other companies involved in the scheme while the criminal conduct was occurring. (Doc. 149 at 5 in Case No. 6:08-cr-231).

According to the allegations of the Second Amended Complaint (Doc. 52), Rachlin – an accounting firm – was retained in 2004 by one of Amodeo's companies, AQMI Strategy Corporation ("AQMI") to give consulting and accounting advice regarding a plan, known as the "Sunshine Companies Plan," to divest Presidion Corporation ("Presidion") of some PEO subsidiaries that had outstanding payroll tax liabilities.[3] (Doc. 52 at 6). Mirabilis asserts that at some point, Holtz and another Rachlin employee, Jose Marrero[4] ("Marrero"), began providing advice to Mirabilis on the Sunshine Companies Plan. (Doc. 52 at 6-7).

Mirabilis and AEM began managing other PEOs for Presidion in July 2005. (Doc. 52 at 7). Mirabilis alleges that the two companies did so "after receiving consulting and accounting advice from Holtz and Marrero," and that the companies "belie[ved] that their actions were legal and proper based, in part, on the representations" made by Holtz and Marrero. (Doc. 52 at 7-8). Mirabilis also asserts that "independent members" of the Mirabilis board of directors or Mirabilis shareholders would have taken "appropriate remedial actions" if the Defendants had informed Mirabilis that the company would be responsible for the subject payroll taxes and that a plan

---

[3] A Presidion subsidiary, Presidion Solutions, Inc. ("PSI"), served as the holding company for a number of PEOs, including five that had previously had the word "Sunshine" in their names. Those five companies were the subject of the Sunshine Companies Plan. The five companies were eventually purchased by an Amodeo-controlled company and then administratively dissolved, with their "book of business" – i.e., their client list – being transferred to a different PSI subsidiary.

[4] Initially, Mirabilis also sued Marrero. The claims against him were dismissed on August 6, 2010. (Doc. 59).

referred to as the "PBS Plan" would subject the company to criminal and civil penalties.[5] (Doc. 52 at 8).

Eventually, Mirabilis's business collapsed, and in May 2008, Mirabilis filed a voluntary petition for relief in the Middle District of Florida Bankruptcy Court. The instant matter was originally filed as an adversary proceeding in that bankruptcy case, one of a number of proceedings brought by Mirabilis's new management against professionals that worked with or for one or more of the companies involved in Amodeo's scheme.

The Second Amended Complaint (Doc. 52) includes four counts. In Count I, Mirabilis asserts a professional negligence claim against the Defendants for failing to advise the company "that the Sunshine Companies Plan, the PBS Plan and [Mirabilis's] operations could result in criminal and civil liability". (Doc. 52 at 10). In Count II, Mirabilis asserts that the Defendants breached their fiduciary duty by failing to advise the company that "entities with authority to exercise significant control over the financial affairs of a company have a statutory duty to withhold, collect, truthfully account for, and pay over payroll 'trust fund taxes'" and "that employment of such schemes as the Sunshine Companies Plan, and PBS Plan, involving the nonpayment of the trust funds, could result in criminal and civil liability" for Mirabilis. (Doc. 52 at 12). In Count III, Mirabilis asserts that Rachlin was negligent in its oversight of Holtz. (Doc. 52 at 13). And in Count IV, Mirabilis asserts that the Defendants breached their fiduciary duties to

---

[5]The "PBS Plan" is alleged to have been another effort to divest Presidion of problem-plagued PEO subsidiaries. Mirabilis asserts that Holtz, who at some point became Chairman of Mirabilis's Board of Directors, "participated in discussions regarding Sunshine [sic] Plan and later PBS plan related tax memoranda with Mirabilis's officers and Board members." (Doc. 52 at 7). Mirabilis does not specify any of the actions it took pursuant to the PBS Plan that exposed it to liability from the IRS, or what remedial actions could have been taken to prevent it from incurring that liability.

the company by aiding and abetting Amodeo in formulating and carrying out the Sunshine Companies Plan and the PBS Plan by consulting with Amodeo and advising him, preparing documents, attending meetings, and the like. (Doc. 52 at 14).

