`

# UNITED STATES DISTRICT COURT
## MIDDLE DISTRICT OF FLORIDA
### ORLANDO DIVISION

IN RE:  MIRABILIS VENTURES, INC.,
**Bankruptcy Case No. 6:08-BK-4327**

_____

**MIRABILIS VENTURES, INC.,**

**Plaintiff,**

**-vs-**                                                      **Case No.  6:09-cv-271-Orl-31DAB**

**RACHLIN COHEN & HOLTZ, LLP and
LAURIE S. HOLTZ,**

**Defendants.**

_____

## ORDER

This matter comes before the Court after a hearing on the Defendants' Motion in Limine to

Exclude Evidence of Improper and Undisclosed Damages (Doc. 115), the response in opposition

(Doc. 124) filed by the Plaintiff, and the reply (Doc. 134) filed by the Defendants.  The Defendants

seek to preclude the introduction of evidence as to certain categories of damages sought by the

Plaintiff in this action: first, a $200,000,000 allowed bankruptcy claim in favor of the United

States, and second, claims for interest and penalties, as well as expenses arising from the

company's defense of certain criminal charges.

## I.        Background

To put it mildly, this matter has an exceptionally lengthy and convoluted history.  A

general understanding of that history is necessary to understand the issues raised in the instant

motion. The account that follows has been gathered from documents in this case as well as other

civil, criminal and bankruptcy proceedings involving these parties or individuals or entities who were involved with them.  So far as the Court is able to determine, except where indicated, the information presented in this section is undisputed.

The Plaintiff, Mirabilis Ventures, Inc. ("Mirabilis"), is one of a number of entities involved in an enormous tax fraud scheme masterminded by Frank Amodeo ("Amodeo").  At all times relevant to the instant case, Defendant Laurie Holtz ("Holtz") was a certified public accountant and a name partner in Defendant Rachlin Cohen & Holtz, LLP ("Rachlin").  Both defendants did accounting work for Amodeo-controlled entities and Mirabilis[1] while the tax fraud was occurring.  Amodeo eventually pled guilty and was sentenced to 270 months in prison and ordered to pay $182 million in restitution.

According to the Plaintiff, Amodeo's crimes had their genesis in an earlier (and apparently legal) effort on his part to reduce another company's liability for payroll tax theft.  Amodeo controlled a company known as AQMI Strategy Corporation ("AQMI"), which was hired in late 2004 by Presidion Solutions, Inc. ("PSI").  PSI owned a number of professional employer organizations ("PEOs").  PEOs act as human resources departments for other companies.  Among other services, PEOs calculate and collect the payroll taxes – such as Social Security and income taxes – due with regard to each of the client companies' employees, for payment over to the IRS.  Collectively, five of PSI's PEOs had amassed a multimillion dollar liability for payroll taxes that had been collected from client companies but not paid over to the IRS.  All five of the PEOs

---

[1]The parties dispute the amount of control, if any, that Amodeo had in regard to Mirabilis.

involved had the word "Sunshine" in their names and were therefore referred to as the "Sunshine Companies."  AQMI was hired to come up with a way to reduce this liability.[2]

The plan that resulted was known as the "Sunshine Companies Plan".  It involved three steps: (1) the sale of the Sunshine Companies' book of business (their major if not sole asset) to one of PSI's remaining PEOs; (2) the subsequent sale of the Sunshine Companies themselves to another Amodeo-controlled company, thereby moving the payroll tax liability off of PSI's books; and (3) negotiation of a settlement of the payroll tax obligation with the IRS, using the newly imposed poverty of the Sunshine Companies to get better terms.  The Defendants performed accounting-related consulting services in regard to the Sunshine Companies Plan.[3]

The Sunshine Companies Plan was carried out, beginning in December 2004.  So far as the record shows, the plan was successful, and no criminal charges were brought in connection with it.[4]  Around the middle of 2005, however, PSI's remaining PEO business[5] ran into financial problems, including an inability to maintain workers' compensation insurance coverage.  PSI

---

[2]It is a federal crime to collect payroll taxes and then willfully fail to pay them over to the IRS. 26 U.S.C. § 7202.  There is nothing in the record to identify those responsible for the initial misuse of payroll tax funds at the Sunshine Companies, but it appears that it was not Amodeo or any of the entities he controlled at that time.