The Defendants deny the claims asserted in the Second Amended Complaint but contend that, even assuming their truth, the claims are barred by the defense of *in pari delicto*. "The doctrine of *in pari delicto* is an equitable doctrine that states 'a plaintiff who has participated in wrongdoing may not recover damages resulting from the wrongdoing.'" *Official Committee of Unsecured Creditors of PSA, Inc. v. Edwards*, 437 F.3d 1145, 1152 (11th Cir. 2006) (quoting *Black's Law Dictionary* 794 (7th ed. 1999)). This common law defense is grounded on two premises: first, that courts should not lend their good offices to mediating disputes among wrongdoers, and second, that denying judicial relief to an admitted wrongdoer is an effective means of deterring illegality. *Id.* (citing *Bateman Eicher, Hill Richards, Inc. v. Berner*, 472 U.S. 299, 306, 105 S.Ct. 2622, 2626, 86 L.Ed.2d 215 (1985)).

Under Florida law, it is well settled that one who engages in a fraudulent scheme may forfeit the right to any legal remedy against a co-perpetrator. *Kulla v. E.F. Hutton & Co., Inc.*, 426 So. 2d 1055, 1057 (Fla. 3d DCA 1983). Where the defense of *in pari delicto* is asserted against a corporate entity based on the misconduct of the corporation's agents, it must be determined whether the misconduct of those agents is properly imputed to the corporation. *O'Halloran v. PricewaterhouseCoopers LLP*, 969 So. 2d 1039, 1044 (Fla. 2d DCA 2007). If the agent was acting adversely to the corporation's interests, the knowledge and misconduct of the agent are not imputed to the corporation. *Id.* at 1045. However, the adverse interest exception cannot be invoked where the corporate actors whose conduct is at issue were the "alter egos" of the

corporation – where the corporation was wholly dominated by persons engaged in wrongdoing. *Id.* Conversely, the presence of any innocent decision-maker in the management of a corporation can provide the basis for invoking the adverse interest exception, preventing the imputation of wrongdoing, and defeating the use of *in pari delicto* defense against the corporation. *Id.*

Thus, to determine whether misconduct should be imputed to the corporation, the Court must first determine whether the misconduct was intended to benefit the corporation. *Id*. at 1046. After wading through the voluminous record in this case and the numerous other Amodeo-related cases that have occupied this Court's docket over the past three years, the Court finds that it cannot make such a determination on the record before it. Both the allegations of the Complaint and the allegations of the instant motion are too vague to permit the Court to even determine what conduct is at issue, when it occurred, and who performed it. Without at least that much information, the Court cannot begin to assess whether the conduct at issue was intended to benefit Mirabilis and, as a consequence, whether it should be imputed to the company.

Amodeo's guilty plea establishes beyond dispute a number of facts about his criminal conduct. However, the record lacks such details about Mirabilis's conduct. Mirabilis pleaded *nolo contendere*, rather than guilty, and therefore there are no admitted facts for the Court to rely on. Before Mirabilis changed its plea from guilty to *nolo contendere*, the Government filed a statement of facts (Doc. 146 in Case No. 6:08-cv-231) which it contended it could prove at trial, and Judge Antoon determined that there was a factual basis for accepting Mirabilis's change of plea. However, Judge Antoon did not specify which facts, if any, from the Government's statement were established beyond dispute, and the Defendants have not pointed to any authority

holding that facts presented in such a statement in connection with a *nolo* plea are established as a matter of law.

Similarly, even if the Court were able to identify the specific conduct that the parties wish to put at issue, it does not appear that the Court could determine on this record whether the conduct ought to be attributed to Mirabilis. The evidence suggests that, in contrast to the situation at a number of the other companies involved in this scheme, Amodeo was not an officer, director, or employee of Mirabilis. Mirabilis did not itself directly own or operate any of the PEOs whose payroll tax funds were misused, and so far as the Court has been able to determine, there is no allegation that a Mirabilis officer, director, or employee ordered (or carried out) the diversion.