[3]The record is not clear as to whether Amodeo or one of the companies he controlled, such as AQMI, actually hired the Defendants to perform these services.

[4]It appears that payroll tax theft continued to occur at the Sunshine Companies after Amodeo became involved with them, but the Plaintiff has not alleged that such theft was a component of the Sunshine Companies Plan.

[5]After the sale of the Sunshine Companies, PSI had two remaining PEOs: Paradyme, Inc. and Professional Benefit Solutions, Inc. ("PBS").  For ease of reference, the remainder of this opinion will refer to these two PEOs, collectively, as "PBS".

again turned to Amodeo.  This time, according to the Plaintiff, Amodeo's proposed solution relied on criminal conduct and was ultimately unsuccessful.

Details of the plan – referred to as the "PBS Plan" – are somewhat sketchy.  According to the allegations of the Second Amended Complaint, Amodeo and his co-conspirators decided to try to solve PBS's financial problems by stealing the payroll tax funds it had collected and using them to fund its operations, including payment of its workers' compensation insurance premiums. According to Mirabilis, the ultimate goal of the PBS Plan was to return PBS to profitability, which would then allow it to pay off its liabilities, including the accumulated payroll tax liability.[6] Amodeo gained control of PBS and began diverting funds from its payroll tax collection accounts.

Operating through much of 2005 and 2006, Amodeo and his co-conspirators appear to have stolen more than $100 million at PBS.[7]  Although not mentioned in the Second Amended Complaint, Mirabilis contends that Amodeo and his co-conspirators used these funds for many purposes aside from payment of PBS's operating expenses.  In particular, it is alleged that Mirabilis was one of the largest beneficiaries of this theft, with tens of millions of dollars' worth of payroll taxes that had been collected by PBS either flowing directly into Mirabilis or being spent for its benefit.  In addition, the withholding funds were used to purchase such things as real estate, motorcycles, automobiles and a Learjet for the benefit of the conspirators.

_____

[6]As detailed below, however, a substantial portion of the payroll tax funds diverted from PBS went to other companies or was spent for the benefit of certain individuals, undermining the notion that rehabilitating PBS was the conspirators' true goal.

[7]As noted above, Amodeo was ordered to pay restitution of approximately $180 million for his role in the theft, but it is not clear from the record that this entire sum was stolen from PBS or that this sum represents the entire amount stolen.   Cuthill testified at the hearing on this motion that he had been informed by the Government that the actual amount stolen topped $200 million.

It is undisputed that the Defendants performed accounting services for Mirabilis during the period when the payroll tax theft was occurring at PBS and proceeds of that theft were flowing into Mirabilis.  For much of this period, Mirabilis was engaged in an acquisition program, buying numerous other companies.  The Defendants contend that their accounting services for Mirabilis were limited to the performance of due diligence in regard to potential acquisitions.  They deny that they knew or should have known anything about the PBS Plan or Amodeo's scheme.

Holtz joined the Board of Directors of Mirabilis in early 2006, and Rachlin stopped performing accounting services for the company around the same time.[8]  In late 2006, the executives at Mirabilis learned that a grand jury was investigating the company.  Shortly thereafter Mirabilis sold its remaining assets and essentially ceased operations.

In April 2008, the Government filed an *in rem* civil forfeiture action (the "In Rem Action") against Mirabilis, seeking to recover certain parcels of real estate that had been purchased by Amodeo.  The Government alleged that Amodeo and (unidentified) co-conspirators had been involved in "a massive tax fraud, wire fraud, and money laundering scheme," that they had used a number of entities, including Mirabilis, to carry it out, and that, all told, the conspirators had "knowingly failed to remit to the IRS payroll taxes totaling approximately $181,807,552.42, including approximately $124,618,674.02 in FICA and withholding taxes (also referred to as trust fund taxes) for PBS and the Sunshine Companies."  (Doc. 1 in the In Rem Action).