The Defendants contend that even though he was not officially employed by Mirabilis, Amodeo controlled the company, and therefore his criminal conduct must be imputed to it. Defendants point to admissions made by Amodeo in his Amended Plea Agreement (Doc. 64-1), such as that he "exercised or attempted to exercise considerable control over both the long term and short term management of" the company.[6] (Doc. 64-1 at 32). They also cite the following passage from the Amended Plea Agreement:

> [D]uring a March 21, 2006 Mirabilis Board of Directors meeting attended by AMODEO, he told the Board that they had a fiduciary obligation to him as the company's sole common stock shareholder and senior secured creditor, recommended various changes to the composition of the Board of Directors that were subsequently implemented by the Board, laid out recommended changes in operational procedures that were also implemented by the Board, and proposed future acquisition strategies which were to be funded by cash infusions which he would supply. The cash infusions made by AMODEO were derived from payroll

---

[6]The Defendants also attempt to rely on two previous orders from this Court in which the Court stated that Amodeo controlled Mirabilis. Those statements, however, were merely dicta, included for background purposes, as Amodeo's control (or lack thereof) was not at issue in those orders.

>tax funds. Mirabilis used these funds to fund acquisitions of other businesses, pay substantial salaries and make investments in businesses in which certain members of the conspiracy held separate interests.

However, Mirabilis denies that Amodeo controlled the company. In addition to pointing out Amodeo's lack of "legal" control (such as his absence from the Board and so forth), Mirabilis points to the deposition testimony of Yaniv Amar ("Amar"), who did consulting work for Amodeo and various companies such as Presidion, and served as interim president[7] of AEM in the first half of 2006. (Doc. 79-18 at 7). Amar testified that it was his understanding that the Mirabilis Board of Directors, not Amodeo, was in control of Mirabilis. (Doc. 79-18 at 16). In addition, even assuming *arguendo* that the admissions in Amodeo's plea agreement are established beyond dispute as against Mirabilis, they are not as damning as the Defendants make them out to be. Amodeo's statement that he "exercised or attempted to exercise" control Mirabilis's management suggests that he did not actually control the company (or there would be no occasion to "attempt" to control it). The extended passage quoted by the Defendants is couched in terms of recommendations and proposals from Amodeo that were approved by the Board – as opposed to Amodeo simply telling the Board members what to do, and having them do it. By all accounts, Amodeo had influence over the company, but on this record the Court cannot conclude, as a matter of law, that he controlled it. This disputed issue of material fact also precludes the entry of summary judgment in favor of the Defendants.[8]

---

[7] At other points in his deposition, Amar also refers to himself as an interim CEO of AEM. (Doc. 79-18 at 20).

[8] The Defendants also contend that the issue of Amodeo's control of Mirabilis is foreclosed by two summary judgment orders entered in *Mirabilis Ventures, Inc. v. Palaxar Group, LLC*, Case No. 6:07-cv-1788-Orl-28KRS (henceforth, the "*Palaxar* case"). However, the first order referenced by

The parties disagree about numerous other matters, but the Court finds that those matters do not warrant extended discussion.

In consideration of the foregoing, it is hereby

**ORDERED** that the Motion for Summary Judgment (Doc. 63) is **DENIED**.

**DONE** and **ORDERED** in Chambers, Orlando, Florida on February 1, 2011.

_____
**GREGORY A. PRESNELL
UNITED STATES DISTRICT JUDGE**

Copies furnished to:

Counsel of Record
Unrepresented Party

---

the Defendants (Doc. 285 in the *Palaxar* case) was vacated. The Defendants have not shown that the *vacatur* was improper or that the order should continue to have preclusive effect, as a matter of law. The second such order (Doc. 287 in the *Palaxar* case) was not vacated but, contrary to the Defendants' representations, it does not reference the issue of Amodeo's control of Mirabilis or incorporate the portion of the other summary judgment order that did so.