Attorneys representing Mirabilis, apparently acting at the behest of Amodeo, attempted to negotiate a resolution of the civil forfeiture action with the Government.  When this was

---

[8]There is a factual dispute as to the order in which these events occurred.

unsuccessful, the Mirabilis Board of Directors appointed R.W. Cuthill ("Cuthill") as president.

Cuthill remains in charge of Mirabilis.  The same day he was appointed president, May 27, 2008,

Cuthill filed a Chapter 11 petition on behalf of the company.  On July 11, 2008, Mirabilis filed its

schedules in the bankruptcy case.  The schedule of liabilities did not indicate that the company

faced any liability in regard to unpaid payroll taxes.

Amodeo was indicted on August 6, 2008, accused of masterminding the tax fraud scheme

and, among other things, of having "knowingly failed to remit to the Internal Revenue Service" a

sum very similar to the sum asserted in the Mirabilis civil forfeiture case: "payroll taxes totaling

approximately $181,810,518.66, including approximately $129,655,309.04 in FICA and

withholding taxes" for the Sunshine Companies and PBS.  (Doc. 1 in Case No. 6:08-cr-176).  On

September 23, 2008, Amodeo pled guilty to five counts alleged in the indictment.[9]  As part of his

plea, Amodeo agreed to the entry of a "forfeiture money judgment in an amount not less that $172

million and not more than $181,810,518.66, the exact amount to be determined by the Court at, or

before, sentencing, which sum constitutes proceeds obtained directly or indirectly as a result of the

conspiracy to commit wire fraud charged in Count One."  (Doc. 23 at 11 in Case No. 6:08-cr-176).

Amodeo also agreed to forfeit a long list of assets, including cash, promissory notes and real

estate.  Some of these assets were part of the Mirabilis bankruptcy estate and were being used to

finance the bankruptcy.

---

[9]More particularly, Amodeo pled guilty to one count of conspiracy to defraud an agency of the United States in violation of 18 U.S.C. § 371, three counts of failure to collect and remit payroll taxes in violation of 26 U.S.C. § 7202, and one count of obstruction of an agency proceeding in violation of 18 U.S.C. § 1505.  (Doc. 126 at 1 in 6:08-cr-176).

On the same day as Amodeo's plea, the Government filed a motion to dismiss the Mirabilis bankruptcy, arguing that it had been filed in bad faith.  In early October, based on Amodeo's plea, the Government sought immediate seizure of all of the assets he had agreed to forfeit, including those making up the Mirabilis bankruptcy estate.  Mirabilis responded by filing an emergency motion to enforce the automatic stay.

Eventually, the parties negotiated a compromise:  the Government agreed to drop its motion to dismiss, the parties agreed that the Government could obtain some but not all of the property in the Mirabilis bankruptcy estate, and Mirabilis agreed to the allowance of a $200 million unsecured forfeiture claim in favor of the Government.  On November 25, 2008, Mirabilis and the Government sought approval of the compromise from the Bankruptcy Court.  The eleven-page motion requesting that approval did not include any explanation as to how the parties had arrived at the $200 million figure.  The Bankruptcy Court approved the compromise in March 2009.  The next month, Mirabilis amended its bankruptcy schedules to include the $200 million claim.

Mirabilis was criminally indicted on October 30, 2008, along with other entities (including PBS) that were alleged to have been involved in the payroll tax scheme.  In the indictment, the Government alleged that Amodeo controlled Mirabilis, that Mirabilis and the other entities had conspired to commit tax fraud, and that

> Amodeo and co-conspirators knowingly failed to remit to the Internal Revenue Service payroll taxes totaling approximately $200,098,423.32, including approximately $157,758,346.77 in FICA and withholding taxes" for the Sunshine Companies and PBS.

(Doc. 1 at 18 in Case No. 6:08-cr-231).  Mirabilis originally pled not guilty, but on June 14,

2010, it changed its plea to one of *nolo contendere*.[10]  Two weeks later, the Government

sought entry of a forfeiture order in the criminal case.  In doing so, the Government stated

that it had previously agreed with Mirabilis "that the amount of the proceeds obtained as a

result of the violations charged in the Indictment is $200,000,000.00."  In a footnote, the

Government went into greater detail, stating that "By the United States' calculations, the

proceeds of the offense are $200,098,423.32, which reflects the federal employment taxes

collected by the PEOs but not paid to the IRS for the 4th Quarter of 2004 for [the] Sunshine

Companies as well as for the 2nd through 4th Quarters of 2005 and all of 2006 for PBS."

(Doc. 151 at 3 in Case No. 6:08-cr-231).  A $200 million forfeiture money judgment was

entered against Mirabilis in the criminal case on July 2, 2010.

Mirabilis filed the instant suit on December 5, 2008, after it had reached the compromise

with the Government in the bankruptcy case but before that compromise had been approved.  In its

Second Amended Complaint (Doc. 52) in this matter, Mirabilis asserts claims for professional

negligence (Count I), breach of fiduciary duty (Count II); negligent supervision (Count III); and

breach of fiduciary duty by aiding and abetting (Count IV).  Count III is asserted against Rachlin;

the other counts are asserted against both defendants.  As to each count, Mirabilis contends that

the Defendants' actions caused the company to suffer "damage to [its] business [and] property,

including an allowed claim in bankruptcy against it in the sum of Two Hundred Million Dollars

---

[10]Despite this plea, Cuthill continues to maintain that Mirabilis was innocent of any crime.

($200,000,000)," as well as "adverse tax consequences, including interest and penalties," and "legal and expert fees and costs."

## II.    Legal Standards

### A.    Motions in Limine

The term "*in limine*" has been defined as "on the threshold; at the very beginning; preliminarily." *Luce v. U.S.*, 469 U.S. 38, 40, 105 S.Ct. 460, 462, 83 L.Ed.2d 443 (1984) (citing Black's Law Dictionary 708 (5th ed. 1979)).  A motion *in limine* seeks a protective order prohibiting the opposing party, counsel, and witnesses from offering offending evidence at trial, or even mentioning it at trial, without first having its admissibility determined outside the presence of the jury.  75 Am. Jur. 2d Trial § 39 (2008).  A motion *in limine* may be proper where the evidence at issue is highly prejudicial or inflammatory; where the evidentiary issue is significant and unresolved under existing law; where the issue involves a significant number of witnesses or volume of material, making it more economical to have it resolved prior to trial; or where the movant does not wish to object in the presence of the jury.  *Id.*

Motions *in limine* are disfavored; admissibility questions should ordinarily be ruled upon as they arise at trial.  *Stewart v. Hooters of America, Inc.*, 2007 WL 1752843 at *1 (M.D.Fla. 2007).  Accordingly, if evidence is not clearly inadmissible, evidentiary rulings must be deferred until trial to allow questions of foundation, relevancy, and prejudice to be resolved in context.  *Id.* Denial of a motion *in limine* does not insure that the evidence contemplated by the motion will be admitted at trial.  Instead, denial of the motion means the court cannot determine whether the evidence in question should be excluded outside the trial context.  *U.S. v. Connelly*, 874 F.2d 412, 420 (7th Cir. 1989).  A district judge is free, in the exercise of sound judicial discretion, to alter a

previous *in limine* ruling, even if nothing unexpected happens at trial.  *Luce*, 469 U.S. at 41, 105 S.Ct. at 463.

### B.      Rule 26 Disclosures

Federal Rule of Civil Procedure 26(a)(1)(iii) requires parties to disclose, without awaiting a discovery request, "a computation of each category of damages claimed by the disclosing party – who must also make available for inspection and copying as under Rule 34 the documents or other evidentiary material, unless privileged or protected from disclosure, on which each computation is based, including materials bearing on the nature and extent of injuries suffered."  Pursuant to Rule 26(e), parties that make disclosures under Rule 26(a) or who respond to an interrogatory, request for production, or request for admission must supplement or correct their disclosure or response in a timely manner "if the party learns that in some material respect the disclosure or response is incomplete or incorrect," so long as the additional or corrective information has not otherwise been made available to the other party.

Rule 37(c) of the Federal Rules of Civil Procedure provides for sanctions against a party that fails to abide by these obligations:

> If a party fails to provide information or identify a witness as required by Rule 26(a) or (e), the party is not allowed to use that information or witness to supply evidence on a motion, at a hearing, or at a trial, unless the failure was substantially justified or is harmless.

Where a party fails to properly identify a category of damages or to provide the calculations underlying it, it is within the court's discretion to exclude evidence relating to those damages.  *Mee Industries v. Dow Chemical Co.*, 608 F.3d 1202, 1221-22 (11th Cir. 2010).

### III.   Analysis[11]

The primary component of the damages sought by Mirabilis here is the Government's $200,000,000 allowed claim in the bankruptcy case. However, it is not entirely accurate to describe that sum as Mirabilis's "damages". Under Florida law, "recoverable damages occasioned by a tort include all damages which are a natural, proximate, probable or direct consequence of the act, but do not include remote consequences." *Taylor Imported Motors, Inc. v. Smiley*, 143 So. 2d 66, 68-69 (Fla. 2d DCA 1962) (citing cases). In this case, the Plaintiff alleges that the Defendants knew or should have known of the payroll tax theft and, despite this, failed to stop the stolen funds from flowing into Mirabilis. The natural, proximate and probable consequence of such professional malpractice would be something in the nature of a civil or criminal judgment requiring Mirabilis to repay the stolen funds, rather than (solely) an agreed claim in bankruptcy. This is not to say that such a claim is unrecoverable. Assuming that Mirabilis's version of the facts is correct, that claim is certainly a consequence of the Defendants' actions. But it is more accurate to think of the allowed claim as a settlement of the company's potential damages rather than the damages themselves.

Although Mirabilis is proceeding under tort theories rather than an indemnification theory, the situation is analogous to an indemnification scenario, in which Party A settles a claim brought

---

[11]In its response, Mirabilis asserts that this Court has previously determined that the damages it seeks are "recoverable" and is seeking a second bite at the apple on that issue. (Doc. 124 at 10-11). This is incorrect. In the portion of the Defendants' Motion for Summary Judgment (Doc. 63) relied upon by Mirabilis, the Defendants argued that the $200,000,000 claim was a "criminal monetary penalty," rather than compensable damages, and therefore could not, as a matter of law, constitute recoverable damages. (Doc. 63 at 22-23). The evidentiary concerns raised in this motion were not at issue in that motion.

by Party B and then attempts to recover the amount of the settlement from its indemnitor.  Even where the right to indemnification is clear, the existence of a settlement, alone, is not enough to compel payment by an indemnitor.  At a minimum, the party seeking indemnification must establish that the settlement was made based on its potential liability to the other party.  "A showing of 'potential liability' is required because the indemnitee must not be a mere volunteer who has settled the underlying claim when there was no exposure to legal liability that obligated him or her to do so."  *Camp, Dresser & McKee, Inc. v. Paul N. Howard Co.*, 853 So. 2d 1072, 1080-81 (Fla. 5th DCA 2003).  *See also Arison v. Cobb Partners, Ltd.*, 807 So. 2d 101, 105-06 (Fla. 3d DCA 2002) (where indemnitors agreed to indemnify plaintiff for payments he made to bank, but plaintiff paid bank $5.4 million more than he was legally obligated to pay, plaintiff could not recover that $5.4 million from his indemnitors).

Again, this is a tort case, not an indemnification case.  Nonetheless, the same underlying considerations of fairness and due process apply.  The Plaintiff cannot simply volunteer to pay a sum to the Government and then recover that sum as damages for the Defendants' alleged torts.[12]

---

[12]The concerns about "volunteerism" are particularly acute here.  At the time of the compromise with the Government, Mirabilis was in bankruptcy, with no possibility of rehabilitation. Any money recovered would inevitably be paid out to creditors.  (Cuthill testified that, aside from the Government's $200 million claim, there are "about $20 million" in other unsecured claims in the Mirabilis bankruptcy.  (Cuthill deposition at 303).)  Moreover, without intending to impugn his integrity, the Court notes that Cuthill's contract entitles him to a percentage of all sums recovered for the Mirabilis bankruptcy estate beyond certain thresholds.  The larger the Government's allowed claim, the larger the sum Mirabilis could seek from the various professionals, such as these defendants, that the company had sued or planned to sue for negligence. Thus, there appears to have been no downside, from the Plaintiff's perspective, to agreeing to allow the Government to assert a huge claim in the bankruptcy case. On the other hand, if the Government had succeeded in its immediate forfeiture efforts, Mirabilis would have been left without the funds to pursue any litigation and recover any additional funds for the estate.  This further reduced any incentive to argue that Mirabilis's potential liability did not warrant a $200,000,000 allowed claim.

Mirabilis must establish that the settlement was made based on its potential liability to the

Government.  For its part, the Plaintiff appears to recognize this necessity.  In its response to the

instant motion, the company asserts that

> Mirabilis has not asserted that Defendants are bound by the terms of the settlement
> and unable to challenge it as unreasonable.  Instead ... Mirabilis intends to submit ...
> evidence showing in excess of $200 million in potential liability that was
> compromised to reach the settlement amount. ...  Defendants are not being bound by
> the terms of a settlement, but instead have the full opportunity to contest liability as
> well as damages.  Therefore, there is no due process violation.

(Doc. 124 at 14).

This accurately describes the law.  However, after an extensive review, the Court finds it to

be at odds with Mirabilis's actions during this case.  More particularly, it is at odds with

Mirabilis's position throughout discovery, which closed on October 29, 2010.  (Doc. 26 at 1).

In its mandatory initial disclosures (Doc. 116-1), there was no mention of potential liability,

or any suggestion that liability "in excess of $200 million" was ever at issue.  The Plaintiff did not

provide any computation of its damages or any "materials bearing on the nature and extent of

injuries suffered."  Instead, after reciting the text of Rule 26(a)(1)(A)(iii), the Plaintiff stated that

> As a result of Defendants' actions, Plaintiff has incurred a liability for payroll taxes
> of **approximately $200,000,000.**  To the extent Plaintiff currently has these
> documents, Plaintiff will provide these to the Defendants.

(Doc. 116-1 at 3) (emphasis added).  This production occurred on January 5, 2010, a year and a

half after Cuthill took over Mirabilis and gained access to its documents, and more than a year after

Mirabilis agreed to the entry of the $200 million forfeiture claim against it.

The Defendants posed damages interrogatories to Mirabilis.  As to each of the four counts,

the Defendants asked the Plaintiff to

-13-

explain in detail the basis for any damages you claim, including (a) the nature of the damages claimed; (b) the dollar amount of the damages claimed; (c) the basis of the equation or calculation you used to ascertain the amount of your damages; and (d) identify (i) every person who has any knowledge regarding any of the facts giving rise to any of your claims for damages, and (ii) all documents that refer or relate to any of your claims for damages.

(Doc. 79-41 at 2-6).  On February 2, 2010, Mirabilis produced its answers to the Defendants'

interrogatories, offering the same response in regard to each count:

**Damages are the $200 Million** representing the government's allowed unsecured forfeiture claim against MVI.  Plaintiff has not completed its damages calculations at this time.  Regarding persons and documents, Plaintiff refers to its Rule 26 disclosure and reserves the right to supplement.

(Doc. 79-41 at 3) (emphasis added).

Again, although the response was provided 15 months after Mirabilis agreed to a $200 million claim in favor of the Government, there is nothing in it to suggest that the company faced potential liability exceeding that amount.  Further, based on this response, Mirabilis and its attorneys had settled the Government's claim without having any idea of the amount of tainted money that had flowed into the company, the penalties and interest it faced as a result, or the legal theory under which such liability might be imposed.[13]  It appears that Mirabilis had simply opted to settle for $200 million for no reason other than because the Government said it wanted that much.[14]  Regardless of whether this was actually the case, this response left the Defendants in the dark as to the legal and factual basis for the settlement.

---

[13]If Mirabilis had any of that information in February 2010, it was clearly obligated to provide it in response to the interrogatories, but it did not do so.

[14]Cuthill testified at the hearing on this motion that, in his view, the company's damages consisted of the $200 million allowed claim, and that he therefore had spent little if any time investigating the potential liability to the Government.

On April 21, 2010, Cuthill appeared as the Rule 30(b)(6) representative for Mirabilis.  In his deposition testimony regarding damages, he made no mention of potential liability exceeding $200 million.  Rather, he testified that the $200 million figure he had agreed to "was the Government's number" and was made up of "$120 million worth of unpaid payroll taxes," "$61 million of penalties and interest," and "$19 million of rounding, upward rounding."   (Cuthill Depo. at 299-301).  He also testified that the total amount of payroll taxes misappropriated by Amodeo was about $121 million,[15] that Mirabilis had received, from all sources, about $82 million, and that more than $70 million of that sum came from Amodeo himself or Amodeo-owned companies.  (Cuthill Depo. at 108-09).   Thus, rather than a potential liability in excess of $200 million, Cuthill was asserting that the company faced at most $181 million in liability, *including* penalties and interest, and that the settlement amount included $19 million that was *not* damages but was instead "rounding, upward rounding".  In his testimony, Cuthill did not provide any information (such as IRS penalty and interest rates) in support of the $61 million figure.  Cuthill also did not provide information regarding other sums, such as legal and expert fees, that might constitute damages recoverable from the Defendants.

Mirabilis continued to maintain this position even beyond the close of discovery.  In its December 6, 2010 response to the Defendants' motion for summary judgment, the Plaintiff reiterated Cuthill's testimony that the $200,000,000 claim "included $61,000,000.00 of interest and penalties, $120,000,000.00 in unpaid payroll taxes, and $19,000,000.00" in rounding (although that

---

[15]It appears that this sum is intended to be the same as the amount of unpaid payroll taxes included in the $200 million allowed claim.  It is not clear whether why the figures vary by $1 million, or whether $120 million or $121 million is the correct amount.

latter category was identified in the response as "miscellaneous").  (Doc. 78 at 11).  Moreover, Mirabilis stated that it was "unclear ... what portion, if any, of those payroll taxes went to Mirabilis rather than Mr. Amodeo or his entities."  Doc. 78 at 11.

Thus, more than a month after the close of discovery, Mirabilis continued to assert that the Government's claim was based on a potential liability of $120 million for unpaid payroll taxes, $61 million for interest and penalties, and $19 million in "miscellaneous" or "rounding".  However, it asserted that it had no knowledge as to how much, if any, of the $120 million in payroll taxes ended up in Mirabilis.  It had provided no explanation as to how, despite being an allegedly innocent pawn in Amodeo's scheme, it could become liable to repay every single dollar stolen by the actual criminals, even stolen funds that never benefitted it.  Mirabilis offered no factual or legal basis as to how it might have become obligated to pay interest and penalties when the admitted mastermind, Amodeo, had only been ordered to pay restitution.[16]  There was no explanation as to how much of the $61 million was a penalty and how much of it was interest, or the sums such penalties and interest had been based on.  In short, throughout discovery, Mirabilis failed to produce even the most minimal evidence as to the basis for the allowed claim.

Subsequently, Mirabilis has adopted a new position.  At the hearing on this motion, Cuthill testified that he had been mistaken all along. He said that the $200 million allowed claim had

---

[16]As noted above, on September 23, 2010, Amodeo pled guilty and agreed to repay the amount that had been stolen – between $172 and $182 million, depending on what the court determined – as a result of the tax fraud.  This was two months before Mirabilis sought approval of its compromise, whereby it agreed to pay $200 million to the Government.  Even assuming that, contrary to Cuthill's position, Mirabilis had been a co-conspirator with Amodeo and could have been held jointly and severally liable for the tax fraud, no explanation has been provided as to how its joint and several liability might have exceeded that of the ringleader, who had been sentenced a few weeks earlier.

always included $181 million in payroll tax liability and had never included $61 million in

penalties and interest, and that the latter figure was simply a mistaken inference on his part. He

was unable to explain how or when he discovered that the proper figure for overall tax liability was

$181 million rather than $120 million, except to say that it must have occurred after his Rule

30(b)(6) testimony. He also testified that he did not recall ever communicating this updated

information to the Defendants.

      Mirabilis attempts to rely on other documents that it produced, arguing that they are enough

to support its damages claim. Primarily, the company points to Form 941 Tax Returns from PBS,

which show that PBS collected a total of approximately $172 million in payroll taxes in 2005 and

2006 but did not turn any of that money over to the IRS. (Doc. 124 at 4). But these documents are

at odds with Mirabilis's contentions throughout discovery, as they show a $172 million liability on

the part of PBS, rather than liability of $120 million or $181 million or $200 million. Further,

prior to its response to the instant motion, Mirabilis had not notified the Defendants that these

Form 941s supported its damages claims or even had any significance whatsoever. Rather, the

record shows that the Plaintiff simply gave the Defendants access to a warehouse full of documents

and hard drives from numerous Amodeo-related entities, which warehouse happened to include

these Form 941s.

      At the hearing in this matter, Cuthill suggested that everyone involved knows that

Mirabilis's payroll tax liability to the Government resulted from the theft at PBS, and therefore the

Defendants should have known that the Form 941s showing payroll tax theft at PBS were relevant

to Mirabilis's potential payroll tax liability. However, Cuthill had the same knowledge and even

greater access to the Form 941s. Despite this, he spent the discovery period asserting that total

payroll tax liability for PBS (and therefore for Mirabilis) was $120 million, not $172 million.  As such, he can hardly criticize the Defendants for failing to recognize the significance of this evidence.

Mirabilis also complains that the Defendants should have reviewed certain QuickBooks files it produced, which would have shown approximately $120 million flowing out of PBS and into accounts controlled by PSI.  (Doc. 124 at 4-5).  It is not entirely clear how these files support the damages claim, as the $120 million flowing from PBS to PSI is not alleged to be the same $120 million in total stolen payroll taxes that allegedly made up part of the $200 million allowed claim.  Nonetheless, as with the Form 941s, Mirabilis made no effort to identify these QuickBooks files as relevant to its damages claim, instead simply allowing the Defendant access to a warehouse that contained these files.

Finally, the Defendants also assert that Mirabilis has failed to produce any evidence in support of the "adverse tax consequences, including interest and penalties," and "legal and expert fees and costs" which it seeks to recover in each count.  In its response, Mirabilis does not challenge this assertion.

## IV.     Conclusion

Whether one regards the $200 million allowed claim as damages or as a settlement of a potential damages claim, Mirabilis cannot recover it without satisfying its discovery obligations.  If it is construed as a settlement, Mirabilis would have to show that the amount was reasonable in light of its potential liability.  If it is construed simply as "damages," Mirabilis would have to provide a computation, as well as materials bearing on the nature and extent of its injuries.  Either way, Mirabilis has fallen short.  Based on the information provided to the Defendants, no

reasonable factfinder could determine Mirabilis's potential liability.  Throughout the discovery period, Mirabilis relied on a bogus "calculation" – which it has since abandoned – of the $200 million allowed claim and failed to produce any evidence supporting it.  Accordingly, the Court will not permit Mirabilis to pursue recovery of the $200 million at trial.  In addition, based on the response to the instant motion, Mirabilis will not be permitted to seek recovery for the "adverse tax consequences, including interest and penalties," or the "legal and expert fees and costs" as described in the Second Amended Complaint.

In consideration of the foregoing, it is hereby

**ORDERED** that the Defendants' Motion in Limine to Exclude Evidence of Improper and Undisclosed Damages (Doc. 115) is **GRANTED**, as set forth above.

**DONE** and **ORDERED** in Chambers, Orlando, Florida on July 28, 2011.

_____
GREGORY A. PRESNELL
**UNITED STATES DISTRICT JUDGE**

Copies furnished to:

Counsel of Record
Unrepresented Party